# EXHIBIT

# A

UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | |
|---|---|
| DANIEL SOUMAS AND VALERIE SOUMAS, husband and wife,<br><br>Plaintiffs,<br><br>vs.<br><br>KOOTENAI COUNTY, IDAHO, a political subdivision of the State of Idaho; and BEN WOLFINGER, Sheriff of Kootenai County, Idaho, in both his official and individual capacities,<br><br>Defendants. | Case No. 2:18-cv-00138-EJL |

DEPOSITION OF DANIEL SOUMAS

TAKEN ON BEHALF OF THE DEFENDANTS

AT 8884 NORTH GOVERNMENT WAY, HAYDEN, IDAHO

MAY 7, 2019, AT 10:00 A.M.

REPORTED BY:

JULIE MCCAUGHAN, C.S.R. NO. 684
Notary Public

1  since you left Cimcorp?
2      A.   No.
3      Q.   So you started with KCSO in April of '88?
4      A.   April of '88 full-time.
5      Q.   Could you give me your progression through
6  the ranks?
7      A.   Sure.  Started there as a patrol deputy.
8  Became a field training officer '89, I would say the
9  fall of '89.  Promoted to -- well, I transferred to
10 detectives and did a year there.  And I would say '92,
11 maybe into -- well, '91.  Sounds more like it.
12          Came back to patrol, tested for sergeant,
13 was promoted in I believe 1993.  Worked as a patrol
14 sergeant on the road.  They moved me over to admin
15 sergeant for the patrol commander sometime in late '94.
16 After that stint was up, they moved me over as the
17 command sergeant, and at that time I was called
18 recreation enforcement but it's basically the marine and
19 back country unit of the Sheriff's Office.  I did that
20 until May of '99.  And part of my duties there were of
21 course I was the dive team leader and rescue diver, did
22 things like that.
23          May of '89, promoted to Lieutenant, was
24 placed in charge of patrol division.  As a division
25 commander.  And I served there and as the SWAT commander

1    until November of I think 2004.
 2              Transferred to the jail, took over services
 3    division in the jail then.  Wasn't in services very long
 4    and they moved me to take over custody.
 5              Came back to patrol in May of 19 -- or
 6    excuse me -- May of 2008.  Transferred -- well, and then
 7    let me break here.  I was -- starting in 1999, I was a
 8    division commander, and I never left the position of
 9    division commander.  I was in charge of different
10    divisions.  But we did a restructure in 2009, in
11    September, and they took our bureau commanders which
12    were then the rank of Captain to the rank of Major.
13    They made the division -- those were appointed.  They
14    made the division commanders test for the two captains'
15    positions they were creating which were division
16    commander positions, so I basically tested for the job I
17    currently held, which was patrol commander in November
18    of 2009.  Prevailed on that test against other
19    candidates, continued on as patrol commander, only at
20    the rank of Captain, until July of 2013.
21              I was transferred as a Captain to detective
22    division or investigations division in July of 2013, and
23    that's where I served until the date of my termination,
24    September 26, 2017.
25         Q.   What were your job duties as a Captain of

1     the investigative division?

2          A.    In general or?

3          Q.    In general.

4          A.    Supervising the different units.  Major
5     crimes.  Special victims, which was sex crimes.  Crimes
6     against children.  Property crimes division.  Overseeing
7     the crime analyst.  I wouldn't say daily supervision,
8     but the violent crimes task force -- special
9     investigations unit was assigned to the violent crimes
10    task force, and I had two detectives on that and I was
11    part of that.  Property room or evidence section was
12    also under my command, so I had some civilian employees
13    there.  And those are basically the five areas or six
14    areas.

15         Q.    Did you have any role with the drug
16    forfeiture program?

17         A.    Yes.

18         Q.    Can you explain that, please?

19         A.    So when I transferred over, I was -- the
20    drug forfeiture program was already coming out of
21    detectives, and I just took over the program, so that's
22    what I did.  That was part of my command.

23         Q.    And that started in July of 2013?

24         A.    Yes.

25         Q.    Okay.  Can you describe more what you did in

1   your role with respect to drug forfeitures?
         2        A.   So what I did was -- asset forfeiture is a
         3   little bit complicated.  So I studied it, for starters.
         4   I read all the guidelines, federal guidelines.  And then
         5   I was placed on the list of notification from the
         6   federal government.  So I was the Department's person
         7   that was the contact with the Department of Justice on
         8   it.  And I also reviewed the previous paperwork and
         9   filings, and I asked the auditor's office to do a full
        10   audit on the program, because I saw that some things had
        11   been misassigned.  And they did that for me over the
        12   course of like nine months, completed that audit.  I was
        13   the person -- the go-to person that if somebody wanted
        14   to spend asset forfeiture money, to come to me and say,
        15   "Do you think this is a valid purchase or a valid use of
        16   the funds?"  And I would do that.  And if there was a
        17   question on that, I would get ahold of the DOJ.  I had a
        18   representative there.
        19        Q.   As a general manager, what's the drug
        20   forfeiture money process?  I mean, who decides who's
        21   going to get what?
        22        A.   All right. Well, there's state and there's
        23   federal, so I'll start with federal.
        24        Q.   Okay.
        25        A.   Federal is -- the best way to describe this

1   is to just describe a typical stop or a seizure.  Our
2   deputies might be out on the highway doing interdiction
3   work, they make a stop, they discover, for instance, a
4   bunch of drugs in a vehicle, or a lot of times we've had
5   seizures as much as almost a half a million dollars in
6   cash that was in the car.  And they would notify me if
7   it was a huge seizure, because I was the patrol
8   commander when those were happening, and so I had -- and
9   I should say that I was the patrol commander when we
10  were doing a lot of this work, so I was familiar with it
11  on the intake end.  And then when I went to detectives,
12  I became responsible for how the money is processed and
13  how it's spent, or at least making sure the department
14  didn't get into a bind on it.  So once that stuff's in
15  the system on the federal side, the US Marshals take
16  custody of that.  We bring it in, we process it, we let
17  the marshals know, and they take it out of evidence.  We
18  don't leave a half a million cash in there, for
19  instance.  If there's a vehicle seizure, they store
20  that.  And then it goes to the FBI, and they have an
21  asset forfeiture process that they go through, and we
22  either prevail or we don't prevail.
23              On the state side, the agreement with Barry
24  McHugh, the prosecutor, is that he gets first bite at
25  the apple on any seizure that the Sheriff's Office

Page 13
www.mmcourt.com        Soumas, Daniel        5/7/2019

1   makes, and he makes the determination, "Am I going to
2   take this through state court or do I want you to just
3   give it to the feds and let them process it?"  That can
4   be, again, anything from vehicles to cash.  Obviously
5   drugs are just going to be seized and eventually
6   destroyed after criminal trial, so -- and that process
7   would then go to the prosecuting attorney's office civil
8   division if -- for the asset forfeiture part.  The
9   criminal side would keep the criminal case.  And they
10  would work together.  And sometimes they decided not to
11  prosecute, but they still did the asset forfeiture.
12      Q.   Okay.  So federal government would get a
13  bite at it.  And would they create a fund, a Kootenai
14  County forfeiture fund?
15      A.   So Kootenai County had an account through
16  the -- in the county auditor's system.  And as I
17  understood it, the moneys would go into this account and
18  they would have it bifurcated as to what was state and
19  what was federal, and that's what I asked for the audit
20  on.  So it would go in there, and then when it needed to
21  be spent, it could be accessed by the Sheriff with some
22  provisos as far as notification.
23      Q.   Does the Sheriff alone decide what to spend
24  forfeiture moneys on or is there some committee?
25      A.   No.  In the end, it's really his decision.

1    Proposals come up unchecked.  They just check with me to
2    make sure -- it's not my money.  They just check with me
3    to make sure it's a valid or legal expenditure.  And
4    that was pretty typical of the patrol commander or
5    whatever wanted to do that, even the jail, we bought
6    stuff for the jail and they would just get ahold of me
7    and say, "Is this valid?"  And I would look it up, and
8    typically I knew because I kept pretty good track.
9         Q.   Did spending forfeiture moneys require
10   commissioner approval?
11        A.   Yes.  And when I say yes, it's a legal
12   issue.  Initially, we didn't do that, but because the
13   commissioners basically control the purse strings on all
14   cash that's in the possession of Kootenai County, a
15   system was put in place where the commissioners receive
16   a letter from the Sheriff saying, "I'm informing you
17   that I intend to spend this money," but he's not asking
18   their permission, he's just informing them that he's
19   going to access that fund, because per the federal
20   guidelines at least it's not their money to spend, they
21   can't tell the Sheriff -- in fact, it's called
22   supplanting if they say, "You have to do this, and
23   you're going to take this money and spend it over here
24   on these bottles of water," which in the -- we would
25   normally budget for -- supplanting.

1    Q.   Did the prosecutor have any role in
2    approving forfeiture expenditures?
3    A.   In the state side, if they were a large
4    expenditure or if it was something unusual, then I would
5    go to Barry, or someone could go to Barry. For
6    instance, we bought a Bear Cat, which is a large armored
7    vehicle for SWAT and for tactical response, and it was
8    three hundred some thousand dollars. And we went to
9    Barry to make sure that he was going to sign off on
10   that, even though I think we eventually spent federal
11   money on it. And it was certainly an allowable expense,
12   but nonetheless, we had Barry go through it and make
13   sure.
14   Q.   So your role was answering questions on
15   whether this could or couldn't be spent?
16   A.   Coordinating and then reporting. So I filed
17   all the annual reports, and I would get with Barry
18   McHugh on the state side. And we would basically just
19   go have a coffee meeting, and I'd say, "Here's kind of
20   where we are on this." And the reporting on the federal
21   was an annual event. And then I'm trying to figure out
22   how I want to express how the auditor worked. So the
23   auditor's office keeps the money, and they're supposed
24   to be providing monthly numbers to us on what's in the
25   account and what's been spent. That's the only way I

1    can do the annual filing, because I need those figures.
 2    I kept a file on the letters that were generated to the
 3    commissioners, so I knew what was in the hopper so to
 4    speak.  But it was the auditor's office that provided
 5    those funds.  And I worked with a gal named Nancy
 6    Corrutto, who's no longer there, and before her Kim
 7    Stevenson.  Corrutto is C-o-r-r- -- I think it was
 8    -u-t-t-o.  I believe.
 9         Q.    So the auditor's office kept the data, would
10    provide it to you, and you'd prepare annual reports to
11    the feds?
12         A.    Yes.  Just on the expenditure portion.
13         Q.    So just so I got this straight, you would
14    provide advice regarding whether it was appropriate or
15    not when asked, and you would also prepare reports
16    annually?
17         A.    Right.
18         Q.    Any other role with respect to drug
19    forfeitures?
20         A.    I'm sure somebody called me once in a while.
21    I had started the program in patrol, and so I had a lot
22    of experience on issues, court rulings and things like
23    that, so once in a while I would get asked on that, but
24    the longer I was outside of patrol and doing
25    detectives -- and detectives has their own problems,

1  there's homicides and things going on -- the less I
2  would provide advice to patrol.
3      Q.   Did county legal have any role in the drug
4  forfeiture program?
5      A.   Once in a while I would talk to Darrin about
6  something, but typically I knew as much about it.  I
7  would bounce some things off of him.  I remember some
8  expenditures that they weren't sure that it was legal,
9  and I told them that it was, and DOJ said, "Yes, it is
10 legal."
11     Q.   So from time to time, Darrin would get
12 involved in forfeiture issues concerning whether it was
13 an appropriate forfeiture or not?
14     A.   Right.  And then on the other side of
15 forfeitures, Dave Ferguson and Jamella -- and I can't
16 remember Jamella's last name -- did the actual asset
17 forfeiture work on the state side.  It came out of their
18 office.  They did the court filings.  And I met with
19 David on a lot of occasions on court filings.
20     Q.   Prior to June 1, 2017, was it uncommon for
21 Darrin Murphey to provide legal advice regarding whether
22 a forfeiture was acceptable or not?
23     A.   I would say that would be true.
24     Q.   Uncommon?
25     A.   Yes.

1      Q.      But he would do it from time to time?
2      A.      Yes.
3      Q.      Was there a certain set of circumstances
4  where Darrin would chime in, as opposed to you?
5      A.      You know, I can't answer that accurately
6  because I don't know -- on my end, I noticed a
7  diminishment of people consulting me, but I don't know
8  who they were talking to.
9      Q.      Okay.  When did you notice a diminishment of
10 people consulting with you?
11     A.      I would say early in 2017.
12     Q.      Any idea why?
13     A.      I do not.
14     Q.      How many drug forfeiture purchases or
15 transfers were there a year?
16     A.      I would have to have the records.  I could
17 only estimate, and it would be an estimate that there
18 were probably 20 to 40 depending upon the year.  And
19 that could be way off.
20     Q.      Understood.
21     A.      Yeah.
22     Q.      And were you routinely consulted on every
23 forfeiture or some of them were just so obvious they
24 didn't need any input?
25     A.      Most of the time, I was asked -- for a long

1      A.   No.  The e-mail was sent by Mattos, but the
2  Sheriff was included in that.  You know, if Dan wanted
3  to explain it to me, he could have just picked up the
4  phone.  It doesn't work the other way.  Yeah, I can pick
5  up the phone, but he's my superior and he's two levels
6  up.  If he wanted me to have a conversation about it, he
7  could have called me over to his office, he could have
8  called me on the phone, he could have called me on my
9  cell, he could have done a personal e-mail to me saying,
10 "Hey, look.  I appreciate what you did, but this is what
11 I'm trying to do."  But they disinvited me to the
12 meeting, just didn't invite me.  I can't really
13 articulate it here, but I worked in the organization, I
14 worked with those people, and I know what was going on,
15 because I've seen them do it to others, I've seen it
16 happen, I've been in the room and stopped that from
17 happening to someone.  We can talk about it all day, but
18 I'm telling you that was what was going on.
19     Q.   Did you see an expression of anger from the
20 Sheriff?
21     A.   I did not.
22     Q.   Thank you.  And did anyone tell you you
23 better not be involved in any more input or in providing
24 any more input?
25     A.   Yeah.  That's what that -- "I don't want you

Page 48
www.mmcourt.com          Soumas, Daniel          5/7/2019

```
 1      A.   I did.
 2      Q.   So at least in this calendar there's no work
 3 on the ACLU public records request between August 11 and
 4 August 25.  Would you agree?
 5      A.   Yeah.  At least specific on there, there's
 6 not an item listed.
 7      Q.   Okay.  Let's go back to the e-mail string.
 8      A.   Okay.
 9      Q.   We're back to August 25, a date stamp of
10 1:17, from you to Darrin.  Do you see that one?
11      A.   I do.
12      Q.   And you're forwarding the Kathy Griesmyer
13 e-mails?
14      A.   Right.
15      Q.   And you say, "Can we talk next week on this
16 request?  I'm going to need some info from Lucia"?
17      A.   Lucia.
18      Q.   "For both KCSO and NIVCTF"?
19      A.   Right.
20      Q.   Why are you sending Darrin that e-mail?
21      A.   This narrative or Kathy's e-mail?
22      Q.   The one where you just said, "Can we talk
23 next week?"
24      A.   Well, I'm forwarding Kathy's e-mails because
25 I forwarded everything to date on that to him.  And then
```