# EXHIBIT B

UNITED STATES DISTRICT COURT
COURT OF IDAHO

DANIEL SOUMAS AND VALERIE )
SOUMAS, husband and wife, ) Case No. 2:18-CV-00138-EJL
)
Plaintiffs, )
)
vs. )
)
KOOTENAI COUNTY, IDAHO, a )
political subdivision of )
the State of Idaho; and BEN )
WOLFINGER, Sheriff of )
Kootenai County, Idaho, in )
both his official and )
individual capacities, )
)
Defendants. )
_____)

VOLUME I

DEPOSITION OF UNDERSHERIFF DANIEL MATTOS

TAKEN ON BEHALF OF THE PLAINTIFFS

AT COEUR D'ALENE, IDAHO

MARCH 7, 2019, AT 11:00 A.M.

REPORTED BY:

PATRICIA L. PULLO, CSR
Notary Public

```
 1   undersheriff.  But I think that's when Rocky Watson was
 2   still here.  So Travis was the undersheriff for more
 3   than just a year.  It was probably two and a half, three
 4   years, something like that.
 5        Q.   Well, let me ask you this.  Do you agree that,
 6   at least as of 2013, Dan Soumas was a for-cause employee
 7   until June of 2017?
 8        A.   At some point in there, yes.  If I could look
 9   at the policy manual, I could give you the exact dates
10   by when the revision was made.  But the bottom line is
11   he was a for-cause employee after the policy was
12   modified and he was indeed a for-cause employee after
13   2013.
14        Q.   Okay.  And there's no question in your mind,
15   is there, that just prior to June 21st all of the
16   captains were for-cause employees?
17        A.   That is correct.
18             (Whereupon, Deposition Exhibit No. 1 was
19                marked for identification.)
20             MR. BECK:  Okay.  So let me show you what's
21   been marked as Plaintiffs' Exhibit No. 1.  And let me
22   represent to you that I copied some portions of the
23   Kootenai County personnel policy manual that was in
24   effect at least by July 18th of 2017.  I don't have a
25   cover page to it.  So I'm just guessing this is the 2017
```

1  had explained to me what happened that there was plenty
2  of information suggestive of the fact that there could
3  have been a problem with the way that was handled.  And
4  on Monday, August 28th, I instructed -- well, on Monday,
5  August 28th, I met with Neal Robertson and Kim Edmondson
6  and that's when I said you're going to have to look into
7  this.
8       Q.   Well, is that all you said to them?
9       A.   No.
10      Q.   What else did you say?
11      A.   I said it's a problem.  I explained the fact
12 that Darrin was really upset and he -- he had a problem
13 with the fact that the sheriff could have liability and
14 the fact that this is -- this is a problem and it needs
15 to be resolved -- it needs to be looked into.  And I
16 wanted an internal launched.
17      Q.   Had anyone else complained to you about this
18 ACLU public records request other than Darrin Murphey?
19      A.   No.  The first I ever heard about it was
20 August 26.
21      Q.   Did you have any involvement in the
22 investigation?
23      A.   I ordered it.
24      Q.   Yes.
25      A.   Yes, sir.

1    Q.   Yeah. Great.

2    A.   And that was his rationale or at least part of
3 the rationale.

4    Q.   Do you recall if it was in 2014?

5    A.   I don't.

6    Q.   Okay. But when the sheriff asked Dan to take
7 a promotion to a major's position, had you discussed
8 that with the sheriff at that time?

9    A.   I did.

10   Q.   Okay. Do you recall where you discussed it?

11   A.   No.

12   Q.   Did you take any notes of that meeting?

13   A.   I did not.

14   Q.   Do you know if the sheriff did?

15   A.   I doubt it.

16   Q.   Okay. I do too.

17   A.   (Laughing.)

18   Q.   When you had the discussion with the sheriff,
19 were you in favor of Dan becoming a major?

20   A.   I was.

21   Q.   Okay. And do you think this is something you
22 discussed with the sheriff before the sheriff offered
23 Dan the major's position?

24   A.   Could have been. Probably was.

25   Q.   He likely would have consulted with you --

1     A.    Absolutely.

2     Q.    Okay.  And so I'm trying to understand how
3 the -- I thought you told me that he -- if he went to
4 the jail, he'd be under a major.  But he was actually
5 being promoted to a major if he accepted?

6     A.    Yes.  And you're correct.  He would have
7 been -- what I started to say on that was that he would
8 have been directly under my supervision, which he was.
9 Then I was discounting the fact that it was a major.  So
10 for the record, he would have been directly under my
11 supervision.

12    Q.    And that was something that the sheriff
13 thought was a good idea?

14    A.    He did.

15    Q.    What was the point of that?  I don't -- I
16 mean, what would be special about him being directly
17 under your supervision?

18    A.    Well, in part, it requires some speculation.
19 But it also includes specific conversations that I've
20 had with the sheriff.  And that was -- is that Dan was
21 somebody that was very capable of handling the job; he
22 had a lot of experience.  Certainly he had experience on
23 both sides of the house, both in the jail and in patrol,
24 which made him even more valuable over there.

25         But to your point, the issue that the sheriff

1  had is that Dan was not good about getting his stuff
2  done on time.  And that was something that he felt that
3  I would be better equipped to handle.  I'm not putting
4  words in his mouth.  But Dan's -- you know, you've seen
5  in other documents the Achilles heel has always been
6  getting his administrative stuff done.
7      Q.   Which you've told us earlier was common in the
8  department with sergeants on up?
9      A.   No.
10          MR. STROMBERG:  Objection, mischaracterizes
11 his testimony earlier.  Over the objection you get to
12 answer.
13          THE WITNESS:  That is what I said relative to
14 evaluations.  Dan's problems with administrative stuff
15 was by far beyond evaluations.  And we were speaking
16 specific to evaluations earlier.
17 BY MR. BECK:
18     Q.   Thank you for clarifying.
19     A.   Yes, sir.
20     Q.   Would you be surprised to learn that sergeants
21 on up in the department have told me that any
22 administrative paperwork it was common to be behind on?
23     A.   Yeah.  You know, to say -- well, your question
24 is would I be surprised to hear that.  I would not.
25     Q.   Okay.  I mean, there were other priorities

1   that would come up in the day-to-day operations of the
2   sheriff's office?
3       A.   So, Mr. Beck, I'll respond to that by saying
4   that the higher you go in an organization, the greater
5   the responsibility and the greater the expectation.  In
6   the context of a captain or a major or a general or
7   whatever you want to call it in an organization, you
8   know, that expectation lies primarily in the area of
9   administrative functions, so your job as an
10  administrator.  And so that is what you're supposed to
11  be being is taking care of administrative stuff.
12           So my point in saying that is when you're a
13  sergeant and you're a first line supervisor, when you're
14  a captain, I'm going to be looking a lot harder at that
15  captain than I am at that sergeant who's still
16  developing in his career.  I expect a lot more
17  responsibility from the captain than I do the sergeant.
18           So to your point that the sergeants would say
19  they all have a problem, yeah, that doesn't surprise me
20  at all.
21      Q.   How about the lieutenants?
22      A.   That wouldn't surprise me either.
23      Q.   How about the captains?
24      A.   That would surprise me.
25      Q.   Really?

1      A.    It shouldn't be that way.
2      Q.    Would it surprise you -- for instance, would
3   you agree that Deak was often behind on his
4   administrative paperwork?
5      A.    Would have been behind on his evaluations.
6   But my experience with Deak, Edmondson, Robertson, any
7   of the others, when it came to getting things done, you
8   know, in a timely fashion, I didn't have to chase them
9   around to get it done.  Now, there was one captain that
10  preceded Dan's departure that did have a problem getting
11  it done and we were about to deal with that before he
12  decided to retire.
13     Q.    How about Richardson?
14     A.    Richardson had some problems sometimes.  But
15  he -- when I -- I leaned on Lee pretty hard when he was
16  in detectives, and he picked up his game.
17     Q.    And he's retiring in March?
18     A.    Yes, sir.
19     Q.    Or -- retiring, right?
20     A.    (Nodding.)
21     Q.    So just to finish up on that major promotion
22  to major --
23     A.    Major, yes.
24     Q.    -- was -- that was in 2014.  Was there an
25  opening or was there going to be a third major?

```
 1        A.    Well, you're going to have to put this in
 2   context, Mr. Beck.
 3        Q.    Okay.
 4        A.    So let's take this from top to bottom.  Is
 5   that fair?
 6        Q.    If we're talking about the CAC thing --
 7        A.    Yes, that's exactly what we're talking about.
 8              So on May 25th or 26th, I reached out to
 9   Darrin Murphey relative to the legality of that expense.
10   And by May 30th, Mr. Murphey had responded to me that it
11   was okay.  On June 1st, I let Dan know that I was going
12   to do that, that we were planning on doing it.  And the
13   reason why is because probably -- I'm going to guess
14   two, three weeks -- sometime before this Dan was upset.
15   And he even made a comment to me.  It was kind of
16   sarcastic, which Dan could be sarcastic sometimes.  But
17   why aren't -- you know, How about letting me know, or
18   words to that effect, about when you and the sheriff are
19   going to send this stuff down to commissioners.  Because
20   he keeps the books and he had a right to know.  And I
21   agree with that; he did.
22              So exactly what I did on June 1st was let him
23   know.  And immediately he responds to me -- or within a
24   very short period of time relatively speaking, he says,
25   whoa, you can't do that and -- or no.  He says, Did you
```

1    talk to the lawyer?  And he says, There's been some
2    changes, or words to that effect, that suggest that we
3    can't do this.  I responded to Dan, yeah, I vetted it by
4    the lawyer.
5           And so I was frustrated with Dan for coming
6    right out of the chute, you know, saying, whoa, hold on.
7    It was frustrating to me because I felt that I had done
8    everything that I could do to cooperate with Dan by
9    telling him what was going to go on.  And then the next
10   thing I hear is that he's, you know, throwing --
11   throwing dirt on the thing and making it to where it's
12   difficult to go forward.  So it frustrated me.  Because
13   I thought Dan was being an obstructionist.  I just
14   thought he was getting in the way of it before we ever
15   even had a chance to talk.  That was my initial feeling.
16          Now, when Dan provided the information that
17   suggested that he was correct exactly, I was very glad
18   for that.  And what we did is we made every correction
19   that there is to make sure it was done legally and
20   appropriately.  So my frustration with Dan was the fact
21   that, you know, he just came out of the chute that way
22   so quick and it's like, look, we're trying to give money
23   to a -- to a -- you know, a charity or a nonprofit
24   organization.  And I think that in the context of a
25   captain of that organization, it would have been a

1   little bit more appropriate to say, hey, Dan, you know,
2   you can't give the money; the rules are different; but
3   there's another way around it. But we just went right
4   to the dark side right off the bat. So that's how I
5   felt the way I did.
6       Q.   My understanding is that the first e-mail that
7   Soumas wrote was to ask you if this had been approved by
8   legal counsel.
9       A.   It was. Yes, sir. And then I believe there
10  was language in that that also suggested some rules had
11  changed.
12      Q.   That's right. So did you consider that coming
13  out of the chutes and being an obstructionist?
14      A.   I did. I told him that I had vetted it from
15  the lawyer. And the next thing I see that -- that
16  there's an e-mail from him, as I recall, to Darrin
17  Murphey indicating that -- he may have even sent the
18  copy of the new rules to Darrin.
19           But the bottom line was is that Dan was right.
20  He was correct and ...
21      Q.   And he wasn't being an obstructionist?
22      A.   Well, I felt -- and again, this is about the
23  way I felt -- is that he came out of the chute so quick
24  to immediate -- he asked me if I talked to the lawyer.
25  I did, you know. And I was already frustrated with Dan

```
 1   about some of his performance, as I had already gone on
 2   to this testimony about the written warnings.  Neal
 3   Robertson was frustrated with him.  And I make the
 4   comment -- and I know where you're headed -- you know,
 5   that he's -- you know, he'd better get on the board,
 6   that -- I meant it.  I wanted him to be on board with
 7   what we're trying to do unless -- instead of throwing a
 8   brick wall up right off the bat, which he was right
 9   about -- understand I agree with it; he was right about
10   that.  But my impression was, you know, Dan was just
11   stonewalling this thing because he didn't like what was
12   going on or he wasn't consulted whether we should spend
13   the money.  I can't tell you exactly what was in Dan's
14   mind, but I can tell you what was in mine.  And it was
15   very frustrating.
16        Q.   But do you recognize that you were wrong?
17        A.   Wrong about?
18        Q.   Thinking that Dan was stonewalling something.
19        A.   Do I think I was wrong about --
20        Q.   Mm-hmm.
21        A.   You know, in retrospect having found out what
22   he sent to Darrin Murphey, yeah, I was wrong to see
23   that.  You're correct.  I was wrong.
24        Q.   He was the asset coordinator for the
25   department, right?
```

1      A.   He was.

2      Q.   At that time at least, he was supposed to see
3 proposed expenditures out of the fund before they were
4 made, right?

5      A.   Yes.

6      Q.   In fact, part of his job was to vet whether
7 they fit within the Department of Justice's guidelines?

8      A.   Well, in this particular case, he was more --
9 I saw Dan more as a bookkeeper and somebody that
10 reported that stuff. And again, you know, rather than
11 somebody that opined on the legality of expenses.
12 Although he did from time to time.

13          But again, the reason that I took the tact
14 that I did, I had talked to Mr. Murphey almost a week
15 before I ever told Mr. Soumas that we were going to go
16 forward with that. And Mr. Murphey said it was a legal
17 expense.

18     Q.   All right. Murphey was wrong too?

19     A.   He was.

20     Q.   And Murphey was upset with Soumas about this?

21     A.   No, he wasn't. Not to me.

22     Q.   You don't think he told the sheriff that he
23 was upset with Soumas for interfering on the asset
24 forfeiture issue --

25     A.   No.

1    money away to the Child Advocacy Center and immediately
2    I'm getting told by him that we can't do it after the
3    lawyer said we could.  And so, yeah, I found it
4    frustrating.  And I found it completely frustrating in
5    the context of all the other stuff that had been going
6    on with Dan, with Neal and everything else that I've
7    already said to you.
8           So Dan, he -- you know, his performance was on
9    my radar, so to speak.  And that was just a frustrating
10   thing.  Look, captains should be solving problems, not
11   creating them.  I realize that he did the right thing.
12   And my reaction to that out of the chute on my end
13   wasn't right.  Because I didn't know that he was doing
14   what he was doing to bring up a problem to our
15   attention.
16          So again, at no point ever did I have any
17   cause to be mad with Dan after I knew that he was doing
18   the right thing.
19       Q.   So after you found that out, do you believe
20   now that Captain Soumas made a good faith effort to
21   report a suspected violation of law?
22       A.   I do.  Absolutely.
23       Q.   And he was trying to do that in good faith and
24   not -- not because he was an obstructionist?
25       A.   Yes.

```
 1      Q.   Are you aware of the remedies that the -- and
 2   sanctions that the Department of Justice can levy
 3   against an agency that doesn't follow the guidelines?
 4      A.   Yes.
 5      Q.   They're pretty serious, aren't they?
 6      A.   They are.  And again, I'm very thankful that
 7   Dan did what he did.
 8      Q.   Have you seen those Department of Justice
 9   guidelines?
10      A.   I've looked at the book.  I saw in the
11   e-mail -- I saw what Dan had wrote about it and also
12   what Darrin had gotten back from the DOJ.  But I haven't
13   read the book from stem to stern, no, sir.
14      Q.   Okay.  One of the things I want to just
15   double-check with you from the last deposition is that
16   you had indicated that following your review of
17   Edmondson's report, you, Robertson and Edmondson met and
18   your initial response was that you didn't think you
19   wanted to fire Soumas?
20      A.   No, sir.  I did not.
21      Q.   And then I know you changed your mind.  What
22   I'm not sure of is what it was that made you change your
23   mind on that.
24      A.   I can answer that.
25      Q.   Great.
```