# EXHIBIT

# C

UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | | |
|---|---|---|
| DANIEL SOUMAS AND<br>VALERIE SOUMAS,<br>husband and wife, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 2:18-cv-00138-EJL |
| | ) | |
| vs. | ) | |
| | ) | |
| KOOTENAI COUNTY, IDAHO,<br>a political subdivision<br>of the State of Idaho;<br>and BEN WOLFINGER,<br>Sheriff of Kootenai<br>County, Idaho, in both<br>his official and<br>individual capacities, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

DEPOSITION OF BEN WOLFINGER

TAKEN ON BEHALF OF THE PLAINTIFFS

AT 451 NORTH GOVERNMENT WAY, COEUR D'ALENE, IDAHO

APRIL 1, 2019, AT 10:00 A.M.

REPORTED BY:

JULIE MCCAUGHAN, C.S.R. NO. 684
Notary Public

1    for those personnel specified by the Sheriff?

2         A.    Yes.

3         Q.    In 2017 -- actually, strike that.  Prior to

4    June 21 of 2017, had the Sheriff's Office designated

5    captains as for-cause employees?

6         A.    Yes.

7         Q.    And your understanding of for-cause -- is

8    your understanding of for-cause to mean that those

9    employees can only be terminated for good cause?

10        A.    Yes.

11        Q.    And that they would have a right to due

12   process?

13        A.    Yes.

14        Q.    And then if you turn to page 1.1940, about

15   halfway down in the definition section, where it talks

16   about "regular full-time."

17        A.    Okay.

18        Q.    Does that state employees who are regularly

19   scheduled to work 35 hours or more per work week -- is

20   that under the definition of regular full-time?

21        A.    That's part of it, yes.

22        Q.    Okay.  Would you agree that in 2017, Mr.

23   Soumas was a regular full-time employee?

24        A.    Yes.

25        Q.    Now, you indicated that the Sheriff's Office

1    that was prepared in conjunction with the at-will

2    acknowledgment?

3         A.    Yes.

4         Q.    Did you meet with all of the captains on

5    June 21, 2017 to have them sign this acknowledgment?

6         A.    All I could contact.  I don't remember if I

7    was able to contact all of them that day.

8         Q.    Okay.  We've had a chance to talk with the

9    captains about that meeting, and let me ask you a couple

10   of general questions.  Would you agree that when you met

11   with the captains to have them sign the at-will

12   acknowledgment on June 21, 2017, that that meeting --

13   each of those meetings lasted less than a minute?

14        A.    They didn't last very long.  I don't know

15   about less than a minute, but they didn't last very

16   long.

17        Q.    Does that seem close to being right?

18   Whether it was a minute, a minute five?

19        A.    A few minutes, yes.

20        Q.    Okay.  A few minutes at most?

21        A.    Yes.

22        Q.    And would you agree that unless the majors

23   spoke with the captains, this would have been the first

24   time they would have understood that the department was

25   making them at-will employees?

1          A.     I wasn't aware of that exactly.

2          Q.     Were you aware that Soumas had mentioned to

3     supervisors that it was his understanding that he was to

4     be consulted on the proper use of the potential fund

5     expenditures?

6          A.     I'm not aware of that.

7          Q.     Were you aware that beginning in March of

8     2017, Soumas had told upper command that he felt like he

9     was being ignored on his concerns that he wasn't being

10    consulted on asset forfeiture fund expenditures?

11         A.     I wasn't aware of that.

12         Q.     So would you agree with me that, at least

13    from the paperwork that is here in the chain of e-mails,

14    if the first e-mail Soumas received on this CAC

15    expenditure came from Dan Mattos on June 1, that all he

16    was doing in the e-mail -- in the first e-mail on page

17    1 -- was responding to Dan Mattos' e-mail to him?  Do

18    you want me to try that again?

19         A.     Let's try it again.

20         Q.     Let's break it down.  Would you agree with

21    me -- I think you already told me this, but the bottom

22    e-mail on page 1 is from Mattos to Soumas dated June 1

23    at 8:46 where Mattos is telling Soumas that there's

24    going to be an asset forfeiture fund disbursal?

25         A.     That's correct.

1      Q.    And that was the one to CAC center?

2      A.    Yes.

3      Q.    CAC meaning child advocacy center?

4      A.    Yes.

5      Q.    And if you look above that, that same day,

6   Soumas responded to Undersheriff Mattos?

7      A.    Yes.

8      Q.    And do you see where Soumas is, in essence,

9   stating -- or asking Mattos whether or not the use of

10   this fund had been reviewed by either the Department's

11   attorney or DOJ?  I think it's in the first sentence

12   there.

13      A.    Oh, yeah.  I do see that.

14      Q.    And that seemed like a legitimate question

15   for the asset forfeiture fund monitor to ask the

16   Undersheriff?

17      A.    Yes.

18      Q.    You didn't fault him for that?

19      A.    No.

20      Q.    And then do you see where in that same

21   e-mail he stated that it was basically his understanding

22   that the funds could not be used to pay salaries of

23   sworn or nonsworn law enforcement personnel?

24      A.    Yes, I see that.

25      Q.    And then the second sentence, do you see

1   where he says that the size of a donation to a

2   community-based program is now limited to 25,000?

3        A.    Yes, I see that.

4        Q.    So he was raising two concerns that he had

5   about this expenditure?

6        A.    Yes.

7        Q.    One was to the amount of the expenditure?

8        A.    Correct.

9        Q.    And the second was that it was supposed to

10  go to a salary?

11       A.    Correct.

12       Q.    And then if you turn to the next page, do

13  you see where on the bottom there, June 1 at 2:25 Mattos

14  responded to Soumas' prior e-mail and told him that it

15  was vetted by Darrin prior to the release of funds and

16  he deemed it okay?

17       A.    I see that.

18       Q.    Darrin is Darrin Murphey?

19       A.    Yes.

20       Q.    And he's the Sheriff's Office legal advisor,

21  one of them?

22       A.    Yes.

23       Q.    And then he says, "I will forward you the

24  correspondence."

25       A.    Yes.

1       Q.    Do you know if Mattos ever forwarded him the

2    correspondence?

3       A.    No.  I don't know.

4       Q.    If he said that he would forward that

5    correspondence to the asset forfeiture fund coordinator,

6    do you think that's something that he should have done?

7       A.    Yes.

8       Q.    Do you know any reason why he wouldn't have?

9       A.    No.

10      Q.    And then if you look above that, there's an

11   e-mail from Darrin Murphey to Dan Mattos, and in the

12   first sentence there, does that indicate that Soumas had

13   contacted Murphey to discuss the matter?

14           MR. STROMBERG:  It does not -- I mean --

15           THE WITNESS:  It doesn't indicate that

16   Murphey contacted Soumas.  It just says they discussed

17   it.

18   BY MR. BECK:

19      Q.    Okay.  So you don't know who contacted who?

20      A.    Right.

21      Q.    If Soumas contacted Murphey, would you fault

22   him for that?

23      A.    No.

24      Q.    Would you agree that that's probably

25   something he should do in his role as the asset

1    forfeiture coordinator?

2         A.    Yes.

3         Q.    And then did Murphey explain that, in

4    essence, he thought maybe what he should do is check

5    with DOJ?  And just to help you out, I'm looking at the

6    last paragraph on that.

7         A.    Yeah, I see that.

8         Q.    And then if you turn to page 3, in the

9    middle of the page, there's an e-mail from Mattos to

10   Soumas dated June 6 at 9:54, and it's actually to --

11   from Mattos to Mattos and Murphey, with a cc to Soumas,

12   Robertson and Wolfinger?

13        A.    Yes.

14        Q.    And he says -- Mattos says, "Just as a

15   clarifier, in the event that the below e-mail is not

16   clear enough, Darrin is the only one that is to discuss

17   this with the DOJ.  I do not want too many cooks in the

18   kitchen."  Do you see that?

19        A.    I saw that.

20        Q.    Did you have a discussion with Mattos about

21   that before he wrote the e-mail?

22        A.    Yes.

23        Q.    Okay.  What do you recall from that

24   discussion?

25        A.    Dan had raised some concerns about whether

1    it could be used for salaries and that the donation

2    amounts had changed under DOJ rules.  So I said, "Well,

3    let's have Darrin contact them, but I only want one

4    opinion," you know, figuring that if two different

5    people called two different attorneys at DOJ, we might

6    get two different opinions.  So I wanted one person with

7    one contact.  And I think it may have been actually my

8    first -- I was the first one to use the phrase "too many

9    cooks in the kitchen."  I didn't want too many cooks in

10   the kitchen.

11        Q.    Okay.  Was there any particular reason why

12   you didn't want Soumas to just simply make the phone

13   call to DOJ or send an e-mail to DOJ to clarify the

14   issue?

15        A.    I wanted Darrin to go ahead and do it.

16        Q.    I know.  Was there a reason why you didn't

17   want Soumas to do it?

18        A.    No.

19        Q.    At this stage, do you think that Mattos --

20   did he relay to you that he was upset with Soumas?

21        A.    I don't remember him saying he was upset.

22        Q.    What do you recall him saying?

23        A.    Well, just that there was some conflict in

24   what we could spend the money for and that's why we

25   decided to have Murphey send it to DOJ, find out for

1    sure.

2           Q.    Okay.  So you didn't think that Mattos had

3    considered Soumas to be an obstructionist at that point?

4           A.    I don't think so.

5           Q.    And you don't think that Mattos considered

6    Soumas -- or that Mattos felt Soumas better get on

7    board?

8           A.    Not at this time.

9           Q.    Okay.  And then if you turn to page 5 of the

10   document -- well, actually, on that same page 3, that

11   same top e-mail again on June 6, at 1:23 from Soumas to

12   Dan Mattos, do you see where Soumas is responding to

13   Mattos and says that "Your message was very clear.  I am

14   not now nor was I planning to be involved in this

15   issue"?  Do you see that?

16          A.    I see that, yes.

17          Q.    And do you see where he says, "I apologize

18   if anyone feels as though I interfered with this

19   effort"?

20          A.    I see that.

21          Q.    Do you know who told Soumas that Mattos

22   thought he was interfering?

23          A.    No.

24          Q.    Did you feel that Soumas was interfering?

25          A.    No.

```
 1        Q.    Okay.  Did anyone tell you that they thought
 2   Soumas was interfering with the issue?
 3        A.    I don't remember anybody saying that.
 4        Q.    Okay.  And then do you see on page 4, the
 5   top e-mail dated June 6, 2017 where Mattos writes to
 6   Soumas and says, "Enough said"?
 7        A.    I see that.
 8        Q.    Is "enough said" kind of another way to say
 9   "drop it, buddy"?
10              MR. STROMBERG:  Objection.  Speculation.
11   Ambiguous.  You can answer.
12              THE WITNESS:  I wouldn't really take it that
13   way.
14   BY MR. BECK:
15        Q.    How would you take it?
16        A.    "That okay.  No apologies necessary.  We're
17   done.  We're moving forward."
18        Q.    So you interpreted that as essentially
19   saying, "Oh, no problem, no apology necessary"?
20        A.    Yeah.
21        Q.    And then do you see on page 5, on the bottom
22   of the page, an e-mail from Soumas to Neal Robertson
23   dated June 6 at 1:30 where he's asking Robertson if they
24   could meet to discuss the relationship between Robertson
25   and him?
```

```
 1          A.    Well, since he came to work here for the
 2     Sheriff's Office.
 3          Q.    So close to 30 years?
 4          A.    22 years, 23 years, something like that.
 5          Q.    Okay.  And do you see where it says, "FYI,
 6     Dan now wants to meet Neal for a beer somewhere to
 7     talk"?
 8          A.    I see that.
 9          Q.    What do you think the purpose of Mattos --
10     or the purpose was for Mattos to tell you that
11     information?
12                MR. STROMBERG:  Speculation.  You can
13     answer.
14                THE WITNESS:  I really don't know.
15     BY MR. BECK:
16          Q.    Were you having concerns about Soumas and
17     his job performance at the time that you received this
18     e-mail on June 7?
19          A.    Yes.
20          Q.    Okay.  What concerns were you having?
21          A.    Dan had struggled for a long time with his
22     administrative duties, and it looks like he's trying to
23     get with his supervisor off site.  You know, we just
24     want him to get on the bus and do his job.
25          Q.    So how did you know that Soumas had been
```

1  struggling a long time with administrative duties if you

2  never read his evaluations?

3      A.   I had complained several times about things

4  that were behind, asking Mattos to get with Robertson to

5  say, "Look, we gotta get him on the bus, we gotta get

6  him working -- we gotta get him doing his job, doing his

7  administrative duties."

8      Q.   So do you recall any specific matter that

9  you complained of where Dan hadn't done an

10 administrative duty that you felt he should have done?

11     A.   There were several.  SWAT.  SWAT training

12 reports.  After-action reports.  All those are public

13 records and need to be filed, and they weren't being

14 done timely.  I knew he was behind in evaluations.  I'd

15 heard that over and over.  There were projects that we

16 asked that Dan never seemed to come up with.  His office

17 was known as the black hole.  Things would go to his

18 office and never be seen again.  And that was

19 frustrating for me.

20     Q.   Who had told you that Dan's office was a

21 black hole?

22     A.   It was kind of a common term around the

23 office.  When he was patrol division commander and when

24 he was the detective commander, it was the black hole.

25 Things went there and never came out.

1          Q.    When you say things went there and never
2     came out, is there anything that you can --
3          A.    Suggestions, recommendations, proposals.
4     Nobody ever heard any feedback.  Anything that went
5     there -- or most things that went there didn't come back
6     out.
7          Q.    If that, in fact, happened, wouldn't you
8     expect that there would be some sort of documentation on
9     that?
10         A.    Yes.
11         Q.    For instance, wouldn't you expect that there
12    would be some documentation that people had made
13    suggestions to Dan Soumas as their commander or
14    supervisor where he never got back to him?
15         A.    I heard several of those things from
16    supervisors, particularly the patrol supervisors.
17         Q.    Right.  But my question is:  Wouldn't you
18    expect that there would be documentation?
19         A.    I would hope that his supervisor was
20    documenting it, yes.
21         Q.    Okay.  Have you checked to see if there was
22    any documentation in Dan's file that subordinates had
23    come to him with suggestions that he just didn't get --
24    he didn't respond to?
25         A.    No, I never checked his file for it.  That's

1    his supervisor's role.

2        Q.    Okay.  So did you just accept some people's

3    words that that's what was happening?

4        A.    Yes.

5        Q.    I mean, what I'm trying to figure out is how

6    do you know that that actually happened.  Lots of rumors

7    going at the department.  How did you know that Soumas

8    did not get back to people with suggestions?  How did

9    you know that?

10        A.    Well, I -- I know that he'd been receiving

11    counseling and warnings.  Because Mattos had told me

12    he'd received a counseling or warning.  I hadn't read

13    them, but I knew that he'd received them.

14        Q.    Would you be surprised to know that there

15    are no written counselings or warnings in Soumas' file

16    that indicate or administrative file, any other files,

17    that would indicate that Soumas didn't get back to

18    subordinates who had suggestions for him?

19        A.    No, I did not know that.

20        Q.    Because if something is happening in a

21    matter of potential performance issues, you would expect

22    documentation, wouldn't you?

23        A.    I would.

24        Q.    And then are you aware that the DOJ -- or

25    first of all, are you aware that Darrin Murphey did

```
 1    contact the DOJ on the CAC issue?

 2         A.    Yes.

 3         Q.    Are you aware that they ultimately confirmed

 4    that Soumas was right in that the 25,000 -- or sorry --

 5    30,000 exceeded the cap?

 6         A.    Correct.

 7         Q.    And that the money could not be used as

 8    salaries?

 9         A.    Correct.

10         Q.    So in that situation, Soumas was correct,

11    wasn't he?

12         A.    He was.

13         Q.    Do you think Soumas made a good faith report

14    to the department -- to Mattos anyway -- that he was

15    concerned -- or he suspected that the expenditure might

16    not be legal?

17         A.    Yes, I believe --

18         Q.    And when I say "legal" I mean in conformance

19    with the DOJ guidelines.

20         A.    Yes.

21         Q.    Did you talk to Soumas after you heard back

22    from DOJ to congratulate him on helping the department

23    not violate DOJ guidelines?

24         A.    No.

25         Q.    Why not?
```

```
1          A.     Just didn't think about it.

2          Q.     Okay.  Do you know if Mattos did?

3          A.     I have no idea.

4          Q.     Did you ask Mattos to?

5          A.     No.

6          Q.     Did it upset you when you found out that DOJ

7    could not approve the expense as was?

8          A.     No, it didn't upset me.

9          Q.     It didn't upset you at all?

10         A.     No.

11         Q.     Okay.  And you weren't mad at Soumas for the

12   fact that he prevented an expense out of the asset

13   forfeiture funds that really wasn't allowed under the

14   guidelines?

15         A.     I wasn't upset.

16         Q.     Are you glad that Soumas caught the issue?

17         A.     Absolutely, yeah.

18         Q.     Because later on, an expenditure was made to

19   the CAC?

20         A.     It was.

21         Q.     And it was for about 23,000, if I

22   understood?

23         A.     I don't remember the exact amount, but it

24   was to cover their operational costs, yes.  Nonsalaries.

25         Q.     I'm going to have you hold on to that
```

1    didn't eliminate any captains' positions, did it, Soumas

2    being terminated?

3         A.    It eliminated a captain, yes, but not a

4    position, no.

5         Q.    Right.  So Soumas, for instance, was Captain

6    of Detectives at the time of his termination.

7         A.    Correct.

8         Q.    Robertson assumed that position the next

9    day.

10        A.    Yes.

11        Q.    So even though it certainly didn't eliminate

12   a captain's position, it opened up a spot for Robertson?

13        A.    Yes.

14        Q.    And Robertson assumed that position?

15        A.    He did.

16        Q.    Tell me how you first learned about the idea

17   that Soumas was going to be investigated for a public

18   records issue.

19        A.    I believe it was Darrin Murphey brought it

20   to my attention that he'd failed to respond to a public

21   records request to the ACLU in a proper manner.

22        Q.    So what do you recall Darrin Murphey telling

23   you in as much detail as you can?

24        A.    That the liability was on me and that it's

25   something ICRMP doesn't cover, and there could be a

```
 1   judgment against me including attorney's fees, and so he
 2   needed to make me aware of that.
 3         Q.    He needed to make you aware that there could
 4   be liability on you because Soumas failed to timely
 5   comply with a public records request?
 6         A.    Correct.
 7         Q.    Is that about it?
 8         A.    That's about right.
 9         Q.    So what did you tell Darrin after he told
10   you this?
11         A.    I don't remember what I told Darrin, but I
12   do remember discussing with Mattos that I wanted it
13   looked into.
14         Q.    Did this concern you?
15         A.    Absolutely.
16         Q.    Did you take some notes of that meeting with
17   you and Darrin?
18         A.    No.
19         Q.    Was Mattos at the meeting you had with
20   Darrin where Darrin told you that Soumas was late?
21         A.    I don't remember if Mattos was in the room
22   or not.
23         Q.    By the way, did Murphey tell you that Soumas
24   was late on a public records request?
25         A.    I think so.
```

1    Mattos, did he tell you if he had had any meetings with

2    Edmondson or Robertson about it?

3           A.    I don't remember that.

4           Q.    Did he tell you whether or not he had spoken

5    to Robertson or Edmondson to ask them if they had a

6    recommendation as to what should happen to Soumas?

7           A.    I don't remember if he asked them for that,

8    if he explained that.

9           Q.    And if that did happen, you were never

10   notified of it?

11          A.    No.

12          Q.    And you were -- before you made your

13   decision -- let me ask you this.  Did you make a final

14   decision as to what should happen to Soumas?

15          A.    I did.

16          Q.    Before you made that decision, had you

17   visited with Robertson about the results of the public

18   records investigation?

19          A.    I don't believe I did, not with Robertson.

20          Q.    Did you visit with Edmondson?

21          A.    I may have visited with her to clarify some

22   things that I did not understand in the investigation.

23          Q.    Okay.  What did you do to review the

24   investigation?

25          A.    I read it cover to cover.

1         Q.    And again, I can show you -- you know, I

2    mean, before I pull out a very large exhibit that is the

3    investigation report and attachments that Edmondson did

4    in this case, do you know if you got any type of

5    separate files or additional files or records from

6    Edmondson other than what was in her investigative

7    report?

8         A.    I don't believe so.

9         Q.    Okay.  And I think you told me that you did

10   not review any of Soumas' actual performance

11   evaluations?

12        A.    That's correct.

13        Q.    After you reviewed the investigation cover

14   to cover, as you say, what was it that made you feel the

15   investigation should be sustained?

16        A.    Well, I guess -- the investigation

17   sustained?

18        Q.    Yeah.

19        A.    I didn't see anything in there that would

20   lead me otherwise, lead me to believe otherwise.

21        Q.    Well, do you think that when an

22   investigation is done on a 30-year career officer, that

23   it should be thorough?

24             MR. STROMBERG:  Objection.  Vague.

25   Argumentative.  You can answer.

```
1              THE WITNESS:  Yes.

2    BY MR. BECK:

3         Q.    And accurate?

4         A.    Yes.

5         Q.    And complete?

6         A.    Yes.

7         Q.    And do you think it should be fair?

8         A.    Yes.

9         Q.    And I think you told us earlier that you

10   didn't feel that Soumas should get -- he shouldn't be

11   entitled to use the discipline procedures that are

12   contained in the manual at the time the investigation

13   was being conducted?

14        A.    He was an at-will employee.

15        Q.    Right.  So your position is because he was

16   an at-will employee, he wasn't entitled to those

17   procedures?

18        A.    Right.

19        Q.    And I think you told me your understanding

20   of that based entirely on what Darrin Murphey and HR

21   told you about at-will employees?

22        A.    Yes.

23        Q.    Are you aware at any time in the history of

24   the department where a career officer had been

25   investigated for allegedly not completing a public
```

1    records request on time?

2        A.    No.

3        Q.    As part of your thorough review of the

4    investigation, did you go down to records and take a

5    look at the public records log?

6        A.    I did not.  There was a copy inside the

7    report.

8        Q.    Well, there was a one-page copy?

9        A.    Correct.

10       Q.    That showed half a screen.  I'm talking

11   about did you look at it say, for instance, even for the

12   last five years?

13       A.    No.

14       Q.    Is that something you could have done?

15       A.    Could have, yes.

16       Q.    If you had done that and found that numerous

17   employees were late on public records requests, would

18   that change your mind as to -- assuming you thought

19   Soumas was late, would that change your mind as to

20   whether Soumas should be terminated?

21             MR. STROMBERG:  Objection.  Speculation.

22   Ambiguous.  You can answer.

23             THE WITNESS:  It may have been a factor, may

24   have been a weight I would have considered.

25   BY MR. BECK:

1    Q.   Is the reason that you didn't look at it

2 because you just didn't think about it?

3    A.   I saw no reason for it.

4    Q.   Okay.  Even though all you saw in her report

5 was half of a screen from the public records log?

6    A.   Correct.

7    Q.   Which dealt only with the Soumas matter?

8    A.   That was the matter at hand, yes.

9    Q.   Yeah.  But it would be important to know --

10 wouldn't it be important to know, when deciding what to

11 do with the employee, as to how many times employees

12 were late on public records requests at the department?

13         MR. STROMBERG:  Objection.  Argumentative.

14 Speculative.  You can answer.

15 BY MR. BECK:

16    Q.   It's up to you, as to what's important to

17 you.

18    A.   I didn't believe it was important at the

19 time.

20    Q.   Okay.  So if many, many, many employees were

21 late on responding to public records requests and

22 weren't punished, and Soumas was to be fired, that

23 wouldn't concern you?

24    A.   It might, if that was the only reason he was

25 fired.

```
 1          Q.    Okay.  What else did you do to review the
 2    public records -- or I'm sorry, the investigation?
 3          A.    I read the entire thing.  A couple of times.
 4    I don't know what else --
 5          Q.    Did you talk to anyone?
 6          A.    Yes, I did.
 7          Q.    Who did you talk to?
 8          A.    I talked to Pierce Clegg.
 9          Q.    Who?
10          A.    Pierce Clegg.
11          Q.    As part of your review of the investigation?
12          A.    As part of my -- yes.
13          Q.    Okay.  Well, explain to me how that would
14    happen.
15          A.    Pierce is a former Sheriff and was a mentor
16    of mine, and I asked if I could meet with him.  I was
17    looking for some outside input, just on the whole matter
18    at hand.  And I value his input, and I knew I could do
19    it confidentially.
20          Q.    And you what?
21          A.    I could do it confidentially with Pierce.
22          Q.    Okay.  So what do you recall asking him?
23          A.    I said, "Here's the problem.  This is this
24    incident.  This is what the investigation concluded.
25    And, you know, here's all the other issues of failure to
```

1    take care of his administrative duties."  And I said,

2    "I'm just looking for input.  What do you think?  What

3    do you think I should do?"  And he said, "I think you

4    gotta get rid of him."

5          Q.    Did you go over the entire investigation

6    with him?

7          A.    Briefly.

8          Q.    Has he read the investigation?

9          A.    No.

10         Q.    Were you asking him to consult on that in

11   any way, on the investigation?

12         A.    No.

13         Q.    Okay.  So I just want to make sure I

14   understand what Pierce's role was.  Was he given a copy

15   of the investigation to review and make notes on?

16         A.    No.

17         Q.    And analyze?

18         A.    No.  I explained to him a synopsis of it.

19         Q.    Okay.  So you told him what the

20   investigative report told you?

21         A.    Yes.

22         Q.    Okay.  Where did you talk to him?

23         A.    We had breakfast at the Owl Cafe.

24         Q.    Okay.  And did you make any notes of that

25   meeting?

1          A.      No.

2          Q.      How long do you think that meeting was?  Or

3     was it just breakfast?

4          A.      About an hour, hour and a half.

5          Q.      Okay.  Did you talk to anyone else?

6          A.      Yes.

7          Q.      Who did you talk to?

8          A.      Ozzie Knezovich.

9          Q.      Who?

10         A.      Ozzie Knezovich.

11         Q.      That sounds familiar.

12         A.      He's the Sheriff in Spokane County.

13         Q.      Yeah.  Ozzie.  Okay.  And when did you do

14    that?

15         A.      That same time frame, probably in that same

16    week.

17         Q.      Okay.  And how long after you got the

18    investigation did you make the decision to terminate

19    Soumas?

20         A.      Oh, it was probably a week or so.

21         Q.      Okay.  And do you know if, at any point in

22    time from the time the investigation was complete until

23    the time you called Soumas into your office, if he had

24    been provided with a copy of the investigation?

25         A.      I don't know.

1    Argumentative.  You can answer.

2    BY MR. BECK:

3         Q.    You can answer.

4         A.    I think I'd say that that probably wasn't

5    fair.  That's why he got a copy that day and he had the

6    opportunity to appeal it.

7         Q.    Oh, he did?

8         A.    Yes.

9         Q.    He got an opportunity to appeal the --

10        A.    He had a name-clearing -- opportunity for

11   name-clearing hearing.

12        Q.    Well, a name-clearing hearing is designed --

13   assuming a name-clearing hearing applied in this

14   instance, it's designed for people who believe they have

15   been slandered or discriminated against.  Is that right?

16        A.    I believe that's correct.

17        Q.    Do you know any other reason for which

18   someone can have a name-clearing hearing?

19        A.    No, I'm not aware.

20        Q.    So if none of those things happened, he

21   wouldn't have had a right to appeal it, would he?

22        A.    No.

23        Q.    And you didn't offer him a right to appeal

24   it, did you?

25        A.    No.  I offered him a right to his