# EXHIBIT

# D

# COVER LETTER 1.449

EXHIBIT

Edmondson

3-21-19



# SHERIFF
# KOOTENAI COUNTY



SHERIFF BEN WOLFINGER                                    UNDERSHERIFF DAN MATTOS

TO:            Sheriff Ben Wolfinger

FROM:          Major Kim Edmondson

DATE:          September 20, 2017

RE:            Administrative Personnel Investigation – Dan Soumas

On August 28, 2017, I was tasked with conducting an investigation regarding a Public Records Request (PRR) which Captain Dan Soumas was provided with on August 4, 2017. The reason for the investigation was to determine the delay in providing a timely response to the requestor as a response had not yet been provided on the assignment date (August 28, 2017). Kathy Griesmyer, Policy Director of the ACLU of Idaho, is the requesting party for records relating to:

1. All documents describing any processes for accounting for all seized property and money in your jurisdiction from 2014-2016.
2. All documents that account for the retention and disposition of all seized property and money in your jurisdiction from 2014-2016.
3. All documents that indicate how many civil asset forfeiture actions were commenced in your jurisdiction from 2014-2016. Please indicate for each of the following categories how many of these were (a) granted; (b) denied; (c) defaulted; (d) settled or (e) resolved in some other manner.
4. All documents that detail all items seized in civil asset forfeiture actions in your jurisdiction from 2014-2016, including:
    a. Documents that detail the total monetary value of the items as well as whether the item was ultimately returned to its original owner or forfeited.
    b. Any documents that indicate whether criminal charges were brought in connection with the seizure and the case numbers of all related cases.
5. All documents that indicate how much funding your office has received for each year from 2014-2016 as a result of civil asset forfeiture, and where money from seized items is allocated.
6. If your jurisdiction participates in the Equitable Sharing Program, please provide any documentation of agreements relevant to the program.

This investigation will follow a timeline established mainly through email conversations. All emails are attached in this document for reference and a general timeline is included. Telephone conversations and interviews were recorded and are included on the attached CD. Interviews with Soumas were professionally transcribed and are included here as well.

5500 N. Government Way • P.O. Box 9000 • Coeur d'Alene, Idaho 83816-9000
Sheriff Phone: 208-446-1300 • Fax: 208-446-1307 • Jail Phone: 208-446-1400 • Fax: 208-446-1407
Website: www.kcsheriff.com • E-mail: kcso@kcgov.us

1.449

Exhibit D Page 2 of 175

# TABLE OF CONTENTS 1.450

**COVER LETTER**                                                  Page 1

**BACKGROUND**                                                   Page 2

**EMAILS**                                                       Page 3 – Page 6

**INTERVIEWS**
    Kathy Griesmyer                          Page 7
    Dan Soumas (1st Interview)               Page 7 - 12
    Dan Soumas (2nd Interview)               Page 12 - 15
    Joyce Cox                                Page 15
    Darrin Murphey                           Page 15 - 16

**SUPPORTING DOCUMENTS**
    Email Comments                           Page 17
    Calendar                                 Page 18
    Comp Tracker                             Page 18

**PERSONNEL FILE REVIEW**
    Evaluation Review                        Page 19 – Page 22
    Past Related Discipline – Entered in Personnel File    Page 23
    Past Related Discipline – Entered in Spillman File     Page 24

**CONCLUSION**                                                   Page 25

**PUBLIC RECORDS RELEASE**
    Initial Request from ACLU
    Public Records Request Delayed Response

**FINAL PRR RESPONSE**
    Final Records (including attachments) Sent to ACLU

**OTHER INFORMATION**
    Transcribed Interviews with Dan Soumas
    CD Recording of Interviews

**TIMELINE**

1.450

# BACKGROUND 1.451

**BACKGROUND**

Initially, Kathy Griesmyer, Policy Director of the ACLU of Idaho, submitted a form letter, dated August 3, 2017, requesting the previously noted information. The request was received in the Records Section on August 4, 2017. That day, the PRR was processed by Records Assistant Supervisor Joyce Cox and provided to Soumas for a delayed response. The delayed response provided for a 10-day extension in providing the information to the requestor. A deadline of August 18, 2017 was established by the delayed response.

Following a number of emails with Griesmyer, Civil Deputy Prosecuting Attorney Darrin Murphey, and a few others, Soumas produced a final document to Griesmyer on August 30, 2017 – twelve days beyond the deadline. The emails associated with this PRR are outlined below, and provide a history of how the PRR was processed by Soumas as well as Soumas' thought process in responding to the PRR.

1.451

# EMAILS

## EMAILS

Kathy Griesmyer's initial form letter was received by Records Assistant Supervisor Joyce Cox on August 4th and Cox immediately processed the PRR, logging it into an established spreadsheet for these types of requests. Upon logging the PRR, Cox forwarded it to both Soumas and Civil Deputy Prosecuting Attorney Darrin Murphey. Cox then completed a Kootenai County Sheriff's Office Public Records Request Form to attach to the letter for appropriate processing and in order to provide a response to Griesmyer. This process is supported through the email sent to me by Cox on August 28, 2017, and also by the email which Cox sent to Soumas and Murphey on August 4, 2017.

In a brief conversation with Cox, I learned she recognized that the amount of information requested in the PRR would take additional time to gather, so she selected the box on the form indicating that KCSO's response would be delayed. The 'Response Delayed' option selected indicates "Additional time is necessary to locate or retrieve the requested record. You should receive a response no later than ten (10) working days following the date of your request." This response was emailed to Griesmyer on August 4, 2017. By having selected the "Response Delayed" option, the deadline established at this point was August 18, 2017.

On August 4, 2017, Cox received an email response from Soumas indicating that he "can't possibly comply with this within the statutory time..." and requesting to know how much time he had to complete the request. Soumas copied Murphey on this email as well.

On August 4, 2017, Soumas forwarded the PRR to Civil Deputy Prosecuting Attorney David Ferguson as Soumas was unaware of Murphey's work schedule. Also on August 4, 2017, Ferguson responded to Soumas advising him that he had forwarded the PRR to Prosecuting Attorney Barry McHugh "as some of those records will likely be in our office." In his email, Ferguson suggested Soumas retrieve all of the records at the Sheriff's Office that comply with the request and offered to review them prior to release to determine if they were exempt from release.

On August 9, 2014, Cox received an email from Griesmyer acknowledging her receipt of the Kootenai County Sheriff's Office Public Records Request Form. Griesmyer indicated she would "look forward to reviewing Kootenai County's documents soon."

On August 10, 2017, Soumas emailed his supervisor, Operations Bureau Commander, Major Neal Robertson. This email is the first in which Robertson was made aware of the PRR. In the email Soumas discusses how long the request will take to complete. Robertson responds to this email on August 10, 2017, and tells Soumas to "call me in the morning and we can figure this out."

Also on August 10, 2017, Murphey returns to the office and responds to Soumas' original email from August 4, 2017. Murphey's response is to both Soumas and Cox. Murphey clearly advises Soumas that the "request must be responded to within 10 days of the request." He goes on to provide language for Soumas to use in order to require advanced payment for the staff time it will consume to produce the information requested.

3

On August 11, 2017, Soumas emails Griesmyer presumably following a telephone conversation. In his email to her, he summarizes their conversation regarding the "significant amount of research and time to produce" the information she requested.  Soumas acknowledges that Griesmyer has agreed to provide additional information to assist in getting the information she wants.  Soumas writes, "Once you clarify your request we will notify you of any anticipated costs and the time frame to produce the requested information." Soumas copied Records Supervisor Linda Mattos and Murphey in this email.  At this point, the established deadline is still understood to be August 18, 2017.  There is no mention of any verbal agreement for a delay.

Griesmyer follows up Soumas' email on August 11, 2017, and provides clarification on the type of information she is interested in collecting.  Following that email, Griesmyer sends an addendum asking if she still needs to send a separate request to the Prosecutor's Office. Neither email from Griesmyer discusses a delay in providing the information.  In both emails, Griesmyer copies Murphey and L. Mattos.

On August 11, 2017, Soumas provides a response to Griesmyer's emails of the same date.  He advised that the PA's office does have a copy of the request and that Soumas will provide more detail on how they (PA's office) will want to handle their response.  Soumas copied Murphey on this response to Griesmyer.  Griesmyer provides a brief response to indicate receipt of Soumas' email and copies Murphey as well.  Her response does not include any mention of a verbal agreement for a delay to produce records.

On August 14, 2017, Soumas sends an email to staff to advise he is out of town from 2:09 PM on August 14 through the evening on August 15, 2017.

On August 22, 2017, Soumas sends an email to staff to advise he is out of town from 11:36 AM on August 22 through the evening on August 23, 2017.

On August 25, 2017, Griesmyer sends the following email to Soumas:

> Dan,
>
> I hope this email finds you well.
>
> I wanted to follow up in regards to the public records request regarding civil asset forfeiture.  I haven't received any information from Kootenai County yet, so I wanted to check-in and see if there is any clarification needed with regards to our request?  When can I expect your response?
>
> I look forward to receiving Kootenai County's information soon.

On August 25, 2017, Soumas responds to Griesmyer from his iPhone and advises that he is "communicating with the Prosecutors (sic) Office for our State cases…" and that he is the "sole source at KCSO" for collecting this data.  Soumas goes on to say that he is "also trying to fit in a long planned staycation with my family and two year old grandson."  Soumas signs off with, "Will have more for you next week."

4

Soumas forwards the email chain between himself and Griesmyer to Murphey on August 25, 2017, and asks Murphey if they could get together next week to talk about this PRR. He indicates he is going to need to get info from other offices. Murphey responds to Soumas on the same day and advises Soumas should "hand this off to someone at the Sheriff's Office ASAP so that the records are produced today, or Monday at the latest." Murphey goes on to remind Soumas of an earlier discussion addressing the timeliness of a response to PRRs.

On the same date, Soumas responds to Murphey with the following email:

> The problem is no one else seems to have the info or knows how to find it. The last clerk left our employ. Can you contact Kathy and get her to agree to the extension? I'm not even at work right now. Let me know if I need to call her.

Murphey responds on the same date with two emails to Soumas following this email. In the first email, Murphey asks how long of an extension is needed and if Soumas is going to require advanced payment (which was suggested by Murphey in an earlier email on August 10, 2017). In the second email, Murphey includes a header which reads, "ATTORNEY CLIENT PRIVILEGE – NOT A PUBLIC RECORD." Murphey's response aptly addresses the liability to the Sheriff by not responding in a timely manner to a PRR and Murphey's obligation to report the potential liability regarding this situation to the Sheriff.

Also on August 25, 2017, Griesmyer responds to Soumas' iPhone email that his response was satisfactory. She indicates she will be out of the office until September 7th and writes, "Do you think I could expect to have Kootenai County's response to me by then?" to which, Soumas responds "Yes from KCSO and I will do what I can with KCPAO and advise." Soumas copies Murphey on this response. On August 28, 2017, Griesmyer responds to Soumas (and copies Murphey) that this is acceptable.

On August 26, 2017, Soumas responds with a lengthy email to Murphey. In his email (which also includes a privacy header), Soumas explains his frustration with a number of issues he has experienced while trying to gather the information requested in the PRR. In this email Soumas indicates that, in coordination with Murphey, Soumas contacted the ACLU and "they delayed a records request to your office because we left them with the impression that your office was going to either coordinate with our response or I was going to let them know to file a separate request. I still have not received an answer on that issue." In the email, Soumas continued to vent his frustration with Murphey's office and closes with a request for a final answer on whether Murphey's office is going to coordinate with Soumas, or if he should just provide what information he can.

On August 28, 2017, Soumas emailed Murphey his response to the ACLU for Murphey's review and copied Robertson. Soumas attached a memorandum addressed to Kathy Griesmyer, Policy Director, ACLU of Idaho (see sub-tab 'FINAL PRR RESPONSE'). Soumas references to Murphey the email he copied him on where Griesmyer indicated she was out of the office until September 7th and "was ok with us continuing to work on the request." In the final paragraph of his memorandum, Soumas writes, "I appreciate your working with me on this request and the extensions you have granted."

Upon his receipt of this email, Murphey responded to Soumas with an email in which Murphey also copied Robertson and Ferguson.   Murphey indicates that he and Ferguson are not the custodians of the records and that Soumas needs to contact McHugh to coordinate or obtain records.   Murphey's email states he has previously informed Soumas of this information. Murphey again addresses the 10 days given to respond to the PRR and that this response was untimely.

# Kimberly Edmondson

| From: | Joyce M. Cox |
|---|---|
| Sent: | Monday, August 28, 2017 5:42 PM |
| To: | Kimberly Edmondson |
| Cc: | Linda Mattos |
| Subject: | RE: Request Info |
| Attachments: | aclu rec req.pdf; FW: Public Records Request  Asset Forfeiture Dated August 3, 2017 |

Major Edmondson,

Attached is the records request and the emails I sent to Kathy @ ACLU, as well as the emails I sent to Capt. Soumas and Darrin in Legal. I've also attached a copy of an email from Capt. Soumas copied to Linda. Below is a copy of the records request log.

I had a conversation with Capt. Soumas on not being able to complete the request in 10 days. I suggested he call and talk with Kathy and maybe something could be arranged. He apparently called and discussed the request, he stated she understood the length of time it would take to complete the request.

| # | BUSINESS/NAME | RECEIVED DATE | RESPONSE DATE | CODE | ITEM |
|---|---|---|---|---|---|
| | ACLU/KATHY GRIESMYER | | | | |
| 46 | LEXIS NEXIS | 8/1/2017 | 8/1/2017 | C | 17-27747 |
| 47 | UNITED STATES OFF OF PERSON MGMT | 8/1/2017 | 8/2/2017 | COMPLETE | BACKGROUND/MARK SCHELL |
| 48 | METROPOLITAN REPORTING BUREAU | 8/1/2017 | 8/2/2017 | COMPLETE | 17-263776 |
| 49 | LEXIS NEXIS | 8/1/2017 | | | 17-25561 |
| 50 | LEXIS NEXIS | 8/2/2017 | 8/2/2017 | COMPLETE | 17-28563 |
| 51 | KCPA/JERI MURINKO | 8/2/2017 | | | 17-14736 |
| 52 | KOOTENAI HEALTH/JEANNE VOGEL | 8/2/2017 | 8/10/2017 | C | TOVAH LAFFLON |
| 53 | FBI/VALERIE ENGLEMAN | 8/2/2017 | 8/17/2017 | C | SAMUEL RICK DUTTON |
| 54 | GENESS CO FRIEND OF CRT/REBECCA LOOK | 8/2/2017 | 8/9/2017 | UNABLE | CHRISTOPHER SMOLINSKI |
| 55 | AREA AGENCY ON AGING/KELLY HOPKINS | 8/2/2017 | | PENDING | ADULT PROTECTION CASES |
| 56 | IDOC/DANIEL CHURCH | 8/2/2017 | 8/2/2017 | C | BOOKING PHOTO/COLIN CHURCH |
| 57 | BONNIE REMMGTON | 8/2/2017 | 8/25/2017 | U | CHARLES CUNNINGHAM BOBBI DELGADO REPO |
| 58 | BONNIE REMMGTON | 8/2/2017 | 8/18/2017 | PD | 17-29814 |
| 59 | BONNIE REMMGTON | 8/2/2017 | 8/18/2017 | PD | 17-29900 |
| 60 | JD REDAL/RHONDA | 8/2/2017 | 8/18/2017 | C | BOOKING PHOTO/JUDSON WESLEY GORTON |
| 61 | RANDY NELSON | 8/2/2017 | 8/25/2017 | C | 17-30496 |
| 62 | JD REDAL/RHONDA | 8/2/2017 | 8/9/2017 | C | BOOKING PHOTO/RANNER G WALDE |
| 63 | STATE OF WA DSHS/CAROL MOGLIOLO | 8/3/2017 | 8/3/2017 | UNABLE | NATHAN DANIEL MCLAY |
| 64 | MICHAEL P BARNUM | 8/3/2017 | | | 17-30488 |
| 65 | BRENDA BLOOD | 8/3/2017 | 8/9/2017 | PD | 17-21900 |
| 66 | KCPA/THERESA PALMER | 8/3/2017 | 8/3/2017 | UNABLE | KC167320 |
| 67 | MADSEN LAW OFFICE/ANGEL CHRISTIAN | 8/3/2017 | 8/3/2017 | UNABLE | DASH CAM KS 1 14C 55762 |
| 68 | KCSO EVIDENCE/STINEBAUGH | 8/3/2017 | 8/9/2017 | COMPLETE | 07-07365 |
| 69 | KCPA/SUE WHITELSITTY | 8/3/2017 | 8/4/2017 | C | SCREENING SHT 17/17-23018/SHANNON BLENN |
| 70 | CALLAHAN & ASSOC/PAMELA MASSEY | 8/3/2017 | | | D.VANDERGRIEND, C.VANDERGRIEND, J.VANDE |
| 71 | KCSO EVIDENCE/SAILOR | 8/3/2017 | 8/3/2017 | C | 17-30224 |
| 72 | KCSO EVIDENCE/SAILOR | 8/3/2017 | 8/3/2017 | C | 17-30507 |
| 73 | CITY OF TEMPE PD/D.HUTCHENS | 8/3/2017 | 8/4/2017 | COMPLETE | BACKGROUND/CURTIS LEE WOOD |
| 74 | MARY SPRAY | 8/3/2017 | | | AUSTIN WISEMAN TRAIN ACCIDENT |
| 75 | STATE OF WA DSHS/CAROL MOGLIOLO | 8/3/2017 | 8/3/2017 | UNABLE | JUDGEMENT & SENTENCE ON NATHAN DANIEL |
| 76 | IDOC/KIM READER | 8/3/2017 | 8/3/2017 | C | INCARCERATION DATES/ERICA LYNN MORRIS |
| 77 | KCPA/JERI MURINKO | 8/3/2017 | 8/3/2017 | C | DEP GIFFORD POST CERTIFICATION |
| 78 | DAN BAKER | 8/3/2017 | 8/3/2017 | C | CV16-702/CV16-5012 |
| 79 | PEDDIE ROOFING/MIKE PODCHYNOK | 8/3/2017 | 8/3/2017 | C | INCARCERATION DATES/SEAN GAINES |
| 80 | KOOTENAI COUNTY PROSECUTOR | 8/3/2017 | 8/4/2017 | C | LIFE LOC 68-01330 / 68-01332N |
| 81 | COA CITY ATTORNEY | 8/4/2017 | 8/4/2017 | C | LIFE LOC 68-01330 / 68-01332N |
| 82 | POST FALLS PROSECUTOR | 8/4/2017 | 8/4/2017 | C | SEIZED AND FORFEITURE |

Joyce Cox
Asst Supervisor
KCSO Records Section
208-446-1313

---

**From:** Kimberly Edmondson
**Sent:** Monday, August 28, 2017 12:10 PM
**To:** Joyce M. Cox
**Cc:** Linda Mattos
**Subject:** Request Info

Hi Joyce,

Exhibit D Page 12 of 175

Can you please send me a copy of the log that would show when you received a public records request from the ACLU which was addressed to the Sheriff and dated August 3, 2017. I show that you emailed it to Dan Soumas on August 4, 2017. I require the log info to document when and how we received it.

Thanks,

Kim



**Major Kim Edmondson**
**Jail Bureau Commander**
**Kootenai County Sheriff's Office**
**(208)446-1401   Fax (208)446-1405**
**E-mail: kedmondson@kcgov.us**

*CONFIDENTIALITY NOTICE: This e-mail is intended only for the personal and confidential use of the individual(s) named as recipients (or the employee or agent responsible to deliver it to the intended recipient) and is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It may contain information that is privileged, confidential and/or protected from disclosure under applicable law including, but not limited to, the attorney client privilege and/or work product doctrine. If you are not the intended recipient of this transmission, please notify the sender immediately by telephone. Do not deliver, distribute or copy this transmission, disclose its contents or take any action in reliance on the information it contains.*

Exhibit D Page 13 of 175

**Joyce M. Cox**

| | |
|---|---|
| **From:** | Joyce M. Cox |
| **Sent:** | Friday, August 04, 2017 11:22 AM |
| **To:** | Darrin Murphey; Daniel Soumas |
| **Attachments:** | Kootenai request.pdf |
| | |
| **Categories:** | Linda, Holding |

Forwarding this to you for your review and action. It has been logged in Records.

Joyce Cox
Asst Supervisor
KCSO Records Section
208·446·1313

1

**Joyce M. Cox**

| | |
|---|---|
| **From:** | Joyce M. Cox |
| **Sent:** | Friday, August 04, 2017 1:10 PM |
| **To:** | 'kgriesmyer@acluidaho.org' |
| **Subject:** | RECORDS REQUEST |
| **Attachments:** | PublicRecordsRequestForm revised 6.2.16.pdf; Kootenai request.pdf |

1

**From:** Daniel Soumas
**Sent:** Friday, August 04, 2017 12:55 PM
**To:** Joyce M. Cox <jmcox@kcgov.us>; Darrin Murphey <dmurphey@kcgov.us>
**Subject:** RE:

Ioyce:

First of all we can't possibly comply with this within the statutory time.  I let Darrin weigh in on the rest.  How much time do we have on this?

Dan S.

**From:** Joyce M. Cox
**Sent:** Friday, August 04, 2017 11:22 AM
**To:** Darrin Murphey; Daniel Soumas
**Subject:**

1

**From:** Daniel Soumas
**Sent:** Friday, August 04, 2017 1:04 PM
**To:** David Ferguson <dferguson@kcgov.us>
**Subject:** FW:

David:

I'm copying you on this since I'm unclear if Darrin is coming back anytime soon.

Dan

**From:** Joyce M. Cox
**Sent:** Friday, August 04, 2017 11:22 AM
**To:** Darrin Murphey; Daniel Soumas
**Subject:**

Forwarding this to you for your review and action. It has been logged in Records.

Joyce Cox
Asst Supervisor
KCSO Records Section
208-446-1313

2

**Kimberly Edmondson**

| | |
|---|---|
| **From:** | David Ferguson |
| **Sent:** | Monday, August 28, 2017 11:02 AM |
| **To:** | Darrin Murphey |
| **Subject:** | FW: |

Yours Truly,
/s
R. David Ferguson, II
Civil Deputy Prosecuting Attorney
Office of the Kootenai County Prosecuting Attorney
Barry McHugh, Prosecutor
451 Government Way
P.O. Box 9000
Coeur d'Alene, ID 83816-9000
(208) 446-1623
(208) 446-1621 (fax)

THE INFORMATION CONTAINED IN THIS ELECTRONIC MESSAGE IS INTENDED FOR USE ONLY BY THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY BE AN ATTORNEY-CLIENT COMMUNICATION AND, AS SUCH, IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THE MESSAGE IS NOT THE INTENDED RECIPIENT OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY BY E-MAIL OR TELEPHONE AND DELETE THE ORIGINAL MESSAGE. THANK YOU.

**From:** David Ferguson
**Sent:** Friday, August 04, 2017 3:42 PM
**To:** Daniel Soumas <dsoumas@kcgov.us>
**Subject:** RE:

Dan,

I forwarded this onto Barry McHugh, as some of those records will likely be in our office. I suggest working on retrieving any records at the Sheriff's Office which comply with the request. I can review any records before producing them to determine if they are exempt.

Yours Truly,
/s
R. David Ferguson, II
Civil Deputy Prosecuting Attorney
Office of the Kootenai County Prosecuting Attorney
Barry McHugh, Prosecutor
451 Government Way
P.O. Box 9000
Coeur d'Alene, ID 83816-9000
(208) 446-1623
(208) 446-1621 (fax)

THE INFORMATION CONTAINED IN THIS ELECTRONIC MESSAGE IS INTENDED FOR USE ONLY BY THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY BE AN ATTORNEY-CLIENT COMMUNICATION AND, AS SUCH, IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THE MESSAGE IS NOT THE INTENDED

*Darrin D. Soum*

## Joyce M. Cox

From:         Kathy Griesmyer [kgriesmyer@acluidaho.org]
Sent:         Wednesday, August 09, 2017 11:47 AM
To:           Joyce M. Cox
Subject:      RE: RECORDS REQUEST

Joyce –

Thank you for your response. We look forward to reviewing Kootenai County's documents soon.

Kathy Griesmyer
Policy Director
ACLU of Idaho & ACLU of Idaho Foundation
P.O. Box 1897, Boise, ID 83701
208-344-9750 x1204 Ph | 208-890-3800 Cell | 208-344-7201 Fax |
kgriesmyer@acluidaho.org
www.acluidaho.org | *"Because Freedom Can't Protect Itself"*

Would you donate $15 a month to protect freedom?

From: Joyce M. Cox [mailto:jmcox@kcgov.us]
Sent: Friday, August 04, 2017 2:10 PM
To: Kathy Griesmyer
Subject: RECORDS REQUEST

1

Exhibit D Page 19 of 175

**Kimberly Edmondson**

| | |
|---|---|
| **Subject:** | FW: |
| **Attachments:** | Kootenai request.pdf |

**From:** Daniel Soumas
**Sent:** Thursday, August 10, 2017 7:54 AM
**To:** Neal Robertson
**Subject:** FW:

Neal:

I am unclear if this request that was addressed to the Sheriff was actually forwarded by Records through the chain of command. I have been in contact with David Ferguson on this. I also notified Joyce in records that this would take quite some time and to notify the ACLU of same.

Dan S.

**From:** Joyce M. Cox
**Sent:** Friday, August 04, 2017 11:22 AM
**To:** Darrin Murphey; Daniel Soumas
**Subject:**

Forwarding this to you for your review and action. It has been logged in Records.

joyce Cox
Asst Supervisor
KCSO Records Section
208-446-1313

1

**Kimberly Edmondson**

| | |
|---|---|
| **From:** | Darrin Murphey |
| **Sent:** | Thursday, August 10, 2017 3:35 PM |
| **To:** | Daniel Soumas; Joyce M. Cox |
| **Cc:** | David Ferguson |
| **Subject:** | RE: |
| **Attachments:** | Kootenai request.pdf |

Dan and Joyce:

I just returned from vacation. Based on the request, it does not appear that any of the records responsive to the request will be exempt. It does appear that it may be easier for you to provide the information requested rather than the documents containing the information. It is up to you as to whether you wish to create a document to respond, as you have no statutory obligation to do so.

You will need to inform the ACLU that it will take more than 3 days to respond to the request. The request must be responded to within 10 days of the request. However, it appears from your email below that it will take more than 2 hours for you to respond to the request. If that is the case, here is a suggested letter to the ACLU.

> The Kootenai County Sheriff's Office is in receipt of your public records request, dated August 3, 2017. It is anticipate that it will take _____ hours of staff time to respond to your request. As such, pursuant to Idaho Code section 74-102(12), advance payment in the amount of $____ is required to process your request. If the actual cost is less than that amount, you will be refunded the difference. If the actual cost is more than that amount, you will be required to pay the difference prior to obtaining the records. The Sheriff's Office will begin processing your request upon receipt of the advance payment described above. Please remit the advance payment to _____.

> Please feel free to contact me if you have any questions.

To determine the amount of the advance payment, you will need to request from the Auditor's office, the loaded wage of the lowest paid staff member able to process the request, and multiply that amount times the estimated time to respond, less the first two hours. Let me know if you have any questions.

Darrin

**From:** Daniel Soumas
**Sent:** Friday, August 04, 2017 12:55 PM
**To:** Joyce M. Cox <jmcox@kcgov.us>; Darrin Murphey <dmurphey@kcgov.us>
**Subject:** RE:

Joyce:

First of all we can't possibly comply with this within the statutory time. I let Darrin weigh in on the rest. How much time do we have on this?

Dan S.

**From:** Joyce M. Cox
**Sent:** Friday, August 04, 2017 11:22 AM
**To:** Darrin Murphey; Daniel Soumas
**Subject:**

1

Exhibit D Page 21 of 175

**Kimberly Edmondson**

| | |
|---|---|
| **From:** | Daniel Soumas |
| **Sent:** | Friday, August 11, 2017 12:52 PM |
| **To:** | 'kgriesmyer@acluidaho.org' |
| **Cc:** | Linda Mattos; Darrin Murphey |
| **Subject:** | Public Records Request  Asset Forfeiture Dated August 3, 2017 |

Kathy,

Thank you for taking the time to discuss this request.  In summarizing our conversation, your request as written encompasses a significant amount of research and time to produce these records.  As we work with our local prosecuting attorney on the state side, participate in the Asset Forfeiture Program federally as well as having two separate programs for KCSO and the North Idaho Violent Crimes Task Force I appreciate your offer to send additional explanation to assist us in getting you the information you want.

I will look forward to your email in the very near future.  Once you clarify your request we will notify you of any anticipated costs and the time frame to produce the requested information.  Please contact me at any time with any additional concerns or clarification.

Captain Dan Soumas
KCSO Detective Commander
Direct: 208 446-1336
dsoumas@kcgov.us

1

Exhibit D Page 22 of 175

**Kimberly Edmondson**

| | |
|---|---|
| **From:** | Kathy Griesmyer [kgriesmyer@acluidaho.org] |
| **Sent:** | Friday, August 11, 2017 1:17 PM |
| **To:** | Daniel Soumas |
| **Cc:** | Linda Mattos; Darrin Murphey |
| **Subject:** | RE: Public Records Request  Asset Forfeiture Dated August 3, 2017 |

Dan –

Thanks for the phone call earlier today and subsequent email. Generally speaking, we're interested in collecting the following information:

- How many civil asset forfeitures were completed between 2014-2016
- What property was seized and ultimately forfeited under ID civil asset forfeiture law from 2014-2016
- If there's a criminal conviction connected to the forfeited property from 2014-2016
- What the approximate value of the forfeited property was from 2014-2016
- Where civil asset forfeiture income is allocated in the Kootenai County Sheriff's budget for 2014-2016
- Any relevant budgetary documents that indicates if the Kootenai County Sheriff's Department budgeted for future civil asset forfeiture income for 2014-2016

I'd also be interested in collecting information that outlines/describes Kootenai County's participation in the Federal Equitable Sharing Program and any income received through that program between 2014-2016. Related to items #1 and 2 from our initial request, I am interested in reviewing any documents that outline or guide Kootenai County's use of civil asset forfeiture – including how the county keeps track of seized property and/or money as well as how the county retains and/or disposes of forfeited property and/or money within its possession.

Does this clarification help? Happy to jump on the phone again if additional clarification is needed.

Have a great weekend!

Kathy Griesmyer
Policy Director
ACLU of Idaho & ACLU of Idaho Foundation
P.O. Box 1897, Boise, ID 83701
208-344-9750 x1204 Ph|208-890-3800 Cell | 208-344-7201 Fax |
kgriesmyer@acluidaho.org
www.acluidaho.org |*"Because Freedom Can't Protect Itself"*

Would you donate $15 a month to protect freedom?

---

**From:** Daniel Soumas [mailto:dsoumas@kcgov.us]
**Sent:** Friday, August 11, 2017 1:52 PM
**To:** Kathy Griesmyer
**Cc:** Linda Mattos; Darrin Murphey
**Subject:** Public Records Request Asset Forfeiture Dated August 3, 2017

Kathy,

Thank you for taking the time to discuss this request.  In summarizing our conversation, your request as written encompasses a significant amount of research and time to produce these records.  As we work with our local

1

**Kimberly Edmondson**

| | |
|---|---|
| **From:** | Kathy Griesmyer [kgriesmyer@acluidaho.org] |
| **Sent:** | Friday, August 11, 2017 1:20 PM |
| **To:** | Daniel Soumas |
| **Cc:** | Linda Mattos; Darrin Murphey |
| **Subject:** | RE: Public Records Request Asset Forfeiture Dated August 3, 2017 |

Dan –

Forgot to mention – if after reviewing the email below you still believe we should sent a separate request to the Kootenai County Prosecutor's Office for additional information the Sheriff's Office may not be able to provide, please let me know.

Thanks,

Kathy

---

**From:** Kathy Griesmyer
**Sent:** Friday, August 11, 2017 2:17 PM
**To:** 'Daniel Soumas'
**Cc:** Linda Mattos; Darrin Murphey
**Subject:** RE: Public Records Request Asset Forfeiture Dated August 3, 2017

Dan –

Thanks for the phone call earlier today and subsequent email. Generally speaking, we're interested in collecting the following information:

- How many civil asset forfeitures were completed between 2014-2016
- What property was seized and ultimately forfeited under ID civil asset forfeiture law from 2014-2016
- If there's a criminal conviction connected to the forfeited property from 2014-2016
- What the approximate value of the forfeited property was from 2014-2016
- Where civil asset forfeiture income is allocated in the Kootenai County Sheriff's budget for 2014-2016
- Any relevant budgetary documents that indicates if the Kootenai County Sheriff's Department budgeted for future civil asset forfeiture income for 2014-2016

I'd also be interested in collecting information that outlines/describes Kootenai County's participation in the Federal Equitable Sharing Program and any income received through that program between 2014-2016. Related to items #1 and 2 from our initial request, I am interested in reviewing any documents that outline or guide Kootenai County's use of civil asset forfeiture – including how the county keeps track of seized property and/or money as well as how the county retains and/or disposes of forfeited property and/or money within its possession.

Does this clarification help? Happy to jump on the phone again if additional clarification is needed.

Have a great weekend!

Kathy Griesmyer
Policy Director
ACLU of Idaho & ACLU of Idaho Foundation
P.O. Box 1897, Boise, ID 83701
208-344-9750 x1204 Ph|208-890-3800 Cell | 208-344-7201 Fax |

1

**Kimberly Edmondson**

| | |
|---|---|
| **From:** | Kathy Griesmyer [kgriesmyer@acluidaho.org] |
| **Sent:** | Friday, August 11, 2017 2:08 PM |
| **To:** | Daniel Soumas |
| **Cc:** | Darrin Murphey |
| **Subject:** | RE: Public Records Request  Asset Forfeiture Dated August 3, 2017 |

Works for me, thanks!

Kathy

**From:** Daniel Soumas [mailto:dsoumas@kcgov.us]
**Sent:** Friday, August 11, 2017 3:00 PM
**To:** Kathy Griesmyer
**Cc:** Darrin Murphey
**Subject:** RE: Public Records Request Asset Forfeiture Dated August 3, 2017

Kathy,

Prosecutor McHugh's Office has a copy of your request.  They are the holder of the records for all the state asset forfeitures proceedings.  However, before you send them the request let me clarify their preference on how they want to handle the current request IE: do they want to piggy back on our response or provide their own.  I am copying their office on this.

Thanks,
Dan Soumas

**From:** Kathy Griesmyer [mailto:kgriesmyer@acluidaho.org]
**Sent:** Friday, August 11, 2017 1:20 PM
**To:** Daniel Soumas
**Cc:** Linda Mattos; Darrin Murphey
**Subject:** RE: Public Records Request Asset Forfeiture Dated August 3, 2017

Dan –

Forgot to mention – if after reviewing the email below you still believe we should sent a separate request to the Kootenai County Prosecutor's Office for additional information the Sheriff's Office may not be able to provide, please let me know.

Thanks,

Kathy

**From:** Kathy Griesmyer
**Sent:** Friday, August 11, 2017 2:17 PM
**To:** 'Daniel Soumas'
**Cc:** Linda Mattos; Darrin Murphey
**Subject:** RE: Public Records Request Asset Forfeiture Dated August 3, 2017

Dan –

1

Exhibit D Page 25 of 175

Thanks for the phone call earlier today and subsequent email. Generally speaking, we're interested in collecting the following information:

- How many civil asset forfeitures were completed between 2014-2016
- What property was seized and ultimately forfeited under ID civil asset forfeiture law from 2014-2016
- If there's a criminal conviction connected to the forfeited property from 2014-2016
- What the approximate value of the forfeited property was from 2014-2016
- Where civil asset forfeiture income is allocated in the Kootenai County Sheriff's budget for 2014-2016
- Any relevant budgetary documents that indicates if the Kootenai County Sheriff's Department budgeted for future civil asset forfeiture income for 2014-2016

I'd also be interested in collecting information that outlines/describes Kootenai County's participation in the Federal Equitable Sharing Program and any income received through that program between 2014-2016. Related to items #1 and 2 from our initial request, I am interested in reviewing any documents that outline or guide Kootenai County's use of civil asset forfeiture -- including how the county keeps track of seized property and/or money as well as how the county retains and/or disposes of forfeited property and/or money within its possession.

Does this clarification help? Happy to jump on the phone again if additional clarification is needed.

Have a great weekend!

Kathy Griesmyer
Policy Director
ACLU of Idaho & ACLU of Idaho Foundation
P.O. Box 1897, Boise, ID 83701
208-344-9750 x1204 Ph|208-890-3800 Cell | 208-344-7201 Fax |
:griesmyer@acluidaho.org
www.acluidaho.org | *"Because Freedom Can't Protect Itself"*

Would you donate $15 a month to protect freedom?

---

**From:** Daniel Soumas [mailto:dsoumas@kcgov.us]
**Sent:** Friday, August 11, 2017 1:52 PM
**To:** Kathy Griesmyer
**Cc:** Linda Mattos; Darrin Murphey
**Subject:** Public Records Request Asset Forfeiture Dated August 3, 2017

Kathy,

Thank you for taking the time to discuss this request. In summarizing our conversation, your request as written encompasses a significant amount of research and time to produce these records. As we work with our local prosecuting attorney on the state side, participate in the Asset Forfeiture Program federally as well as having two separate programs for KCSO and the North Idaho Violent Crimes Task Force I appreciate your offer to send additional explanation to assist us in getting you the information you want.

I will look forward to your email in the very near future. Once you clarify your request we will notify you of any anticipated costs and the time frame to produce the requested information. Please contact me at any time with any additional concerns or clarification.

Captain Dan Soumas
KCSO Detective Commander

**Neal Robertson**

| | |
|---|---|
| From: | Daniel Soumas |
| Sent: | Monday, August 14, 2017 2:09 PM |
| To: | SDCommand; SDPatrolSgts; detectives |
| Subject: | Out of town |

All:
I'm out of town effective now returning Tuesday evening (tomorrow).  Sgt Lallatin has command and is on call.

Thanks,
Capt Dan Soumas

Sent from my iPhone

**Neal Robertson**

| | |
|---|---|
| From: | Daniel Soumas |
| ent: | Tuesday, August 22, 2017 11:36 AM |
| To: | SDCommand; SDPatrolSgts; detectives |
| Cc: | 'Neth, David' |
| Subject: | Out of Town |

All:

I'll be out of town starting now and overnight returning tomorrow evening (Wednesday August 23rd). In my absence Sgt. Brad Maskell will be acting on my behalf. Please notify him as you would me.

Captain Dan Soumas

1

**Kimberly Edmondson**

| | |
|---|---|
| **From:** | Kathy Griesmyer [kgriesmyer@acluidaho.org] |
| **Sent:** | Friday, August 25, 2017 11:41 AM |
| **To:** | Daniel Soumas |
| **Cc:** | Darrin Murphey |
| **Subject:** | RE: Public Records Request  Asset Forfeiture Dated August 3, 2017 |

Dan –

I hope this email finds you well.

I wanted to follow up in regards to the public records request regarding civil asset forfeiture. I haven't received any information from Kootenai County yet, so I wanted to check-in and see if there is any clarification needed with regards to our request? When can I expect your response?

I look forward to receiving Kootenai County's information soon.

Thank you,

Kathy Griesmyer
Policy Director
ACLU of Idaho & ACLU of Idaho Foundation
P.O. Box 1897, Boise, ID 83701
208-344-9750 x1204 Ph|208-890-3800 Cell | 208-344-7201 Fax |
kgriesmyer@acluidaho.org
www.acluidaho.org |*"Because Freedom Can't Protect Itself"*

Would you donate $15 a month to protect freedom?

**From:** Daniel Soumas [mailto:dsoumas@kcgov.us]
**Sent:** Friday, August 11, 2017 3:00 PM
**To:** Kathy Griesmyer <kgriesmyer@acluidaho.org>
**Cc:** Darrin Murphey <dmurphey@kcgov.us>
**Subject:** RE: Public Records Request Asset Forfeiture Dated August 3, 2017

Kathy,

Prosecutor McHugh's Office has a copy of your request. They are the holder of the records for all the state asset forfeitures proceedings.  However, before you send them the request let me clarify their preference on how they want to handle the current request IE: do they want to piggy back on our response or provide their own.  I am copying their office on this.

Thanks,
Dan Soumas

**From:** Kathy Griesmyer [mailto:kgriesmyer@acluidaho.org]
**Sent:** Friday, August 11, 2017 1:20 PM
**To:** Daniel Soumas
**Cc:** Linda Mattos; Darrin Murphey
**Subject:** RE: Public Records Request Asset Forfeiture Dated August 3, 2017

Dan –

1

> -----Original Message-----
> From: Daniel Soumas [mailto:dsoumas@kcgov.us]
> Sent: Friday, August 25, 2017 2:15 PM
> To: Kathy Griesmyer <kgriesmyer@acluidaho.org>
> Subject: Re: Public Records Request Asset Forfeiture Dated August 3, 2017
>
> Kathy,
> I am communicating with the Prosecutors Office for our State cases. I am working in house to gather the information and the federal reports. I'm really the sole source at KCSO and am also trying to fit in a long planned staycation with my family and two year old grandson.
> Will have more for you next week.
>
> Dan Soumas
>
>
> Sent from my iPhone
>





> On Aug 25, 2017, at 2:56 PM, Kathy Griesmyer <kgriesmyer@acluidaho.org> wrote:
>
> Dan -
>
> That sounds good to me. I just wanted to check-in and get an update. I'll also be out of the office next week through Sept. 7th. Do you think I could expect to have Kootenai County's response to me by then?
>
> Thanks,
>
> Kathy
>



**From:** Daniel Soumas
**Sent:** Friday, August 25, 2017 1:17 PM
**To:** Darrin Murphey
**Subject:** Fwd: Public Records Request Asset Forfeiture Dated August 3, 2017

④

Can we talk next week on this request. I'm going to need some info from Lucia for both KCSO and NIVCTF.

Sent from my iPhone

Begin forwarded message:

> **From:** Daniel Soumas <dsoumas@kcgov.us>
> **Date:** August 25, 2017 at 1:15:21 PM PDT
> **To:** Kathy Griesmyer <kgriesmyer@acluidaho.org>
> **Subject:** Re: Public Records Request  Asset Forfeiture Dated August 3, 2017
>
> Kathy,
> I am communicating with the Prosecutors Office for our State cases. I am working in house to gather the information and the federal reports. I'm really the sole source at KCSO and am also trying to fit in a long planned staycation with my family and two year old grandson.
> Will have more for you next week.
>
> Dan Soumas
>
>
> Sent from my iPhone
>
> On Aug 25, 2017, at 11:40 AM, Kathy Griesmyer <kgriesmyer@acluidaho.org> wrote:
>
> > Dan –

1



Exhibit D Page 32 of 175

**Kimberly Edmondson**

| | |
|---|---|
| From: | Darrin Murphey |
| Sent: | Friday, August 25, 2017 1:30 PM |
| To: | Daniel Soumas |
| Subject: | RE: Public Records Request  Asset Forfeiture Dated August 3, 2017 |
| Attachments: | RE: |



Dan:

I would hand this off to someone at the Sheriff's Office ASAP so that the records are produced today, or Monday at the latest. As we earlier discussed, the public records law requires a response within 3 days, unless notice of delay is provided, then 10 days. My suggestion that you obtain something in writing from the requestor that they agree to an extension to avoid an award of attorney fees against the Sheriff. Also, as we discussed, the Sheriff has an obligation to produce the records for which his is the custodian, not another agency or elected official's records. Again, my recommendation is that the Sheriff's Office timely gather and produce the records which are in the custody and control of the Sheriff. If it is going to take more than 2 hours to respond, again, my suggestion is to obtain advance payment for the cost, as indicated in the attached email. That is going to be a difficult position to take based on this long of a delay.

Darrin

---

**From:** Daniel Soumas
**Sent:** Friday, August 25, 2017 1:17 PM
**To:** Darrin Murphey
**Subject:** Fwd: Public Records Request Asset Forfeiture Dated August 3, 2017

Can we talk next week on this request. I'm going to need some info from Lucia for both KCSO and NIVCTF.

Sent from my iPhone

Begin forwarded message:

> **From:** Daniel Soumas <dsoumas@kcgov.us>
> **Date:** August 25, 2017 at 1:15:21 PM PDT
> **To:** Kathy Griesmyer <kgriesmyer@acluidaho.org>
> **Subject: Re: Public Records Request  Asset Forfeiture Dated August 3, 2017**
>
> Kathy,
> I am communicating with the Prosecutors Office for our State cases. I am working in house to gather the information and the federal reports. I'm really the sole source at KCSO and am also trying to fit in a long planned staycation with my family and two year old grandson.
> Will have more for you next week.
>
> Dan Soumas
>
>
> Sent from my iPhone
>
> On Aug 25, 2017, at 11:40 AM, Kathy Griesmyer <kgriesmyer@acluidaho.org> wrote:
>
>> Dan —

1

Exhibit D Page 33 of 175

**From:** Daniel Soumas
**Sent:** Friday, August 25, 2017 1:35 PM
**To:** Darrin Murphey
**Subject:** Re: Public Records Request Asset Forfeiture Dated August 3, 2017



The problem is no one else seems to have the info or knows how to find it. The last clerk left our employ. Can you contact Kathy and get her to agree to the extension? I'm not even at work right now. Let me know if I need to call her.

Sent from my iPhone

2

**From:** Darrin Murphey
**Sent:** Friday, August 25, 2017 4:32 PM
**To:** Daniel Soumas
**Subject:** RE: Public Records Request Asset Forfeiture Dated August 3, 2017



ATTORNEY CLIENT PRIVILEGE - NOT A PUBLIC RECORD

Dan:

The Sheriff has exposure to liability in the form of attorney fees on this matter, which is not covered by ICRMP. Judge Mitchell made it clear to me in another public records case that he expects the Sheriff to follow the law in responding to public records requests. I informed Ben that I would do my part in making sure his employees were aware of the legal requirements in responding to public records requests, and that I would let him know if ˙ observed anything of concern. Ben, as the elected Sheriff is my client. As such, I have an obligation to inform Ben of the potential liability in this matter. Do you want to talk to Neal, Dan or Ben before I discuss with Ben?

Darrin

-------- Original message --------
From: Darrin Murphey
Date:08/25/2017 1:40 PM (GMT-08:00)
To: Daniel Soumas
Subject: RE: Public Records Request Asset Forfeiture Dated August 3, 2017

How long of an extension do you need. The end of the day on Monday? Are you going to require advance payment?

**From:** Daniel Soumas
**Sent:** Friday, August 25, 2017 1:35 PM
**To:** Darrin Murphey
**Subject:** Re: Public Records Request Asset Forfeiture Dated August 3, 2017

The problem is no one else seems to have the info or knows how to find it. The last clerk left our employ. Can you contact Kathy and get her to agree to the extension? I'm not even at work right now. Let me know if I need to call her.

Sent from my iPhone

2



-----Original Message-----
From: Daniel Soumas [mailto:dsoumas@kcgov.us]
Sent: Friday, August 25, 2017 7:03 PM
To: Kathy Griesmyer <kgriesmyer@acluidaho.org>
Cc: Darrin Murphey <dmurphey@kcgov.us>
Subject: Re: Public Records Request Asset Forfeiture Dated August 3, 2017

Yes from KCSO and I will do what I can with KCPAO and advise.
Thanks
Dan S.

Sent from my iPhone

**Kimberly Edmondson**

| | |
|---|---|
| **From:** | Daniel Soumas |
| **Sent:** | Saturday, August 26, 2017 5:21 AM |
| **To:** | Darrin Murphey |
| **Subject:** | RE: Public Records Request  Asset Forfeiture Dated August 3, 2017 |



ATTORNEY CLIENT PRIVILEGE – NOT A PUBLIC RECORD

Darrin:

I concur with your obligation to inform the Sheriff about his exposure on this issue and as his attorney you should do so. Of course until I received your last email I had no idea that the Sheriff has already been to District Court on a untimely records response issue. I have no desire for him to be in that position again which is why I have sought your offices advice and cooperation all along.

I am personally frustrated by the lack of response and support on this ACLU records request from all levels of the County system. From the day this request was forwarded to me from our Records Section as some sort of "hot potato", I have been in communication with your office, our Records, and the Auditor's Office none of whom seem particularly interested in facilitating this request for a variety of reason to include vacations, budget work or other pressing business. To the extent that the ACLU request has been handled, clarified or informally extended has all been by my intervention. I copied you on my email this afternoon with the ACLU wherein Kathy Grismyer advised she would be out until September 7th and I committed to her to have KCSO's portion there by that date.

While at this moment you are wearing your Sheriff's attorney hat, your office is also the primary resource for the information I need to facilitate this request for the state asset forfeiture side. I understand you were out when the request came in which is why I forwarded it to David. Since your return, you and I have emailed, talked about it and met on it. You have also been copied on all correspondence and are well aware that per our conversations and email exchange with the ACLU, both they and I were under the impression that KCPAO were going to coordinate this information with KCSO so we could submit a complete response.

I have already gathered the required information I have access to for the federal side two weeks ago. I don't have access to auditor information on receivables, payables and some budget requests but that too is part of the request in order for me to submit a complete picture. They have been less than helpful as they are in the middle of budgets. But I have gathered some information and can probably fill in those blanks.

I don't see how we can honestly state we don't have that information at KCSO when we initiate these asset forfeiture filings and all spending of these monies. Yes, I could just gather a bunch of information and provide it to the ACLU without context, allowing them to apply whatever meaning they can derive from it. Or we can, as I have asked all along, coordinate our responses to give the true picture of our program with an opportunity to create some understanding. That (as I requested early on) will require a level of cooperation from your office beyond legal advice on how to handle a records request.

Additionally in coordination with you, I contacted the ACLU and they delayed a records request to your office because we left them with the impression that your office was going to either coordinate with our response or I was going to let them know to file a separate request. I still have not received an answer on that issue. (See email string from August 11th).

I have to this point and intend going forward, to act in the best interest of the Sheriff. I hope to do so by not creating an adversarial position with the ACLU as well as avoid finger pointing in all directions when we can with a little effort, provide the comprehensive response needed to clear up this matter. If for some reason my intention to do so all along

1

**Kimberly Edmondson**

| | |
|---|---|
| **From:** | Daniel Soumas |
| **Sent:** | Monday, August 28, 2017 8:22 AM |
| **To:** | Darrin Murphey |
| **Cc:** | Neal Robertson |
| **Subject:** | ACLU Records Response Asset Forfeiture 817 |
| **Attachments:** | ACLU Records Response Asset Forfeiture 817.pdf |

Darrin,

I am attaching my response to date for your review prior to forwarding it to the ACLU. I copied you an email on Friday evening wherein Kathy Griesmyer will be out of the office until the 7th and was ok with us continuing to work on the request.

At this point unless your office has moved in a different direction, I am just going to submit what I can based upon our records. I would anticipate a request from the ACLU to your office as I told them at this point you won't be combining your information with our response.

I will be out of the office and email range from this morning until tomorrow afternoon. I intend to send this request via email along with the supporting Federal reports on Wednesday.

I would still like to coordinate with your office on any response you make so I can understand what was sent. I would anticipate Lucia will need to produce a spreadsheet on the requested items and case information.

Talk to you Wednesday.

Thanks,

Dan S.

1



# SHERIFF
# KOOTENAI COUNTY



SHERIFF **BEN WOLFINGER**                    UNDERSHERIFF **DAN MATTOS**

Memorandum

| | |
|---|---|
| To: | Kathy Griesmyer, Policy Director, ACLU of Idaho |
| From: | Captain Dan Soumas, Detective Commander, KCSO |
| Date: | August 27, 2017 |
| Subject: | Response to ACLU Records Request Asset Forfeiture |

Kathy,

First thank you for working with me on your request to include our conversations which clarified what you are seeking as well as what you would not want to receive as part of this request (IE: copies of police reports and other court paperwork) I have concluded that some of my answers will be more general in nature in anticipation of follow up conversations with you at a later date. After reviewing your request and the records actually held by KCSO I am submitting the following to you as our response:

For clarification on asset forfeitures records held by KCSO, we assist on this record keeping for two separate organizations, KCSO and the North Idaho Violent Crimes Task Force (NIVCTF) of which we are a member agency. I will report on each separately when appropriate as well as whether they are in fact State or Federal asset forfeitures.

Additionally, as you are aware, I have made attempts to coordinate a response by retrieving the records of our state court forfeitures from the Kootenai County Prosecuting Attorney's Office Civil Division (KCPAO) as they represent our interests in such matters. As of August 27, 2017 those KCPAO records have been unavailable. Therefore I will complete the response for KCSO with the information I have that would include only records generated by our Office. As we discussed previously via email, I am now notifying you that you will need to submit a request directly to them for this information. I will indicate in my response which portions of your request will need to be routed there.

Much of your records requests seem to focus on asset forfeitures as a result of state court proceedings. The KCPAO initiates all state forfeiture proceeding on KCSO's behalf, disburses the money or physical asset through the Kootenai County Auditor's Office to our agency when such actions result in a judgment of forfeiture.

<u>Answers to Specific "Descriptions" Set Forth in Request:</u>

1. All documents describing any process for accounting for all seized property and money in your jurisdiction from 2014 – 2016:

Answer: For state court asset forfeitures, KCSO does not per se have an internal policy for tracking and accounting for seized money and property specific to the asset forfeiture process. The monies or property we seize and submit for asset forfeiture are held by our property and evidence section under our normal evidence procedures. They are tracked by the KCPAO during the court process. Under some

5500 N. Government Way • P.O. Box 9000 • Coeur d'Alene, Idaho 83816-9000
Sheriff Phone: 208-446-1300 • Fax: 208-446-1307 • Jail Phone: 208-446-1400 • Fax: 208-446-1407
Website: www.kcsheriff.com • E-mail: kcso@kcgov.us

Exhibit D Page 39 of 175

circumstances cash may be transferred to a bank account for safe keeping. Once the court process has been completed we receive a copy of any judgment along with instructions from the KCPAO on the disposition of the asset which varies on a case by case basis. KCPAO is the keeper of those records.

The tracking of any cash received or assets converted to cash is conducted by our County Auditor's Office. These monies are kept in a separate fund and further delineated by whether they are state of federal forfeiture dollars as the rules for the use of these monies are different depending upon their origin.

On Federal Court asset forfeitures, all assets are transferred to the US Marshals to be held pending disposition. We follow the Equitable Sharing Guidelines published by the DOJ during this process as well as for the disposition of any assets after they are awarded. Those guidelines are typically modified each year so specific rules did change during the time frame of your request.

Any assets awarded to KCSO are tracked by our auditor's office using the same process as described above.

2. All documents that account for the retention and disposition of all seized property and money in your jurisdiction from 2014-2016.

Answer: On state asset forfeitures those documents are held by the KCPAO. On the federal side we file annual equitable sharing reports for both KCSO and the NIVCTF. Those report for the years 2014 – 2016 will be submitted as attachments as part of this response.

3. All documents that indicate how many civil asset forfeiture actions were commenced in your jurisdiction from 2014 – 2016. Please indicate for each of the following categories how many of these were (a) granted, (b) denied, (c) defaulted, (d) settled or (e) resolved in some other manner.

Answer: On state asset forfeitures those documents regarding cases filed and dispositions are held by the KCPAO. On the federal side we file annual equitable sharing reports for both KCSO and the NIVCTF. Those report for the years 2014 – 2016 will be submitted as attachments as part of this response. With some inquiry to the DOJ and Courts we can likely provide copies of any filings / judgments received by both KCSO and the NIVCTF. There were a small number (typically large amounts of cash) during the time period specified in your request. However to get those specific case filings will require additional time.

4. All documents that detail all items seized in civil asset forfeiture actions in your jurisdiction from 2014 – 2016 including:
   a. Documents that detail the total monetary value of the items as well as whether the item was ultimately returned to the original owner or forfeited.
   b. Any documents that indicate whether criminal charges were brought in connection with the seizure and the case numbers of all related cases.

Answer: On state asset forfeitures those documents are held by the KCPAO. On the federal side we file annual equitable sharing reports for both KCSO and the NIVCTF. Those report for the years 2014 – 2016 will be submitted as attachments as part of this response. The specific case numbers on the federal side will require additional time to access records not held by KCSO in order to cross reference those records to the KCSO reports which initiated the asset forfeiture action. In short, we don't maintain a list of police

reports specific to this category.  I will need to look at asset transactions transferred to KCSO through the federal process via our Auditor's Office and track them back in that manner.

5.  All documents that indicate how much funding your office has received for each year from 2014 - 2016 as a result of civil asset forfeiture, and where these monies are allocated.

Answer:  Audit records indicate we received revenues for those fiscal years as follows:

KCSO:
| | | |
|---|---|---|
| 2014 (State): | 14,495.47 | 1,171.64 (Interest) |
| 2014 (Federal) | 121,141.29 | 1,999.23 (Interest) |
| | | |
| 2015 (State): | 23,729.69 | 2,497.75 (Interest) |
| 2015 (Federal) | 81,158.40 | 2,361.32 (Interest) |
| | | |
| 2016(State): | 24,258.35 | 243.58 (Interest) |
| 2016(Federal) | -0- | 2,172.48 (Interest) |

NIVCTF:
| | | |
|---|---|---|
| 2014 (State): | 8282.46 | 162.65(Interest) |
| 2014 (Federal) | 31,575.48 | 62.12 (Interest) |
| | | |
| 2015 (State): | 1,042.00 | 546.98 (Interest) |
| 2015 (Federal) | 83,078.48 | 126.72 (Interest) |
| | | |
| 2016(State): | 25,572.77 | -0- (Interest) |
| 2016(Federal) | -0- | -0- (Interest) |

Note: The above numbers are part of a spread sheet provided by the KC Auditor's Office prior to this request.  I noted no interest indicated for 2016 which was likely updated by journal entry at a later time. Additional information will have to be requested from the auditor's office.

The monies listed above along with any balances carried forward are contained in specific accounts allocated for the Sheriff's use based upon the Prosecutor's Office interpretation of state code regarding the use of state court forfeiture assets and DOJ guidelines for the equitable sharing program on federal forfeiture assets.  Generally speaking, the state guidelines are more restrictive than federal and typically require a nexus to drug activity. Specifics on how those dollars were spent will require additional time to audit each transaction.

6.  If your jurisdiction participates in the Equitable Sharing Program, please provide any documents relevant to the program.

Answer: As stated previously both KCSO and the NIVCTF participate in the Federal Equitable Sharing Program.  Copies of our filings for the time frame requested are attached as part of this response.

As part of your clarification email you added this item specific to future budgeting.

- Any relevant budgetary documents that indicates if the Kootenai County Sheriff's Department budgeted for future civil asset forfeiture income for 2014-2016

Answer: KCSO does not budget for future or anticipated revenues from either state or federal forfeitures. Our budget will include a line item for current asset forfeiture funds already in that fund as part of our budgeting process and authorization to spend a portion of those monies if deemed necessary. As the intent of these dollars is not to supplant normal funding but rather to be used as an enhancement to our general budget for the purpose of providing increased service to the community, these purchases are typically one-time items of equipment or training that improves those services.

Kathy, again I appreciate you working with me on this request and the extensions you have granted. The information to complete the picture is kept by three different government entities along with some other supporting agencies. To that end I had hoped to gather that information and submit a complete picture to you of our asset forfeiture program. Unfortunately that has not been possible to this point. I am asking that you review this document when you return to your office on September 7th, then contact me so we can fill in any gaps you find. I will commit to working with you and the KCPAO to gather any additional information needed to complete this request.

Sincerely,

Captain Dan Soumas
KCSO Detective Commander

## Kimberly Edmondson

**From:** Neal Robertson
**Sent:** Tuesday, August 29, 2017 6:57 AM
**To:** Kimberly Edmondson
**Subject:** FW: ACLU Records Response Asset Forfeiture 817

For your review

**From:** Darrin Murphey
**Sent:** Monday, August 28, 2017 5:17 PM
**To:** Daniel Soumas
**Cc:** Neal Robertson; David Ferguson
**Subject:** RE: ACLU Records Response Asset Forfeiture 817

Dan:

As Dave and I informed you, neither Dave nor I are the custodian of the records of the Prosecutor.  If you have want to discuss, coordinate or obtain records of the Prosecutor, you need to contact Barry McHugh, not Dave or I.

Regarding your response, if you have produced all of the records in the custody of the Sheriff which are responsive to the request, then that is all that is required of the Sherriff.  The Sheriff is not responsible for producing records in the custody of another elected official.  Informing the ACLU where it can obtain any other records responsive to the request, although not required by the law, is helpful and appropriate in my opinion. The only problem is that the Sheriff should have produced the records within 10 days of the public records request. However, producing all of the records responsive to the request which are in the custody of the Sheriff, although untimely, mitigates any liability to the Sheriff.

Let me know if you have any questions.

Darrin

**From:** Daniel Soumas
**Sent:** Monday, August 28, 2017 8:22 AM
**To:** Darrin Murphey <dmurphey@kcgov.us>
**Cc:** Neal Robertson <nrobertson@kcgov.us>
**Subject:** ACLU Records Response Asset Forfeiture 817

Darrin:

I am attaching my response to date for your review prior to forwarding it to the ACLU.  I copied you an email on Friday evening wherein Kathy Griesmyer will be out of the office until the 7th and was ok with us continuing to work on the request.

At this point unless your office has moved in a different direction, I am just going to submit what I can based upon our records. I would anticipate a request from the ACLU to your office as I told them at this point you won't be combining your information with our response.

I will be out of the office and email range from this morning until tomorrow afternoon. I intend to send this request via email along with the supporting  Federal reports on Wednesday.

1

# INTERVIEWS 1.452-1.461

## INTERVIEWS

Kathy Griesmyer
(1st Interview) – On August 28, 2017, I contacted Griesmyer by telephone. Griesmyer provided me with the email thread she shared with Soumas which showed she provided an extension to Soumas on August 25, 2017 which allowed for his response to be delayed until September 7, 2017.

(2nd Interview) – On September 7, 2017, I contacted Griesmyer by telephone. I explained that I was concerned with the timely reporting of this PRR to her office and asked her what her expectation was regarding when it should have been completed. Griesmyer said she sent the PRR out on August 3, 2017 and received a response on August 4, 2017 which indicated the response would be delayed 10 business days. She said, following her conversations with Soumas regarding clarification of the requested information (which occurred on August 11th), she waited for information. When she hadn't received any information or further requests for clarification, Griesmyer explained she sent an email on August 25, 2017 to Soumas indicating she hadn't heard back from anyone. At that time, Soumas followed up with her and only at that time did she provide a deadline of September 7, 2017. I asked her if, up to August 25th, she had anticipated receiving information from us, and she said she did expect to receive information, but was happy to provide the extended deadline after she heard back from Soumas on August 25, 2017.

Dan Soumas
(1st Interview) – On August 30, 2017 at approximately 10:30am, Human Resources Director Skye Reynolds and I met with Soumas in my office. I asked Soumas to explain to me what processes he utilized to complete the PRR beginning when he received it on August 4, 2017 to completing the request on August 30, 2017. I asked Soumas to provide me the timeline from his perspective.

Soumas said he received the PRR on August 4, 2017 and upon reviewing it, Soumas said he sent Cox an email as well as walked it over to her in order to explain to her that it was going to take more than 10 days (and maybe more) to gather the information. He explained that he told her she sent him this "hot potato and washed [her] hands of it." Soumas noted both he and Cox had included Murphey in their emails regarding this PRR and Soumas, upon receiving a notification from Murphey's email account, realized Murphey was out of the office. At that time, Soumas forwarded the initial email string from Cox to Ferguson. Soumas recalled receiving an email from Ferguson which indicated he had forwarded the PRR to McHugh.

Soumas explained his concern was, even though we (KCSO) may be the agency that conducts the stops and spends the money, the "intermediary" is the prosecutor's office, so for "all the state stuff" the PA's office keeps all of the records. Soumas said he gets his information regarding the state accounts from Lucia (Lucia Saitta is a Senior Legal Secretary on the Civil side in the PA's office) who keeps a spreadsheet and all of the records on those accounts.

Soumas recalled talking to Murphey on the telephone when Murphey returned to work the following week. Soumas said the problem, in his view, is that Murphey "is trying to wear two hats" by trying to give legal advice on what the records request is asking for, but not helping him

7

to fill the records request when his office is holding those records. Soumas said he understands that the "Sheriff's records are the Sheriff's records and Barry's (McHugh) records are Barry's records" but Soumas was concerned that he was responding to the ACLU and said, "I don't wanna screw around with them." Soumas felt it was wrong to provide information to the ACLU without context that would help them understand the information.

Soumas said he met with both Murphey and Ferguson on August 11, 2017, and he thought, through their discussion, they were going to help him gather some of the records which were kept at their office.

Soumas said he also emailed the Auditor's office and asked Keith Taylor for assistance with information on the accounts. Soumas said Keith told him they wouldn't be able to help until "after budgets."

Soumas said he gathered information and prepared a file on his desktop with the Federal information but he wanted to wait to send the response until he could do it "properly." Soumas said he made an assumption that Murphey's office was going to provide him with the PA's information so he could package it all up. Soumas said even with all of that information, the response was still going to require more verbal and written explanation on his part for the ACLU to fully understand the information because it is so complicated.

Soumas said he called Kathy (Griesmyer) on August 11, 2017. He explained to her that the request was "voluminous" and, due to our fairly robust program, he had a lot of information to gather for the request. Soumas said, at that time, Griesmyer explained she was looking for more general information, and not detailed reports. He said following their conversation, she sent him a clarification email describing what she needed him to provide. Soumas said he came away from their phone call feeling "that we had time to extend it 'cause I told her I'm not gonna be able to meet the deadline and she was good with that."

Soumas said, "Fast forward to last week. She (Griesmyer) sent me just a, a follow-up email that said hey, where are we at on this and, um, and I sent sev, several emails back and forth with Darrin and, um, and I can't tell you what's going on in his mind, but what I got back from him basically was, hot potato, okay, well, I've been telling you this has to get out and now the sheriff's got liability here and all that, and I go no, you have, you've been te, you've told me that these were the statutory dates and I've told you it's physically impossible to do that, and I don't, I'm the only person. Uh, records can't support it, nobody can support it, nobody wants to support it downtown. Soumas said this was his view on it.

Soumas said he updated the date on the information he had already put together because it was mostly written and he forwarded the information to Murphey. He said there was a lot of other information which he could have provided from the federal side through DOJ, but he basically didn't feel he had the time to complete the research. I asked him how much time he had into what he had developed to this point. Soumas said he had three or four hours, or more, of writing time, with editing, into what he put together. Soumas said he put in "a bunch" of time in regards to the research portion – he said he couldn't give me a number and he didn't know if it was in his Outlook.

Soumas went on to justify the many reasons why he was the sole source to gather the complex information which was requested -- the was due to many people no longer working here who could have assisted him previously (Chris Clay, Trudy Whittenburg). He also explained how complex the financial records were because he had to have them audited and there were gaps in the previous records and how we not only manage the records for KCSO, but also for the North Idaho Violent Crimes Task Force.

Soumas said, "So, obviously, I'm sitting here because the department is concerned that I just either A, blew it off or we just went over our time, and I've seen the tone in Darrin's emails, like well, it's not my fault. I told you, you know. Well, that's not helpful. What helpful is help me."

I went over the process this particular request had gone through to this point. I recapped the dates in regards to Soumas receiving the PRR on August 4, 2017 and being provided a 10-day delay to respond by Records upon receiving the PRR. I reminded Soumas that the deadline, at that point, would have been August 18, 2017. I also reminded him that, at least by email, there was not any conversation between Griesmyer and Soumas between August 11, 2017 when she provided the clarification he requested, and August 25, 2017 when she provided a deadline of September 7, 2017.

Soumas assumed what my next question was going to be and began to answer. He said, "Well, the reason, and don't let me interrupt, the reason that she emailed back in that friendly fashion is because our agreement on the phone -- it was verbal -- I didn't get something in writing, um, was, 'hey, you know, just keep working on it and let me know what we're doing.' So she was leaving town and she's doing her thing and I sent her an explanatory email as to what my plans were as well and uh, she said can we have it by the 7th, and I said, sure." Soumas said, at that point, he had most of the response done and it only needed attorney review.

Soumas again began justifying the many reasons why this request was so complex and how many different agencies held the records. I reminded him his only responsibility was to provide the Sheriff's records. Soumas said he understood that, but he was trying to "not make us look like an ass" by creating an adversarial relationship. He felt by building a relationship with Griesmyer, he could work through this request.

Soumas said he felt Murphey didn't "grasp the fact that his office is the one that does civil forfeiture and when I send it to them and David Ferguson is the one that does our civil forfeiture, when I send it to David and I say -- and he says he copied it to Barry McHugh, I'm expecting, uh, something back and I'm gonna share a sidebar on tape with you. So why did I not contact Barry McHugh directly to talk to him?" Soumas said, "Because the last time I emailed Barry McHugh about something going on in the office, which was just a month ago, Neal Robertson paid me a visit in my office and said why are you going directly to Barry McHugh, and I said because we work with him all the time."

Soumas continued describing the conversation with Robertson, "and, uh, he goes well, you know, the guys -- I said what guys. He goes well, I can't tell you that, can't, not gonna tell you who said, but, but it came back around that you had talked to Barry and David Ferguson. You know, I said well, I copied him on the email. You have a copy of it. I copied you too. You know,

9

it was an issue, so this time because somebody was upset last time, I didn't go directly to Barry. I left it to them to contact their boss and get me a response, which they did not."

I directed Soumas back to the email dates and the gap between the clarification email sent to him on August 11, 2017 and the September 7, 2017 deadline noted in the August 25, 2017 email. I asked him to explain his understanding of the extension he thought was provided by Griesmyer. Soumas said his understanding, based on a phone conversation he had with Griesmyer was that he had until the "end of the month, basically" to provide information to her. Soumas said, "I told her we should be able to have most of what we need by the end of the month for you. And, it's the end of the month coming up next week. So, that's what – that was my understanding from our phone conversation. I don't have anything in writing to back that up."

Soumas felt the email Griesmyer sent on August 25, 2017 was "a house keeping" thing because she was leaving town and wanted to know where we were with the response. Soumas said before that, there wasn't a lot of communication because he was gathering information on his end and trying to get the Prosecutor's Office and the Auditor's Office to work with him. Soumas said he had completed his part – and more – but still didn't have the "state numbers that come through the Civil Section of the Prosecutor's Office and that's where that stuff's done."

I asked Soumas to answer an abstract question for me – I asked him how long it would have taken him to only research and produce those portions of the request that were only within the Sheriff's records. Soumas provided a long response again about the complexity of the request, but his bottom-line was that it would have taken the same amount of time because it was the same amount of information either way.

I asked him if, without considering the waiting that he did for others to provide him information, if he could have responded within the 10-day timeframe. Soumas could not answer. He felt he had received a waiver on the deadline and had until the end of the month to report. Soumas said and Murphey had an agreement too and Murphey suggested he (Soumas) "call her and see what you can work out with her." Soumas went on to say, "He's known me for a long time. I'm capable of negotiating stuff like that, and, and so I did, and she's a nice lady. I mean I don't know what they may have in the background, but, you know, I would certainly be going to court going no, we had a phone conversation and she agreed to do this. Now, they can say statutorily it's different, but I have an email now even showing that she's willing to go all the way out to the 7th."

Soumas confirmed he had not provided any cost information to Griesmyer to give her a determination regarding the costs for the length of time the request would take to fill and amount the amount of paper the request was going to generate. Again, Soumas went into a long account regarding the complexity of the process of gathering the information and how he was the only one who could conduct it.

I discussed how providing the advance payment information to Griesmyer may have provided for the extension since the language provided by Murphey's email on August 10, 2017 indicates that the "Sheriff's Office will begin processing your request upon receipt of the advance payment described above." Soumas agreed the language could have provided an extension, but again,

he referred to the agreement he had with Griesmyer.  He said, "we kind of came to a verbal thing on the phone and I was trying to be, again, whole point being we don't need to be in an adversarial position with the ACLU or anybody for that matter, but, um, so just working with her. She was being cooperative with me.  I was being cooperative with her, and, uh, you know, I don't get paid overtime, so, you know.  It is what it is."

Soumas explained he was trying to plan a 'staycation' with this family.  He was planning family time with his grandson and he was trying to work vacation time into his schedule while still maintaining his responsibilities to his command.

Soumas continued to explain his impression following his communication with Griesmyer. Soumas felt that, as far as a time frame for completing the PRR, he was in good standing with Griesmyer.  Soumas said when he "dug into it," he realized the time it was going to take due to the complexities of the request.  Based on that, Soumas said, "we were going to be over their statutory deadline anyway, and I didn't wanna like zap her with a big, you know, - 'cause it's not gonna be big to this point, like I say, 6 hours writing it and a bunch more research and probably 24, 20 hours, but that's just the way it is."

I asked Soumas if that's how many hours he has into the research – 20 to 24?  He replied, "I would think, um, maybe not that much.  You know, um, at least that much because of all the meetings and the emails trying to get people to comply with, you know -- which to me seemed like such a simple thing.  I, and, I, and frankly I don't understand -- I understand I'm the sheriff's attorney and we need to, you know, we need to be compliant with this.  I don't understand the inability or the unwillingness to switch over and recognize that oh, civil division and we're the ones that actually do this work, and, you know, I just assumed, without going to Barry, that, or going around David to Lucia and asking for this information, um, because of this other event, you know.  Um, with everything else going on around here I didn't wanna get sideways with somebody on this, which apparently failed miserably because I'm sitting in your office being interviewed."

I asked why Soumas did not go to Robertson earlier.  Soumas explained he had reported the PRR to Robertson early on.  Soumas said Neal had the ACLU request from "early on."  Soumas said, "he was out of town, by the way, when all this was going on initially.  He's been on vacation.  And he wasn't back until the 23rd of August, so that's one reason I didn't go to him 'cause he wasn't here from like the 14th to the 23rd or something like that, but I know he had a copy."

I advised Soumas that I didn't show Robertson involved until Robertson received an email on August 10th from Soumas.  Soumas responded, "Right.  We don't normally forward record's requests to the bureau commander."  I agreed with Soumas that, 'normally, we don't but because he considered this such a 'hot potato' I asked what steps he took to get assistance, beyond himself, to respond to the request.  Soumas said, "Right.  I frankly didn't think it was gonna be an issue with the prosecutor's office getting what we needed."

Soumas added that he had sent his response out on this particular morning (August 30, 2017), including six attachments.  I asked Soumas to provide the entire document to me electronically. Additionally, I asked him to provide a weekly snap shot of his Outlook calendar for August and

11

his comp log.  Soumas indicated his comp log was not up to date and he would have to update it prior to sending it.

At this point, I advised Soumas I was excusing him unless Reynolds, who was also present in the room during the interview, had any questions.  Reynolds asked Soumas -- if, upon looking back at the whole situation, he 'could wave a magic wand' - is there anything that he would do differently, himself, in this situation.  Soumas responded, "I guess maybe I would just have less expectation of everybody else and just do what I can do and get, get it out the door.  I'm – at the level I work in the organization I'm used to comprehensive work, so it's not, um, I'm just gonna do what I have to do and I'm not gonna do anything more than that.  I'm just gonna – it's off, the hot potato is off my desk and it's on to somebody else's.  Um, you know, especially with, um, somebody like the ACLU that would have the ability to come back very easily on us and, and, you know, you're kind of – and, and I get why we're even sitting here because they're, it's that very reason.  Well, you were screwing around with the ACLU and you're, you're slow on your response and they could come back, uh, and, you know, but by making the phone call, you know, I've done all that.  If, if, if Kathy hadn't agreed to that, then I would have just worked through the weekend and gave her what I could have given, so the answer to your question is, um, you know, work through the weekend, get what I can get, and just send it out by the 13th.  We were delayed a lot, even just by legal getting back to me and giving me advice because we didn't actually physically meet on it 'till Friday, the 11th, and it was right after that I started the phone conversations with Kathy.  I wanted to talk to our attorney first.  He wasn't initially available.  He was out, I think, 'till midweek that week or something.  He got right back to me on the 10th with here's the statutory part and that's all well and good, but now I need to talk to you about all the whole picture.  What do we wanna do here, and so, you know, I guess, to answer your question, if after I talked to Kathy on the 11th, um, you know, and I just decided we're just gonna do this, then that's what we're gonna do and, and I just plow through it for that weekend and, and get it done, and it's out the door and we don't have an issue, but she had in fact, given me extension on that, and, uh, and I wanted to do a good job for them because that represents the sheriff's interests."

Soumas ended with the following statement, "You know, my heart is pure on this deal.  I'm sorry that we're here and, uh, I guess they'll do what they're gonna do to me, but, uh, it's unfortunate.  It's, it's, you know, along with everything else that's going on, it's just super unfortunate that this continues, um, but I guess it is what it is, so there's not much I can do about it."

(2nd Interview) – On September 14, 2017, Soumas and I met at approximately 1:00pm in my office.  I advised Soumas I had a few follow up questions for him to answer.  Soumas was upset that he had not received any due process.  Following a short administrative discussion regarding his at will status, I referred him to the August 4, 2017 email from Ferguson which directed Soumas to retrieve all of the records at the Sheriff's Office that comply with the request.  I asked Soumas why he had continued to gather records which were outside of the Sheriff's records.

Soumas was markedly frustrated.  He explained how difficult his week (very recently, he lost a close personal friend and just returned from some time off).  Soumas was also frustrated due to learning he was not receiving due process and had no time to prepare for this second interview.  He said, "you're asking me to remember stuff without record in front of me.  I've already

12

recorded an interview with you that, um, I'd certainly like to see a transcription of and have time to study it so I can at least answer this, because, Kim, I mean, it's, the whole thing just feels like an ambush, and, you know, I'm called over here in the beginning, uh, I mean, this is a, this is a long record, and I need some time, at least, to study what I've already said."

Once again, I referred him to the email from Ferguson and I provided him with a copy for reference and asked the same question. Soumas went on for some time with a response about how the process went upon receiving the PRR assignment and notifying Ferguson, but never truly answered the question, except to say that he had been gathering the information.

I asked him about the follow-up email he received from Murphey on August 10. Again, I provided him with a copy of the email I referenced. I explained to Soumas that Murphey's response said the request must be responded to within 10 days of the request. Murphey also provides the language for the advanced payment in this email. Again, Soumas went on for some time discussing the attorney's responsibilities. He did indicate that he saw the 10-day delay deadline and Murphey had advised him 10 days was 10 days -- Soumas initially thought the response was due on August 13th, but learned it was calculated on business days.

Soumas said following the email from Murphey, he, Murphey and Ferguson all met on August 11, 2017 to discuss the PRR. Soumas' impression of this meeting was that he was to follow-up with Griesmyer to get clarification on her response. Soumas said he called Griesmyer and discussed it on the phone with her.

I referred Soumas to the email he sent to Griesmyer on August 11th, where he asks for clarification and advises he will notify her of any anticipated costs and a timeframe to produce the requested information. I asked Soumas why nothing further regarding the costs or timeframe is provided to her upon his answer to him. I also asked why, in this email, he summarized all other parts of the conversation he had with Griesmyer on the phone except for the extended deadline.

Soumas said, "Basically, we, she and I had an agreement, and, uh, I was working on it, and I was waiting on Darrin's office to come with their, either decision to not work on it and make them file a request, or work with me on it so that I could get all of our information, our information, not their information." Soumas began outlining the responsibilities everyone else had in collecting the information necessary for this PRR response and how complex it was.

I referred Soumas back to the phone conversation with Griesmyer on August 11th. I asked him if it was that specific phone call where he was provided with the 'end of the month' deadline. Soumas said, "Mm hmm." I asked him what specific words Griesmyer used to give that deadline. Soumas responded, "I don't remember." I said, "you don't remember?" Soumas responded, My God, Kim, that's, it's a month ago and everything I've been through in the last 10 days?"

I discussed the follow-up email which was sent by Griesmyer on August 11, 2017 in response to Soumas' request for clarification. Griesmyer also provided a summary of their conversation and the clarification requested. I reminded Soumas that Griesmyer did not provide any information regarding an expectation of an extended deadline in her summary either.

13

I reminded Soumas of Griesmyer's email dated August 25, 2017, which reads, "I haven't received any information from Kootenai County yet.  So I wanted to check in.  When can I expect your response?"  I asked Soumas why she would ask when she should expect the response if she had an expectation that she would receive it at the end of the month.  Soumas answered, "I don't know."

Soumas asked me if I had talked with her and I told him I had.  He asked what her version of events were.  I advised him she did not recall having an end of the month extension.  Soumas responded, "Well, that's unfortunate."  I told Soumas I was trying to understand how he developed the impression he had that she did agree to an extension.  He said, "By talking with her and working cooperatively and her understanding it was gonna take time.  I told her it was gonna take time, at least a couple weeks.  So, um, which from August the, whatever it is, the 11th."

I asked Soumas about an email he sent to Murphey after Griesmyer's email was received on August 25th.  In the email Soumas sent to Murphey, he asks Murphey to "contact Kathy and get her to agree to an extension?  I'm not even at work right now."  I asked Soumas why he would want Murphey to contact Griesmyer if he thought he already had an extension.  Soumas said, "I'm also trying to be responsive to her request.  You know, the whole way this works is that we're cooperative on this deal, um, with them.  You know, I'm trying not to, and I think we talked about it last time, not to create an adversarial relationship with these guys over this deal.  The request is voluminous in nature and requires a lot of work on our part.  Um, you know, but unfortunately we don't have a lot of people with that information.  Um, so, um, you know, I don't know, I'm just goin' with the flow.  If the flow says she's concerned about it, I'm gonna be responsive to that concern to make sure that we're back on track and that we're workin' with each other cooperatively.  I would think that would be the expectation.  I think that's what my role is here to do that.  So that's what I did, and I asked Darrin, 'cause he was working, and, uh, he didn't get back to me right away, and then he asked about an extension which I didn't see.  So I just dealt with Kathy myself and got it in writing, so."

Soumas began to discuss his frustration with Murphey on what Soumas perceived as a lack of cooperation in assisting him with the response.  Soumas was frustrated with a lot of things that did and did not occur through his email interactions with Murphey.  I redirected Soumas and asked him about a personal text message.  I asked him if he had received a personal text message from Murphey which was sent as a kind message from one friend concerned for the other and urging Soumas to work on the request.  Soumas said he had not received any texts from Murphey.  He searched his phone and both contacts he had entered for Murphey in his phone.  Soumas was unable to produce any such message from Murphey and said he did not recall it.

I advised Soumas that I had reviewed his personnel files and entries to examine other issues regarding timeliness.  I asked him what he thought I found in my review.  Soumas said, "We both know what's in there."  I told him I saw entries referring to his office as "a black hole" and that this has been brought to his attention a lot in the past.  Soumas said, "It's also been grieved."  I reminded him that the grievances did not change those entries.  Soumas agreed that they weren't changed.

1.459

I reminded Soumas that we're talking about a timeliness issue again. I asked him directly, "Do you bear any responsibility in the delayed response in this public records request?" Soumas responded, "No. I don't." After a brief pause, he followed with, "I've done what needed to be done on this thing and, you know, to, this is a, once again, and I'm gonna be respectful here, just, uh, you know, this is an investigation, this is not a disciplinary hearing, and yet because this is so weak on its face, we're gonna try to go back into Dan's file and make it something that it's not."

I concluded the interview at 1:25pm.

<u>Joyce Cox</u>
On August 29, 2017, I contacted Cox by telephone. Cox explained the process she utilized when receiving this particular PRR. She said the she believes she had already sent out the "Delayed Response" before Soumas came to see her. Cox said that Soumas sent her an email on August 4, 2017 and then, shortly after she received the email, he came over to her office and advised her there was a lot of information to gather and he was going to need more time. Cox recalled (as stated in her email to me) a brief conversation with Soumas where she suggested he contact Griesmyer to see if "something could be arranged." Cox said she had no further conversations with Soumas regarding this PRR after that brief one.

<u>Darrin Murphey</u>
On September 18, 2017, I contacted Murphey by telephone. Murphey had previously provided me with email communications he had with Soumas and a brief explanation of his involvement with Soumas regarding the PRR during a meeting which he and Ferguson had with Soumas on August 11, 2017. I had specific questions for Murphey to answer in regards to his involvement. My first question was to determine what Murphey believed he communicated to Soumas during the August 11th meeting. Murphey indicated he clearly explained the requirements under Idaho statute regarding the time frame the PRR must be responded to, including an explanation of the 10-day delayed request. He recalled Soumas discussing that it was going to take a lot longer to respond than 10 days due to the amount of records he had to collect from other departments. Murphey said, at that time, both he and Ferguson advised Soumas that there was technically no way to get an extension of time, but indirectly, an extension could be gained through a request for prepayment due the volume of the records requested.

Murphey went on to explain it is the practice of the Sheriff's Office to request prepayment for PRRs when they take more than 2 hours to produce. Murphey said they described to Soumas how that prepayment request is calculated. Murphey said Soumas took issue with charging a "lesser fee than his own hourly rate" to respond since he was the one collecting the information. Murphey suggested Soumas contact the ACLU to get clarification on their request and to discuss the advanced payment.

I asked Murphey if he had given Soumas any indication that he or the Prosecuting Attorney's office was working on coordinating a response with him or for him from the civil side of the PRR. Murphey said Ferguson and he made it "extremely clear" that they were not involved in collecting the records from the Prosecutor's office and they directed him to Barry McHugh for

15

further.  Murphey went on to say that Ferguson had informed Soumas that he let "Barry Black and/or Barry McHugh" know this request was out there for informational purposes.  He said that both he and Ferguson made it clear to Soumas that they are not the custodians of those records.  Murphey added, "Furthermore, our strong recommendation was just respond with the records of the Sheriff's office and defer the ACLU to any other department or elected official in the county as necessary."

Murphey said the advice they gave Soumas at that meeting was clear, from his perspective.  He said the advice was they "are absolutely not coordinating a response – absolutely not."  He added that coordinating the response was not their role – they are legal advisors only.

I referred Murphey to the email Soumas sent to him on August 25th upon receiving Griesmyer's email indicating she was expecting a response and had not received one.  In that email, Soumas asked Murphey to request an extension from the ACLU for him.  My question for Murphey is if he indicated to Soumas at any point that he would do this for Soumas?  Murphey explained he was aware of other issues regarding the ACLU and untimely responses in other counties.  Murphey said he did not want to litigate with the ACLU an untimeliness of a response to a public records request.  Murphey said his clear direction to Soumas was that Soumas needed to hand the request off to someone who could respond right now, or to respond right away, himself.  Murphey said he did not indicate he was going to contact the ACLU for an extension.

Murphey said there was no communication between him and Soumas between the August 11th meeting and the emails they exchanged on August 25th.  Murphey's impression, following his review of the email Soumas sent Griesmyer on August 11th (in which Soumas writes, "Once you clarify your request we will notify you of any anticipated costs and the time frame to produce the requested information") was that everything was going along just fine and the records request would be addressed in short order.  Murphey added, however, that he was also left with the impression that Soumas was not only going to produce the records of the Sheriff's office, but that he was also going to take it on, himself, to produce records from the other departments as well, even though it wasn't his obligation to do so.  I asked Murphey if that was against his advice, and he agreed it was.  Murphey added that, even with that impression, he still felt Soumas would complete the request within the 10 days (following their meeting on August 11th).

I asked Murphey about a personal text he sent to Soumas, which I was made aware of by Undersheriff Dan Mattos.  In the text, Murphey appeared to be urging Soumas to respond to the request from the standpoint of a friend giving further advice to another friend.  Murphey indicated he had sent such a text, and later provided me with the text and the number it was sent to.  That text was sent to Soumas' landline phone, and would not have been received as a text.  Based on this information, I will not consider the personal text pertinent to this investigation.

I concluded our interview at 10:50am.

16

1.461

# SUPPORTING DOCUMENTS 1.462-1.472

## SUPPORTING DOCUMENTS

### David Ferguson -- Email Comment

On August 28, 2017, Ferguson provided me with a single email which he sent to Soumas in regards to the PRR. In his narrative to me, Ferguson referred to the meeting which he and Murphey had with Soumas (meeting occurred on August 11, 2017). In this meeting, Ferguson recalls explaining to Soumas the "need for urgency" in responding to a PRR as local judges have ruled against the Sheriff's Office in the recent past. Ferguson goes on to explain that both he and Murphey advised Soumas to contact the ACLU for an extension and to estimate both the cost and time to fulfill the response and to require prepayment. Ferguson felt Soumas understood this advice.

In his email to me, Ferguson also commented on the late response provided by Soumas. He indicated that the late response does "expose the Sheriff to liability, and potentially an award of attorney's fees."

As Ferguson's only interaction in this event was through one email and the August 11, 2017 meeting, I did not require further information from him through an interview.

### Neal Robertson -- Email Comment

On August 28, 2017, Robertson provided me with a single email which he sent to Soumas in regards to the PRR. Robertson's email was sent in response to an email which was sent to him by Soumas on August 10, 2017. Robertson's email to Soumas simply read, "Call me in the morning and we can figure this out."

In his email to me, Robertson commented that he met with Soumas once on this issue (either on the 10th or the 11th) and, following Soumas' explanation in regards to how complex this PRR was, he provided Soumas with direction to clarify what the ACLU was looking for and to ask for an extension if the response was going to be delayed. Robertson was on vacation until August 23rd following that meeting.

As Robertson's only interaction in this event was through this single email and the August 10/11, 2017 meeting, I did not require further information from him through an interview.

### Darrin Murphey -- Email Comment

On August 28, 2017, Murphey provided me with emails which he had exchanged with Soumas in regards to the PRR. The emails were in the form of attachments, but in his main email to me, Murphey provided context for his interaction with Soumas regarding this project. Murphey reported both he and Ferguson advised Soumas of the requirements for timely reporting on PRRs and also that he should require advanced payment in order to gain some time in developing a response. Murphey added that both he and Ferguson advised Soumas to respond to the PRR based on the records which the Sheriff is custodian of and to have the ACLU request records from other departments. They advised Soumas they (the Civil Department) were not custodians of the Prosecutor's records and directed him to Barry McHugh.

17

Exhibit D Page 56 of 175

## Kimberly Edmondson

From:        David Ferguson
Sent:        Monday, August 28, 2017 1:40 PM
To:          Kimberly Edmondson
Subject:     FW:

Kim,

Please see below the email I sent to Dan Soumas in response to his request for help with the records request.

Darrin and I met with Dan in his office about a week later (I do not remember the exact date). We explained to him the need for urgency as the local judges have ruled against the Sheriff's Office recently when a timely response to a public records request was not provided. Dan said things to the effect that he was the only one who could provide the response at the S.O. and that it would take a "lot of time" to locate the records. Darrin and I explained that he should contact the ACLU and explain that a ten day extension would be required, and that he should work on estimating the time and cost to fulfill the response, and then he should provide the ACLU with an estimate of that time and cost, and ask for prepayment. He seemed to say, at that time, that he would do all of that. To my knowledge, he contacted the ACLU, but was late in providing the responses, which does expose the Sheriff to liability, and potentially an award of attorney's fees.

Let me know if you want to discuss this further. Thanks.

Yours Truly,
/s
R. David Ferguson, II
Civil Deputy Prosecuting Attorney
Office of the Kootenai County Prosecuting Attorney
Barry McHugh, Prosecutor
451 Government Way
P.O. Box 9000
Coeur d'Alene, ID 83816-9000
(208) 446-1623
(208) 446-1621 (fax)

THE INFORMATION CONTAINED IN THIS ELECTRONIC MESSAGE IS INTENDED FOR USE ONLY BY THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY BE AN ATTORNEY-CLIENT COMMUNICATION AND, AS SUCH, IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THE MESSAGE IS NOT THE INTENDED RECIPIENT OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY BY E-MAIL OR TELEPHONE AND DELETE THE ORIGINAL MESSAGE. THANK YOU.

From: David Ferguson
Sent: Friday, August 04, 2017 3:42 PM
To: Daniel Soumas <dsoumas@kcgov.us>
Subject: RE:

Dan,

I forwarded this onto Barry McHugh, as some of those records will likely be in our office. I suggest working on retrieving any records at the Sheriff's Office which comply with the request. I can review any records before producing them to determine if they are exempt.

1

**Kimberly Edmondson**

| | |
|---|---|
| **From:** | Neal Robertson |
| **Sent:** | Monday, August 28, 2017 11:26 AM |
| **To:** | Kimberly Edmondson |
| **Cc:** | Neal Robertson |
| **Subject:** | FW: |
| **Attachments:** | Kootenal request.pdf |

Kim,

After I sent Soumas the below email requesting that he call me, we met once, it would have either been the afternoon of the 10th or the morning of the 11th. In that meeting he explained that he did not have all of the records as the PAO's held some as well and that he had already spent about two days researching the request and that the ACLU would need to pay for his time. He had said something about working with Joyce Cox. I told him that, in my experience, the ACLU was easy to work with and that he should call them to clarify exactly what they are looking asking for and if it is going to be delayed ask if they will provide an extension.

The next week I left for Boise and was away from the office until the 23rd. I only saw Soumas briefly on the 23rd during our meeting with Ben and Dan regarding the retirement buy out issue. I left myself a note to follow up with Dan on Thursday but as I recall he was not in. So today was my first chance to follow up with him. This morning was when he sent his response to legal from their review.

Call me if you have any questions.

Neal

**From:** Neal Robertson
**Sent:** Thursday, August 10, 2017 2:52 PM
**To:** Daniel Soumas
**Cc:** Neal Robertson
**Subject:** FW:

Call me in the morning and we can figure this out.

**From:** Daniel Soumas
**Sent:** Thursday, August 10, 2017 7:54 AM
**To:** Neal Robertson
**Subject:** FW:

Neal:

I am unclear if this request that was addressed to the Sheriff was actually forwarded by Records through the chain of command. I have been in contact with David Ferguson on this. I also notified Joyce in records that this would take quite some time and to notify the ACLU of same.

Dan S.

**From:** Joyce M. Cox
**Sent:** Friday, August 04, 2017 11:22 AM
**To:** Darrin Murphey; Daniel Soumas
**Subject:**

1

## Kimberly Edmondson

| | |
|---|---|
| **From:** | Darrin Murphey |
| **Sent:** | Monday, August 28, 2017 4:50 PM |
| **To:** | Kimberly Edmondson; David Ferguson |
| **Cc:** | Daniel Mattos |
| **Subject:** | RE: Inquiry Info |
| **Attachments:** | FW: ; ACLU Records Response Asset Forfeiture 817; RE: Public Records Request  Asset Forfeiture Dated August 3, 2017; Re: Public Records Request  Asset Forfeiture Dated August 3, 2017; Re: Public Records Request  Asset Forfeiture Dated August 3, 2017; Fwd: Public Records Request  Asset Forfeiture Dated August 3, 2017; RE: ; RE: Public Records Request  Asset Forfeiture Dated August 3, 2017; RE: Public Records Request  Asset Forfeiture Dated August 3, 2017; RE: ; RE: Public Records Request  Asset Forfeiture Dated August 3, 2017; RE: Public Records Request  Asset Forfeiture Dated August 3, 2017; RE: Public Records Request  Asset Forfeiture Dated August 3, 2017; RE: Public Records Request  Asset Forfeiture Dated August 3, 2017; RE: Public Records Request  Asset Forfeiture Dated August 3, 2017; RE: Public Records Request  Asset Forfeiture Dated August 3, 2017; Public Records Request  Asset Forfeiture Dated August 3, 2017 |

Kim:

Attached are the email with Dan S. that I was able to locate on this matter.

I do not record phone calls, and I do not have nor do I recall receiving any voice messages on this matter.  I did send Dan S. a personal text over the weekend.

The only discussion I recall having with Dan S. was a meeting with Dave F., Dan S. and I on August 11th at approximately 9:30 a.m., which Dave F. asked me to attend.  I did not give Dan S. any direction, only advice.  The advice I provided at the meeting was essentially the same as the advice I provide in the attached email.

In summary, regarding the mandatory time period to respond to the public records request, Dave F. and I advised Dan S. that the public records law requires a response within 3 days, unless the requestor is provided with notice that it will take more than 3 days to respond, then a response must be provided in 10 days from the date of the request.  I informed Dan S. that if he believed that it would take more than 2 hours to respond, that he should request advance payment in the amount he estimated it would cost to respond.  I informed Dan that a timely request for advance payment would provide for an extension of time in that he need not respond to the request until he received the requested advance payment.  Dave and I recommended that Dan S. contact the ACLU to discuss.

Regarding records of the Prosecutor and the Auditor, Dave F. and I made it very clear to Dan S. that the Sheriff was obligated to respond within 10 days with the records in the custody of the Sheriff, and that it was our recommendation that he timely produce the Sheriff's records and inform the ACLU that the Prosecutor and Auditor are custodians of other records which appear to be responsive to the request.

Both Dave F. and I made it very clear to Dan S. that neither Dave nor I are the custodian or have anything to do with the records of the Prosecutor.  Dave F. informed Dan S. that he needed to deal with Barry M. with regard to the records of the Prosecutor, and not Dave or I.

Let me know if you have any questions.

Darrin

**From:** Kimberly Edmondson
**Sent:** Monday, August 28, 2017 11:32 AM

1

<u>Soumas' Calendar</u>

I requested Soumas provide a snapshot of his August calendar to me in a weekly format. This request was made based on Soumas' comments during our interview in regards to how many meetings he must attend each day which kept him from completing research on the PRR.

In reviewing Soumas' calendar from August 4th forward, I highlighted those areas which referenced Griesmyer's PRR. Those areas are as follows:

    Friday, August 04: 12:30pm – 1:00pm Reviewed ACLU Email from Joyce Cox and called her
    Thursday, August 10: 8:00am – 9:00am worked on ACLU records request info gathering
    Friday, August 11: 9:00am – 11:30am Meet w/ Darrin and David re: ACLU Records request
    Friday, August 11: 11:30am – 12:00pm Spoke with Kathy Griesmyer at ACLU re: Records request
    Friday, August 11: 12:00pm – 12:30pm Email follow-ups with ACLU – copied legal
    Friday, August 11: 12:30pm – 2:00pm Additional ACLU Research
    Friday, August 25: 1:30pm – 2:30pm ACLU Issue contacts w/ Attorney and ACLU
    Monday, August 28: 5:30am – 9:00am ACLU Response
    Wednesday, August 30: 9:00am – 9:30am Sent Initial Reponse to ACLU on Records Request
    Wednesday, August 30: 10:30am – 11:00am Meet w/ Major Edmondson re: ACLU Records Request
    Wednesday, August 30: 11:00am – 11:30am Follow up Info for ACLU

Noted are entries for work completed on the follow weekend dates:
    Sunday, August 20: 9:00am – 10:00am Emails and paperwork
    Sunday, August 20: 4:30pm – 6:00pm Emails
    Sunday, August 20: 5:00pm – 7:00pm Case Management
    Sunday, August 27: 2:30pm – 3:30pm Ironman Accident Calls

Also noted also are two calendar 'Tasks' which are listed as follows:
    Thursday, August 10: Asset Forfeiture Records Request from ACLU
    Wednesday, August 30: Send ACLU Response after Legal Review (Done)

<u>Soumas' Comp Tracker</u>

I requested Soumas provide his current comp-log. Soumas indicated his log was not up to date and he would have to update it prior to sending it.

In reviewing his comp-log from August 4th forward, I noted the follow comp time was used:

| Date | Comp Used |
|---|---|
| 8/10/2017 | 2 hours Comp Used |
| 8/14/2017 | 4 hours Comp Used |
| 8/16/2017 | 8 hours Comp Used |
| 8/21/2017 | 3 hours Comp Used |
| 8/22/2017 | 3 hours Comp Used |
| 8/23/2017 | 8 hours Comp Used |
| 8/24/2017 | 5 hours Comp Used |
| 8/26/2017 | 6 hours Comp Used |
| 8/28/2017 | 5 hours Comp Used |
| | 44 Hours Total |

1.466

# July 31, 2017 - August 06, 2017

| July 2017 | August 2017 |
|---|---|
| SuMo TuWe Th Fr Sa | SuMo TuWe Th Fr Sa |
|             1 |  1  2  3  4  5 |
| 2  3  4  5  6  7  8 | 6  7  8  9 10 11 12 |
| 9 10 11 12 13 14 15 | 13 14 15 16 17 18 19 |
| 16 17 18 19 20 21 22 | 20 21 22 23 24 25 26 |
| 23 24 25 26 27 28 29 | 27 28 29 30 31 |
| 30 31 | |

## Monday, July 31

- 7:00am - 7:30am At KCSO 0720
- 7:30am - 8:00am Met w/ Major Robertson
- 8:00am - 10:30am Missing Female Case w/ Bobler
- 10:30am - 12:00pm Emails and paperwork
- 12:30pm - 1:00pm Meet w/ Dan Rawls
- 1:00pm - 3:30pm Case management
- 3:30pm - 4:00pm Out of Service 1530

## Tuesday, August 01

- ☐ 1 hour comp earned
- ☐ CITF Plicy to Dave Neth (Done)
- ☐ Monthly Report
- ☐ Prosecutor Subpoena Process In Progress)
- 7:00am - 7:30am At KCSO
- 7:30am - 8:00am Jail Supervisor's Meeting re: Inmate Interviews (Jail Briefing Room) - John Holecek
- 10:00am - 11:00am Captains meeting (TBD) - Neal Robertson◊
- 1:00pm - 1:30pm Spoke with Bob Balser 687-9262
- 2:00pm - 3:30pm Case Review ISP Investigation w/ Ryan Duncan and Art Verheran
- 3:30pm - 4:00pm Met w/ US mattos we will pay 50% Of truck bill
- 4:00pm - 4:30pm Out of service

## Wednesday, August 02

- ☐ 3 hours comp earned
- ☐ Case Management
- 7:00am - 7:30am AT KCSO 0720
- 7:30am - 8:00am Emails and Admin Duties
- 8:30am - 10:00am Stateline Crime Scene Renfro
- 10:00am - 11:00am Case management
- 12:00pm - 12:30pm Case management
- 1:00pm - 2:00pm Detective )Property Crime Meeting w/ NCIS at our Conference Room
- 3:00pm - 6:30pm Stateline Crime Scene Renfro Trailer

## Thursday, August 03

- ☐ 1 hour comp earned
- 7:00am - 7:30am At KCSO 0700
- 8:00am - 9:00am Records Retention period for videos (Maj's office) - Neal Robertson
- 10:00am - 11:30am Senior Staff Meeting (Jail Conference Room) - Daniel Mattos
- 11:30am - 12:30pm Case management
- 1:00pm - 2:00pm Meet w/ Dave Neth ISP re: several issues
- 2:00pm - 2:30pm Meet w/ Paul Farina ICAC re: HSI Operation Fair Game
- 3:00pm - 4:00pm Meet w/ Ryan Duncan re: ISP Investigation
- 4:00pm - 4:30pm Work on two cases (Cramer and Kremer)
- 4:30pm - 5:00pm Out of service 1650

## Friday, August 04

- ☐ 1 hour comp earned
- ☐ IACP Access
- 7:00am - 7:30am Work on 17-31014
- 8:00am - 8:30am Meet w/ Paul Farina and Brad maskell
- 9:00am - 10:30am Work on Subway sex case with Det case
- 10:30am - 11:00am Wayne Kramer Issues
- 11:30am - 12:00pm Case Management
- 12:00pm - 1:00pm Reviewed ACLU Email Work Joyce Oakland
- 1:00pm - 4:00pm Case Management

## Saturday, August 05

## Sunday, August 06

1.467

# August 07, 2017 – August 13, 2017

| August 2017 | September 2017 |
|---|---|
| SuMo TuWe Th Fr Sa | SuMo TuWe Th Fr Sa |
| 1 2 3 4 5 | 1 2 |
| 6 7 8 9 10 11 12 | 3 4 5 6 7 8 9 |
| 13 14 15 16 17 18 19 | 10 11 12 13 14 15 16 |
| 20 21 22 23 24 25 26 | 17 18 19 20 21 22 23 |
| 27 28 29 30 31 | 24 25 26 27 28 29 30 |

## Monday, August 07
- ☑ Culver Case reactivation - CI - see email
- ☐ Payroll Due
- ■ 7:30am - 11:30am Case management
- ■ 8:00am - 8:10am Swear in new CRO (SO Admin Lobby) - Marcia Heglie
- ■ 11:30am - 12:00pm Lunch
- ■ 12:30pm - 1:30pm Case management
- ■ 1:30pm - 2:30pm Mathis Case Intel Bulletin Suggested Language
- ■ 2:30pm - 3:00pm Afternoon emails and consults
- ■ 3:30pm - 4:00pm Out of Service 1545

## Tuesday, August 08
- ☑ Command Retreat Cancelled on 7/27/2017 by US Mattos
- ■ 7:00am - 7:30am At KCSO 0710
- ■ 7:30am - 9:00am Case Management
- ■ 9:00am - 10:00am Property Crimes Unit Meeting
- ■ 10:00am - 10:30am Nancy Ellis 1404 re camera
- ■ 11:00am - 12:00pm Case Management - Volunteer Ellis' Cases
- ☐ 12:00pm - 1:00pm Meet w/ NIVCTF re: two cases Culver and Decker
- ■ 1:00pm - 1:30pm Meet w/ Det Duncan re: ISP Investigation
- ■ 1:30pm - 2:00pm Lunch at my Desk
- ■ 2:00pm - 3:00pm Monthly Report

## Wednesday, August 09
- ☐ Monthly Report (Done & Sent)
- ☐ Renfro Truck Bill  (Done)
- ■ 8:00am - 8:15am Swear in  new Jail Deputy (SO Admin) - Marcia Heglie
- ■ 8:30am - 9:00am Coffee with Mike Patrick at Calypso's
- ■ 9:00am - 10:30am Complete Monthly Report
- ■ 10:30am - 12:30pm AT KCSO Case management
- ■ 2:00pm - 2:30pm Case meeting w/ Sgt Jovick
- ■ 2:30pm - 3:00pm Tow Bill Issue with Hilde and Body by Scotty.
- ■ 3:00pm - 3:30pm Out of Service

## Thursday, August 10
- ☐ CDAPD pulling 2 TF slots (Emailed neal)
- ☐ 2 hours comp used
- ☐ ~~About Perkins Public Records from ACLU~~
- ☐ Follow up on Victim Letter w/property crimes unit
- ☐ Review Body Worn Camera Policy
- ☐ Update Comp Log
- ■ 7:00am - 7:30am AT KCSO 0710
- ■ 7:30am - 8:00am Meet w/ Ryan Duncan re: ISP Internal  (Done)
- ■ ~~███████████ work with CA Burcham re: public records request policy~~
- ■ 9:00am - 9:30am Jail Expansion Groundbreaking (KCSO Recreation
- ■ 9:30am - 10:00am Read Walgreens Robbery Report from 2010 (em
- ■ 10:30am - 12:00pm Case Management
- ■ 1:00pm - 1:30pm Out of Service 2 hours comp used

## Friday, August 11
- ☐ 1 hour comp earned
- ■ 7:00am - 7:30am At KCSO
- ■ 7:30am - 8:00am Meet w/ Major Robertson Several Issues + rumor)
- ■ 8:00am - 8:30am Meet w/ Kelso and Campbell
- ■ ~~████████████████████ and David re: ACLU arbeids~~
- ■ ~~███████████████████████~~
- ■ ~~██████████ Speak with Kirby Oelasmyer at ACLU re:~~
- ■ ~~██████████ Email followup with ACLU - copied legal~~
- ■ ~~12:00pm - 3:00pm Walgreens ACLU Research~~
- ■ 2:30pm - 4:00pm Work with CA Burcham on Patrol Intel Bulletin
- ■ 4:00pm - 4:30pm Out of Service

## Saturday, August 12

## Sunday, August 13

Exhibit D Page 62 of 175

# August 14, 2017 -
# August 20, 2017

| August 2017 | September 2017 |
|---|---|
| SuMo TuWe Th Fr Sa | SuMo TuWe Th Fr Sa |
| 1 2 3 4 5 | 1 2 |
| 6 7 8 9 10 11 12 | 3 4 5 6 7 8 9 |
| 13 14 15 16 17 18 19 | 10 11 12 13 14 15 16 |
| 20 21 22 23 24 25 26 | 17 18 19 20 21 22 23 |
| 27 28 29 30 31 | 24 25 26 27 28 29 30 |

## Monday, August 14
- ☐ 12:00am Vacation (Boise) - Neal Robertson
- ☑ Eye Appt Schedule 208 772 3208  (Done)
- ☐ 4 hours comp used
- ☑ 7:00am - 7:30am AT KCSO 0702
- ☑ 8:30am - 9:00am Meet w/ Matt Street and marcia re: LT Board
- ☑ 9:00am - 11:00am Case management
- ☑ 11:00am - 11:30am Out of Service

## Tuesday, August 15
- ☐ ✦ Vacation (Boise) - Neal Robertson
- ☐ At Cabin for Day
- ☑ 10:00am - 11:00am Captains meeting (TBD) - Neal Robertson ✦

## Wednesday, August 16
- ☐ ✦ Vacation (Boise) - Neal Robertson
- ☐ 4 hours comp earned
- ☑ 6:45am - 6:15pm Lieutenant's Selection Process (KCSO Admin Conference Room) - Marcia Heglie

## Thursday, August 17
- ☐ ✦ Vacation (Boise) - Neal Robertson
- ☑ 12:00am Prosecutor Subpoena Process
- ☑ Gordon Rice
- ☑ Kelso about Mike Bauer Email
- ☑ Media Issue Prosecutor
- ☑ Moving vehicle impound (Assigned)
- ☐ Prosecutor contacts for IT on their end
- ☐ Review Kathleen Durkin Case 07-02075
- ☐ SAK New Laws in Place
- ☐ Secret Service MOU and Inspection of our Lab
- ☐ Which SAK to FBI (see email)
- ☑ 7:00am - 7:30am AT KCSO 0730
- ☑ 8:00am - 8:30am Case management
- More Items...

## Friday, August 18
- ☐ ✦ Vacation (Boise) - Neal Robertson
- ☑ ✦ Prosecutor Subpoena Process
- ☑ 7:00am - 8:30am Dan Mattos (Discuss Rumor of RIF)
- ☑ 9:30am - 11:00am Case Management
- ☑ 11:30am - 12:00pm Call Bill Brooks re: Death Threat
- ☑ 12:30pm - 1:00pm emails and paperwork

## Saturday, August 19
- ☐ ✦ Vacation (Boise) - Neal Robertson
- ☑ ✦ 12:00am Prosecutor Subpoena Process

## Sunday, August 20
- ☐ ✦ Vacation (Boise) - Neal Robertson
- ☐ 3 hours comp earned
- ☑ 9:00am - 10:00am Emails and paperwork
- ☑ 4:30pm - 5:00pm Emails
- ☑ 5:00pm - 7:00pm Case Management

1.469

# August 21, 2017 -
# August 27, 2017

| August 2017 | September 2017 |
|---|---|
| SuMo TuWe Th Fr Sa | SuMo TuWe Th Fr Sa |
| 1 2 3 4 5 | 1 2 |
| 6 7 8 9 10 11 12 | 3 4 5 6 7 8 9 |
| 13 14 15 16 17 18 19 | 10 11 12 13 14 15 16 |
| 20 21 22 23 24 25 26 | 17 18 19 20 21 22 23 |
| 27 28 29 30 31 | 24 25 26 27 28 29 30 |

## Monday, August 21
- ☐ ✦ Vacation (Boise) - Neal Robertson
- ☐ 3 hours comp used.
- ☐ Contact Darrin re: Abandoned Vehicle Procedure
- ☐ Payroll Due ✦
- ☐ Set Up meeting on Case Book Format w/ Linda Val and Det Sgts
- ■ 8:00am - 8:15am Swearing In (SO Admin) - Marcia Heglio
- ■ 8:30am - 11:30am Comp off 3 hours
- ■ 12:00pm - 12:30pm At KCSO
- ■ 4:30pm - 5:00pm Darrin Murphey re: Evidence Vehicle Disposal
- ■ 5:00pm - 5:30pm Out of Service at 1710

## Tuesday, August 22
- ☐ ✦ 12:00am Vacation (Boise) - Neal Robertson
- ☐ Family in Town
- ■ 7:00am - 8:00am Black Tag Shop
- ■ 10:00am - 11:00am Meeting with Sheriff (Jail Conference Room) - Daniel Mattos
- ■ 12:00pm - 12:30pm Out of Service

## Wednesday, August 23
- ☐ 6 hours comp used
- ☑ 9:00am - 10:30am Delivering Effective Performance Feedback - 9am (1A) - Cecilia Sweet

## Thursday, August 24
- ■ HIS child porn op
- ■ 7:00am - 7:30am AT KCSO
- ■ 7:30am - 8:00am emails and logs
- ■ 8:00am - 9:00am case management
- ■ 9:00am - 9:30am Discuss Staffing at NIVCTF (Sheriff's Office) - Neal Robertson
- ■ 10:00am - 10:30am Out of Service - Family in Town

## Friday, August 25
- ☐ 6 hours comp used
- ■ 9:00am - 10:00am Photos (House)
- ■ 12:30pm - 1:30pm Emails and Responses
- ■ 1:30pm - 2:30pm ACLU issue contacts w/ Attorney and ACLU

## Saturday, August 26
- ☐ 3 hour comp earned

## Sunday, August 27
- ☐ 1 hour comp earned
- ■ 2:30pm - 3:30pm Ironman Accident Calls

1.470

# August 28, 2017 - September 03, 2017

August 2017
SuMo TuWe Th Fr Sa
          1  2  3  4  5
6  7  8  9 10 11 12
13 14 15 16 17 18 19
20 21 22 23 24 25 26
27 28 29 30 31

September 2017
SuMo TuWe Th Fr Sa
                   1  2
3  4  5  6  7  8  9
10 11 12 13 14 15 16
17 18 19 20 21 22 23
24 25 26 27 28 29 30

## Monday, August 28
- ☐ 4.5 comp taken
- ☐ Elter Arson Case
- ☐ Order New Duplicator for Evidence
- ☐ Read the email Matt Street sent (in your DC File)
- ☐ Tim Valles Tow Bills
- ■ ~~8:00am - 9:00am ACLU Response~~
- ■ 9:00am - 9:30am Out of Service

## Tuesday, August 29
- ☐ 8 hours comp used
- ☐ At the Cabin
- ☑ 10:00am - 11:00am Captains meeting (TBD) - Neal Robertson

## Wednesday, August 30
- ☑ Advise Cecelia Sweet on Al's leave extension. (Done)
- ☐ Get updates on Units from All Sgts (Still Need maskell)
- ☑ ~~Send ACLU Responses after Legal Review (Done)~~
- ■ 7:00am - 7:30am AT KCSO 0720
- ■ 7:30am - 8:00am Meet w/ Sgt Jovick re: Property Crime Issues
- ■ 8:00am - 8:30am Meet w/ Sgt Lallatin re: SVU Issues
- ■ 8:30am - 9:00am Meet w/ Sgt Maskell (interupted and cancelled)
- ■ ~~9:00am - 9:30am Sent Initial Response to ACLU on Records Reqest~~
- ■ 9:30am - 10:00am Spoke w/ Sgt March re: FMLA extension
- ■ ~~10:00am - 11:00am Meet w/ Major Edmondson for ACLU Recoring R~~
- ■ ~~11:00am - 11:30am Follow up Info for ACLU~~
- ■ 11:30am - 12:00pm Leaving for time - received permission from M
- ■ 4:00pm - 5:00pm emails and paperwork
- More items...

## Thursday, August 31
- ☐ Fill Out non smoker for insurance
- ☐ Put out Face Book Training from Ryan
- ☑ Review Monthly Items for transfer to September

## Friday, September 01
- ☐ Check with Ken Lallatin on SVU Case Audit Updates.

## Saturday, September 02
- ☐ Look at IKTS Info email on Desktop

## Sunday, September 03

**Soumas**

| Date | Earned | Used | Total | Reason Earned |
|------|--------|------|-------|---------------|
| 6/2/2017 | | 2 | 141 | Comp used |
| 6/4/2017 | 3 | | 144 | Evals / Letter of Request WW |
| 6/6/2017 | | 8 | 136 | Comp Used |
| 6/7/2017 | | 8 | 128 | Comp Used |
| 6/11/2017 | 1 | | 129 | Case Management |
| 6/25/2017 | 2 | | 131 | Chief's Newsletter |
| 7/23/2017 | 2 | | 133 | Emails case Management (Sunday) |
| 7/25/2017 | 2 | | 135 | Case Audit PCU |
| 7/27/2017 | | 1 | 134 | Comp Used |
| 7/28/2017 | | 8 | 126 | Comp Used |
| 8/1/2017 | 1 | | 127 | Late Meeting |
| 8/2/2017 | 3 | | 130 | Renfro Evidence Stateline |
| 8/3/2017 | 1 | | 131 | Case work |
| 8/4/2017 | 1 | | 132 | Case Management 2404 |
| 8/10/2017 | | | 130 | Comp Used |
| 8/11/2017 | 1 | | 131 | Extended shift |
| 8/14/2017 | | | 127 | Comp Used |
| 8/15/2017 | | | 119 | Comp Used |
| 8/16/2017 | 4 | | 123 | LT Boards |
| 8/20/2017 | 3 | | 126 | Case management 2404 |
| 8/21/2017 | | | 123 | Comp Used |
| 8/22/2017 | | | 120 | Comp Used |
| 8/23/2017 | | | 112 | Comp used |
| 8/24/2017 | | | 107 | Comp Used |
| 8/25/2017 | | | 101 | Comp Used |
| 8/26/2017 | 3 | | 104 | Stabbing / Emails |
| 8/27/2017 | 1 | | 105 | Emails |
| 8/28/2017 | | | 100 | Comp Used |

1.472

# PERSONNEL FILE REVIEW 1.473-1.786

**PERSONNEL FILE REVIEW**

<u>Evaluation Review</u>

In this section, I have reviewed only the evaluations which rated Soumas as a Division Commander either as a Lieutenant or Captain. Only areas directly related to his timeliness or delays on administrative tasks and suspense dates are noted.   Soumas is rated at the Lieutenant rank between 2001 through part of 2009 and at the Captain rank from 2009 forward.

**11/5/15 to 11/5/16**

Major Neal Robertson notes in the People Management/Development category:  "As of the writing of this report his division has 12 of 19 evaluations past due.  I recognize his division has seen a record number of significant events...but the timeliness of his people's evaluations must improve."  Soumas is rated a '3' (Meets Standard) in this area.

**6/30/14 to 11/3/15**

Major Neal Robertson notes in the Planning and Organization category: "Dan has missed several suspense dates on some recurring responsibilities...Because of Dan's delinquency in these routine administrative matters, I have discussed with him his need to focus on his primary role as a member of KCSO's management team..."  Robertson also notes, "Dan's performance...can be described as inconsistent; his 'field performance' exceeds requirement however, his 'administrative performance' leaves room for improvement; but has recently shown improvement..."  Soumas is rated a '3' (Meets Standard) in this area.

Robertson also notes in the People Management/Development category: "...there are two areas of concern that should be discussed.  Dan division has been behind on their employee evaluations.  As such, I encourage him to better utilize the employee performance evolution process in the development of his people..."(sic)   Soumas is rated a '3' (Meets Standard) in this area.

**5/17/13 to 5/29/14**

Undersheriff Dan Mattos, then Major Mattos notes in the Planning and Organization category: "...in the non-situational areas of administration -- the day to day administrative duties of a Divison (sic) Commander -- Dan often has to be prodded to get results...Dan's performance...creates frustration at multiple levels when assigned tasks are delayed and deadlines missed." Soumas is rated a '3' (Meets Standard) in this area.

**5/17/12 to 5/17/13**

Undersheriff Dan Mattos, then Major Mattos notes in the Planning and Organization category: "From time to time, Dan has had trouble organizing his administrative duties in such a way as to keep himself from getting behind on required paperwork and related duties." Soumas is rated a '3' (Meets Standard) in this area.

1,473

**5/17/11 to 5/17/12**

Undersheriff Dan Mattos, then Major Mattos, did not note any deficiencies related to timeliness or delays on administrative tasks and suspense dates.

**5/17/10 to 5/17/11**

Undersheriff Dan Mattos, then Major Mattos notes in the Planning and Organization category: "...Dan had some challenges relating to the timely completion of paperwork and other administrative tasks." Soumas is rated a '4' (Above Standard) in this area.

Mattos also notes in the Documentation-Employee Performance category: "Dan could have rated higher in this category, however during the rating period had some difficulty staying current with his evaluations." Soumas is rated a '4' (Above Standard) in this area.

Mattos also notes in the Productivity category: "At the onset of the rating period, Dan was significantly behind on some essential paperwork (SWAT After Action Reports and other issues). This shortcoming was brought to Dan's attention...At present, Dan remains focused on applying himself toward overall efficiency and the timely completion of paperwork..." Soumas is rated a '3' (Meets Standard) in this area.

Soumas attached a rebuttal to this particular evaluation and indicated on the cover of the evaluation he did not agree with the evaluation report. Soumas' rebuttal was received and reviewed by Undersheriff Travis Chaney and was attached to the evaluation; however no further action or changes were made to the original evaluation document.

**5/19/09 to 5/17/10**

Undersheriff Dan Mattos, then Major Mattos notes in the Planning and Organization category: "...I do need to point out a need for Dan to more effectively organize his office to allow for a more streamlined flow of work product through his office. At times...Dan has allowed paperwork to get bogged down in his office thus creating a bottleneck that interferes with the efficiency of operations." Soumas is rated a '4' (Above Standard) in this area.

Mattos also notes in the Documentation-Employee Performance category: "Dan would have rated "exceptional" in this area would he have been consistent in completing his employee evaluations in a timely manner." Soumas is rated a '4' (Above Standard) in this area.

Mattos notes in the Productivity category: "Dan is rated as MEETS STANDARDS in this category, however this is an area in which Dan has difficulty. Over the rating period Dan has had to be prompted to stay current on evaluations, and failed to meet some deadlines. Dan has also held paperwork in his possession for extended periods, the results of which has been a bottleneck of work flow at his office." Mattos continues

20

to note, "Dan needs to manage his time in a way that allows for the overall management of his Division...the issue of timely processing of work...is Dan's "Achilles heel" and an issue that has historically been a problem for Dan."

In the summary section, Mattos notes, "Dan needs to be more focused on time management and become more attentive to the flow of paperwork through his office...*it is imperative that Dan makes improvement in this area to avoid a below standard rating in the future.*"

**5/19/08 to 5/19/09**

Undersheriff Dan Mattos, then Captain Mattos notes in the Productivity category: "Dan's passion...often challenges Dan in the sense that he often devotes too much time to singular issues. This is not to say that Dan does not get assigned work done; Dan does complete all assigned tasks, and does them very well. However, the issue of timeliness does come into play from time to time." Soumas is rated a '3' (Meets Standard) in this area.

Mattos notes in the summary section, "Dan has gotten behind on some routine tasks and assignments...Undoubtedly, part of the reason for getting behind is due to the heavy load that Dan carries...; however, part of the reason can be attributed to the need for better prioritization of time..."

**4/2005 to 4/2007**

Captain Travis Chaney notes in the Planning and Organization category: "There is a re-occuring problem that has caused frustration both above and below his level. Again...Dan has allowed work to bottleneck at his desk. This bottleneck is one that he continues to struggle with." Soumas is rated a '4' (Above Standard) in this area.

Chaney continues to note in the Teamwork category: "He [Dan] still needs to be more responsive to my requests for completing projects on schedule." Soumas is rated a '4' (Above Standard) in this area.

**4/2003 to 4/2005**

Captain Travis Chaney notes in the Planning and Organization category: "During this rating period Dan has allowed some work to bottleneck at his desk. He needs to be ever mindful of prioritization and moving work along so that others can continue to perform their tasks and functions." Soumas is rated a '4' (Above Standard) in this area.

Chaney also made the following note regarding Dan's performance in the Teamwork category: "He needs to be more responsive to my requests for information, completing projects on schedule and to follow-up on matters within his area of responsibility." Soumas is rated a '4' (Above Standard) in this area.

21

1.475

Exhibit D Page 70 of 175

**11/01 to 04/03**

Captain Travis Chaney made the following notes regarding Soumas' performance in the People Management/Development category: "One concern was his recreational time away from his assignment. I discussed the goals that must be accomplished and the importance for him to balance his recreating time with that of meeting deadlines...Another concern discussed was the need for him to balance personal contacts with his time availability. Many of the personal contacts are marathon sessions that affect his overall time management."

In addressing probationary performance of a new sergeant, Chaney also notes, "The issue here is, his recommendation for her to pass probation while not performing to a "Meets Standard" rating. He did not complete all required quarterly evaluations not did he request an extension to give additional time for evaluation." Soumas is rated a '2' (Needs Improvement) in the People Management/Development category.

Chaney made the following notes in the Teamwork category: "Although Dan has improved on getting performance evaluations up to date, more progress is needed in this area." Soumas is rated a '3' (Meets Standard) in this area.

Soumas attached a rebuttal to this particular evaluation and indicated on the cover of the evaluation he did agree with the evaluation "in part" and did not agree with the evaluation "in part." Soumas' rebuttal was received and reviewed by Undersheriff Gary Cuff and was attached to the evaluation; however no further action or changes were made to the original evaluation document in response to the rebuttal.

**10/31/00 to 11/30/01**

Captain Travis Chaney notes in the Planning and Organization category: "Dan needs to keep focused on time management and delegation in order to keep the communication flowing...This has been a recurring problem that bottlenecked written and verbal communication." Soumas is rated a '3' (Meets Standard) in this area.

Chaney made the following notes regarding Soumas' performance in the People Management/Development category: "He needs to coordinate the work-flow from his desk more efficiently. Because he has a high volume of work that passes his desk he needs to relieve the bottleneck that often occurs..." Soumas is rated a '2' (Needs Improvement) in this area.

**11/01/99 to 10/31/00**

Captain Travis Chaney notes in the People Management/Development category: "He needs to coordinate the work-flow from his desk more efficiently. Because he has a high volume of work that passes his desk he needs to relieve the bottleneck that often occurs..." Soumas is rated a '2' (Needs Improvement) in this area.

1.478

<u>Past Related Discipline – Entered in Personnel File</u>

In reviewing Soumas' Personnel File, I located the following:

5/30/2017    <u>Written Warning:</u> Soumas received a written warning in regards to an incident where Soumas did not provide information requested by the Undersheriff in a timely manner.   Major Neal Robertson issued the warning and noted Soumas' performance in this way: "as it relates to being efficient and meeting suspense dates on administrative matters can be described as inconsistent."

2/16/2017    <u>Written Warning:</u> Soumas received a written warning for not processing training records in a timely manner.   Major Neal Robertson issued the warning.   In it, Major Robertson addresses Soumas' performance with the following:

> Captain Soumas, your lack of responsiveness and timeliness has not been limited to the Training Unit.   Although; whether you realize it or not, your office is frequently referred to as a "black-hole".   The 'black-hole syndrome', no matter where it occurs, is a source of inefficiency that can create a chain of events that negatively affect others.   As a General Staff Officer, you have a duty to run your Division in an efficient and productive manner.   We have had more than one conversation about your performance as it relates to the timely completion of administrative duties.

1/23/2013    <u>Written Warning:</u> Soumas received a written warning in regards to a failure to produce paperwork in a timely manner.   Undersheriff Dan Mattos, then Major Mattos, issued the warning.   In the warning, Mattos addressed with Soumas the fact that he was overdue in completing evaluations, "excessively behind" on completing SWAT After Action Reports (AARs), and in getting SWAT training records to the Training Unit.   Mattos noted to Soumas, "Your prompt and continued attention to matters relating to the completion and timeliness of all tasks and assignments is essential and necessary..."

12/7/2010    <u>Written Reprimand:</u> Soumas received a written reprimand in regards to a failure to produce reports in a timely manner.   Major Mattos, issued the reprimand.   In the warning, Mattos addressed with Soumas the fact that he was overdue in completing AARs, overdue in completing a number of evaluations, and failed to address incidents which required reporting (cited are a personnel issue and a fleet crash).

Mattos addressed Soumas' performance writing, "...there has been a distinct pattern of poor performance relating to your use of time and lack of productivity." As related to delayed AARs, Mattos writes, "That you failed to complete After Action Reports in a timely manner speaks to the fact you grossly mismanaged your time and efforts as a seasoned Command Officer and exposed the Department to potential liability should the timeliness of your reporting be questioned." Mattos goes on to write, "...It is clear that you struggle to  manage your time and paperwork in an effective manner..."

23

1.477

## Past Related Discipline -- Entered in Spillman File

| | |
|---|---|
| 3/9/2017 | Counseling Note Entry #25: Soumas received a counseling note entered by Major Neal Robertson. The entry was made in regards to performance evaluations which are delinquent. Robertson noted, "Dan is personally delinquent on two evaluations." |
| 12/8/2015 | Counseling Note Entry #24: Soumas received a counseling note entered by Major Neal Robertson. The entry was made in regards to a meeting which Soumas failed to both prepare for and attend. Robertson "discussed the importance of good time management, completing assignments and being effective administrators." |
| 11/23/2010 | Counseling Note Entry #17: Soumas received a counseling note entered by Undersheriff Dan Mattos, then Captain Mattos. The entry was made in regards to a personnel event assigned by Mattos for Soumas to look into. Mattos addressed the untimeliness of Soumas' response to matter and noted, "...it is clear Captain Soumas struggles with prioritizing assignments..." and the intent of the counseling note was partially to urge Soumas to "...work towards efficiency in the handling of paperwork, assignments, and other matters that require prioritization and completion." |
| 8/4/2009 | Counseling Note Entry #14: Soumas received a counseling note entered by Captain Mattos. The entry, "makes note of the unsatisfactory performance by Lt. Soumas in the area of work productivity" and addresses several evaluations which Soumas failed to complete in a timely manner. At the time of the entry, Mattos identified nine evaluations assigned to Soumas which were overdue. Mattos noted, "...this entry serves as notice to Lt. Soumas that he needs to be conscious of deadlines, and to take what steps are needed to insure that assignments, routine tasks, and all other matters are addressed in a timely and efficient manner." |

24

1.478

```
^9/06/17              Kootenai County Sheriff's Office                    677
 3:56             Administrative Events Summary, by Date       Page:       1

Supervisor       Administrative Code            Employee
---------------  ----------------------------  ------------------------------
03/09/17
--------
N.ROBERTSON      Counselled                     SOUMAS, DANIEL
Comments:
```

Today, I met with Dan to review the status of his Division's personnel
evaluations.  9 of 19 employees are past due for their annual performance
review.  Dan is personally delinquent on two evaluations.  Sgt. Lallatin and
Sgt. March are each delinquent on several evals.  Lallatin is 32 months late on
one eval.

I explained to Dan that in the last year I have discussed with him, and others,
in our weekly Bureau meeting the need of getting and keeping current on evals, I
have sent him at least three emails advising him of the issue, I have provided
him a list of my expectations which include timely evaluations, and I have
documented in his last two evaluations that his division is consistently behind
in its people's performance evaluations.

Dan acknowledges the problem and said he will address it.  I explained that I
would be putting a counseling note in his file to hold him accountable.

Maj. Robertson 3/9/17

```
--------------------------------------------------------------------------
Report Includes:
All Employees matching `  92-65`
All Dates matching `03/09/17`
All Supervisor codes
All Admin Codes
--------------------------------------------------------------------------
              *** End of Report /tmp/rptVnUqaa-rppeadsm.r1_1 ***
```

1.479

9/06/17          Kootenai County Sheriff's Office              677
3:57          Administrative Events Summary, by Date      Page:    1

Supervisor      Administrative Code        Employee
---------------  ---------------------------  ---------------------------------
12/08/15
--------
N.ROBERTSON     Counselled                 SOUMAS, DANIEL
Comments:
On 9/30/15, the Undersheriff chaired a meeting regarding police video cameras,
digital media storage and digital evidence management.  At the conclusion of the
meeting, Capt. Soumas was assigned to identify issues associated with storage of
evidence (media, etc.).  At that time, the Undersheriff told the attendees to
bring back their recommendations to a follow-up meeting scheduled for 12/2/15 at
1000 hours.  Later that same day (9/30/15) the Undersheriff sent out an email
recapping the assignments and the date and time for the follow-up meeting.
Capt. Soumas, and the others, failed to attend the December 20th meeting.  To
Capt. Soumas' credit, he had researched his assigned topic(s) and emailed them
to me but not until after I sent him notice that he missed the meeting.

During our December 3rd meeting, we discussed the importance of good time
management, completing assignments, and being effective administrators.  I told
Capt. Soumas that I would be placing a counseling note in his file for the
missed meeting and provide him with a copy of it.

Maj. Neal W. Robertson

.------------------------------------------------------------------------------
Report Includes:
All Employees matching `    92-65`
All Dates matching `12/08/15`
All Supervisor codes
All Admin Codes
-------------------------------------------------------------------------------
          *** End of Report /tmp/rptVnUqaa-rppeadsm.rl_2 ***

1.480

```
09/06/17                    Kootenai County Sheriff's Office                        677
  :58                    Administrative Events Summary, by Date          Page:       1

Supervisor        Administrative Code              Employee
----------        ------------------              --------
11/23/10
--------
D.Mattos          Counselled                      SOUMAS, DANIEL
Comments:
```

In late October, 2010, information was brought to the attention of the administrative staff that suggested the possibility of a new deputy being mistreated by two tenured deputies.  Upon receipt of this information, I specifically made it known to Captain Soumas that both I, as well as the Undersheriff were interested in getting the facts surrounding the incident. Captain Soumas acknowledged my request, and said he would have someone look into it.

In the following weeks I checked with Captain Soumas to find the status of the inquiry.  Captain Soumas assured me that it was being looked into, and that Sergeant McFarland was assigned to investigate the matter.  I continued to inquire as to the status of the inquiry well into the month of November; Captain Soumas continued to tell me it was being looked into though had very little details on the incident.

On November 19th, Captain Soumas began a vacation in which he indicated he would not be returning to work until the 2nd or 3rd of December.  With this in mind, and knowing he Soumas would be gone for about two weeks, I sent the following email message to Lt. Miller, and Sgt. McFarland. As a courtesy to Captain Soumas, I copied the email to him; the email was sent on November 19th at 11:18 m:

Mike and Stu:

I need to get a handle on what went on out there between Sciortino, Nye, Hilton,(and Lyons?). This has been floating around for quite awhile, and I need the details as soon as possible.

Thanks

Dan

On November 19th at 1310 hrs., Captain Soumas sent the following email to me, and copied the email to both Lt. Miller and Sgt. McFarland:

Dan,

At this point Nye has been talked to, Lyons has been initially interviewed, and Hilton needs to be contacted.  When I was told about this I directed Sgt. McFarland to conduct a preliminary inquiry then report back to me on the events. If necessary, we will proceed further.  I have briefed you and the Undersheriff to get you in the loop, but I caution against going around our process.  It had already been "out there for a while" when we found out about it and it is being looked into.  Barring any significantly egregious conduct by any of the parties, my plan and preference is to deal with this informally at my level or below.

Thanks,

An

Supervisor        Administrative Code          Employee
----------------  --------------------------   ------------------------------

The above correspondence by Captain Soumas directed at specific orders I had given at best undermined the directions I had given to Lt. Miller and Sgt. McFarland, and at worst borders on insubordination.

I make specific reference to the fact I gave explicit orders that I expected to be carried out ("..this has been floating around for awhile, and I need the details as soon as possible..."). Captain Soumas responds to the specific orders in my correspondence by commenting in his above email: "If necessary, we will proceed further..." This comment alone by Captain Soumas--both in tone and intent--infers that my specific orders need not be followed and gives the clear impression that he has sole say of how this matter was to be directed.

I also make note that this matter had been in-process since late October 2010 and had yet to be satisfactorily completed.  Failure to complete tasks in a timely manner has been an ongoing problem with Captain Soumas. Earlier in the year specific steps had been taken to address this problem through extensive counseling as well as a directed assignment in which Captain Soumas was detailed to catch up several items of overdue paperwork (some of which was delayed for well over a year).

At this point it is clear Captain Soumas struggles with prioritizing assignments in such a way that they are in-line either with the wishes of those he is subordinate to, or to the same standard he holds others responsible for.  In the 'tuation with the inquiry into the deputies behavior, I make note that it was .ear that the matter was important not only to me, but also to the Undersheriff (who had also inquired as to the status on more than one occasion). The failure to address the matter in it's totality after weeks in process, coupled with Captain Soumas's above email correspondence speaks of a fundamental disregard for the wishes of his superiors as well as poor organizational and management skills.

The intent of this Counseling Note serves to make it clear that:

1.  Should Captain Soumas engage in any activity (either by word or deed) that could be reasonably regarded as undermining or insubordinate, the indicated conduct will be dealt with swiftly by the administration of appropriate discipline.  I note this is not the first instance in which I have spoken to Captain Soumas about behavior that had either the appearance or intent of undermining my authority as his direct supervisor.

2.  Captain Soumas will continue to work towards efficiency in the handling of paperwork, assignments, and other matters that require prioritization and completion.

Without a doubt, it does not fall short on senior members of the Command Staff that Captain Soumas is a dedicated, capable employee.  However, despite his service to both the community and the organization, I point out that Captain Soumas's conduct and performance is not beyond reproach, nor is he immune to the same disciplinary standards he hold others in his Command responsible for.  With this said, I again need to make it clear that any further behavior or performance that falls below the standards of this organization will be dealt 'th accordingly.

Major Dan Mattos
Operations Bureau Commander

1.482

```
`9/06/17                    Kootenai County Sheriff's Office                        677
 5:58                    Administrative Events Summary, by Date        Page:         3

Supervisor          Administrative Code              Employee
----------------    -------------------------        -----------------------------------

--------------------------------------------------------------------------------------
Report Includes:
All Employees matching `    92-65`
All Dates matching `11/23/10`
All Supervisor codes
All Admin Codes
--------------------------------------------------------------------------------------
              *** End of Report /tmp/rptVnUqaa-rppeadsm.r1_3 ***
```

1.483

| Supervisor | Administrative Code | Employee |
|---|---|---|
| | | |

```
08/04/09
--------
```

D.Mattos        Counselled                    SOUMAS, DANIEL
Comments:

The following administrative entry makes note of unsatisfactory performance by Lt. Soumas in the area of work productivity. This entry is corrective in nature, and serves to make the deficiency known to Lt. Soumas so the performance can be corrected in a positive manner:

Lt. Soumas transferred to the Patrol Division from the Jail Bureau in May, 2008. Lt. Soumas came to the Patrol Division after commanding the Custody Division at the KCSD Jail, and at the time he took command of the Patrol Division he had (5)pending evaluations that were due to Captain Chaney.  Lt. Soumas was aware of these evaluations, and early after his transfer there was casual discussion between he and I concerning the need to get the evaluations completed. As time went on and the year (2008) drew to an end, I was told by Captain Chaney that he had not receive the evaluations.

On February 17th, 2009, I spoke with Lt. Soumas about the evaluations. I told Lt. Soumas Capt. Chaney had inquired about the status of the evaluations.  Lt. Soumas told me at this point he was aware that the evaluations were due and acknowledged that he needed to be working on them.

n May 7th, 2009 I spoke with Lt. Soumas regarding the status of the Jail Bureau valuations. I learned that Lt. Soumas still had not completed four of the five evaluations due to Capt. Chaney.  I told Lt. Soumas during this conversation that he needed to be conscious of the need to complete his evaluations, as at this point he was getting desperately behind. I pointed out that at this time he had six evaluations due for Patrol Sergeants, and still owed Captain Chaney four.  Lt. Soumas acknowledged that the evaluations were due, and I told him it would be a good idea to try and get one a week done Lt. Soumas replied earnestly,  saying he would try to do two a week.

On June 3, 2009, at a Watch Commanders meeting, I brought to the entire Sergeant group's attention the fact that Patrol Division evaluations were getting behind. I solicited the group concerning what would be fair time-wise in terms of getting the evaluations caught up.  I suggested giving everybody two months to get current on the evaluations. It was ultimately agreed that two months would be the amount of time for the Division to get caught up.  This discussion is documented in the Watch Commander Meeting notes for that day.

On June 30, 2009, I sent an email to the Patrol Sergeants group reminding them well in advance that all evaluations needed to be "..completed, handed in, and signed off on.." by August 3rd, 2009. On this day I also spoke personally with Lt. Soumas and Lt. Richardson about the need to complete the evaluations as indicated. I also made it clear both in my conversation with Soumas and Richardson, as well as in the email, that personnel would be held accountable for the timely preparation and submission of the evaluations.

On July 1, 2009, during a Watch Commanders meeting in which Lt. Soumas was present, I again reminded all in attendance that the evaluations were due on ugust 3rd.  Quoting from the Watch Commander meeting notes

"Evaluations--can't stress enough the importance of getting them done and turned in on time (August 3). They are not expected to be novels, but they do need to

1.484

Supervisor        Administrative Code              Employee
-------------     ----------------------------    ---------------------------------
be personal (not just generic, non-specific) and done right."

On July 3, 2009, I issued an email to the Patrol Sergeant group, again
addressing the issue of the pending evaluations.  This email gave specific
instructions on what was expected in the evaluations and again brought to light
the fact that evaluations were coming due.

On August 4, 2009, I came to work and checked on the status of the evaluations.
I asked Personnel Technician Marcia Heglie to prepare a list of evaluations that
had not been completed for the Patrol Division; I also asked Capt. Chaney for a
list of evaluations that may be pending from Lt. Soumas.  In the list provided
by Heglie, I found that Lt. Soumas had failed to complete evaluations on Patrol
Division Sergeants Eixenberger, Jovick, Stinebaugh, Smart, Knight, McFarland,
and Miller.  In a check of the evaluations due to the Jail Bureau, I found that
Lt. Soumas had still not completed evaluations on Sergeants Boots and Forsythe.

I subsequently spoke with Lt. Soumas concerning the uncompleted evaluations.
Lt. Soumas acknowledged the fact that he was behind, and accepted responsibility
for not having the evaluations done--with some explanation.  Lt. Soumas told me
there were a host of events that had came up during the year that made it
difficult to get the evaluations done.  I told Lt. Soumas that I was aware of
the fact that he manages an extremely busy Division, however under the
circumstances there was ample time to complete his evaluations.  I told Lt.
Soumas at this time I would be issuing a counseling note documenting the fact
that his performance in this area was lacking.

Historically, Lt. Soumas has distinguished himself as an able, confident, and
effective leader in nearly all areas associated with his role as Patrol
Commander. Beyond any doubt, he has a great deal of common sense, a well defined
sense of service, and the raw ability to make difficult decisions both in the
field, as well as in the office.  Lt. Soumas is articulate, well spoken, and
capable of completing excellent written documents.

In the end, however, the singular area in which Lt. Soumas falls short is
his management of time in such a way as to complete assignments in a timely
manner.  In my conversation with Lt. Soumas on the issue of the evaluations I
pointed out to Lt. Soumas that he needed to find a way to manage his time
better, pointing out that I felt he tended to be a perfectionist--and that
although the need for perfection was important, the need to process matters in a
timely manner was equally important.  Lt. Soumas acknowledged this as a truth,
and told me he was aware that he needed to "find balance."

To the extent that I believe Lt. Soumas is capable of making a positive change
in time management, I have no doubt; Lt. Soumas is an excellent Command Officer,
and my talks with him regarding this subject reflect an acceptance of
responsibility and a willingness to effect change. With this said, I make one
final observation relative to the issue of the overdue evaluations:  in general,
the Patrol Sergeants that he manages complied with the evaluation deadline. The
fact that he did not meet the deadline on multiple evaluations will not go
unnoticed by those he supervises (all supervisors are privy to the list that
shows what evaluations are due, and those that are not).  Lt. Soumas, therefore,
needs to make every effort to have the evaluations turned in as quickly as
possible to retain integrity within the Division. To insure this is followed
through on, I am setting a due date for all incomplete evaluations of September
15, 2009.

1.485

```
 9/06/17                  Kootenai County Sheriff's Office                   677
   5:59              Administrative Events Summary, by Date      Page:        3

Supervisor        Administrative Code        Employee
---------------   --------------------------  ---------------------------
```

In conclusion, I note that this entry serves as notice to Lt. Soumas that he
needs to be conscious of deadlines, and to take what steps are needed to insure
that assignments, routine tasks, and all other matters are addressed in a timely
and efficient manner.


Captain Dan Mattos
Operations Bureau Commander


```
------------------------------------------------------------------------------
Report Includes:
All Employees matching `     92-65`
All Dates matching `08/04/09`
All Supervisor codes
All Admin Codes
------------------------------------------------------------------------------
```

             *** End of Report /tmp/rptVnUqaa-rppeadsm.r1_4 ***

1.486

# CONCLUSION 1.487-1.491

## CONCLUSION

The main focus of this investigation was to determine the reason for a delay in responding to a Public Records Request (PRR). The request in question was submitted by Kathy Griesmyer, Policy Director of the ACLU and received by our Records Section on August 4, 2017. Although Griesmyer's original request was dated August 3, 2017, it was received by our Records Section and disbursed to Captain Dan Soumas on the date it was received. Upon receiving it, the Records Assistant Supervisor, Joyce Cox, recognized the amount of information requested would most likely require more time to complete than normal and she elected to respond to the requestor with a delayed response which provided for a 10-day extension. She then provided the request to Soumas by email.

Upon receiving the request, Soumas' first response was to email Cox about the amount of information requested and his perspective on how long it was going to take for him to collect it. This theme carried on for several weeks, until Soumas sent his final response to Griesmyer on August 30, 2017. Given the 10-day extension, the request should have been answered by end of day on August 18, 2017.

During the twenty-six days in between receiving the request and answering it, Soumas makes several claims which he perceives as having caused delays in his ability to collect the required information. Soumas says the following things caused delays:

- The request was "voluminous" and complex, requiring information from many sources.
- The civil attorneys were not cooperating in collecting the information from the P.A.'s office for him.
- Keith Taylor was busy with budgets and did not have time to coordinate information from the Clerk's office for him.
- KCSO no longer had clerks available to assist in the collection of the information.
- Soumas was planning some "long planned staycation with" family.
- Soumas felt he had received an extension to the "end of the month" from Griesmyer.

In this conclusion, I will address each point listed above.

### The request was "voluminous" and complex, requiring information from many sources:

On several occasions, Soumas was advised both in emails from Civil Deputy Prosecuting Attorney David Ferguson and Civil Deputy Prosecuting Attorney Darrin Murphey and during a meeting with the same attorneys that he was only responsible to provide those records held by the Sheriff. There was no requirement for him to provide records held by the Prosecutor's office or the Clerk's office. Soumas was directed to have the ACLU provide records requests to the other elected officials.

Due to the "voluminous" and complex nature of the request, Soumas was also advised by the same attorneys to require advanced payment from the ACLU in order to cover the costs of the time to prepare the requested material as well as to 'indirectly' provide more time to collect the information. Murphey recalled advising Soumas there was technically "no way to get an

1.487

extension of time, but indirectly, an extension could be gained through a request of prepayment."

Soumas had a conversation in which he advises Griesmyer that the amount of information was going to take a "significant amount of research time and time to produce." During that conversation, Soumas asked Griesmyer to provide some clarification to her request. He also told her that, upon receiving clarifying information, he would notify her "of any anticipated costs and time frame to produce the requested information." His conversation was summarized in a follow-up email. Upon receiving the information from Griesmyer, Soumas did not provide any further information regarding costs or time to produce information.

The final document produced by Soumas was 3 ½ pages of a typed memorandum and six Annual Certification Reports (three from the North Idaho Violent Crimes Task Force and three from Kootenai County Sheriff's Office). All six of these reports indicate they were printed on August 10, 2017.

<u>The civil attorneys were not cooperating in collecting the information from the P.A.'s office for him:</u>
Soumas indicated he was under the impression the attorneys mentioned above were assisting him in collecting the information by coordinating with the prosecuting attorney to get the records he needed. His impression of this initially came from an email he received on August 4, 2017 from Ferguson which indicated Ferguson had forwarded the PRR to Prosecuting Attorney Barry McHugh "as some of those records will likely be in our office." Soumas held this assumption as he was directed by Ferguson to only produce the information held by the Sheriff's office in the email Ferguson sent to Soumas on August 4, 2017.

On August 11, 2017, Soumas emailed Griesmyer and advised her "before you send them (P.A.'s office) the request let me clarify their preference on how they want to handle the current request IE: do they want to piggy back on our response or provide their own." Soumas never provides any follow-up to this email – his next response is on August 25, 2017, and is a response to an email in which Griesmyer's is wanting to know when she might receive the information she requested.

In an interview, Murphey advised he had no communication with Soumas between August 11 and August 25, 2017. Murphey also advised both he and Ferguson told Soumas during their August 11th meeting the civil department was not the custodian of the Prosecutor's records and directed him to Barry McHugh. Both attorneys advised Soumas to respond to the PRR based on the records which the Sheriff held and to have the ACLU request records from other departments.

Soumas also described a conversation with Major Neal Robertson where Soumas was left with the impression he was not supposed to contact the prosecutor directly and had to go through the civil attorneys.

26

1.488

Exhibit D Page 84 of 175

**Keith Taylor was busy with budgets and did not have time to coordinate information from the Clerk's office for him:**
Knowing that the Clerk's office was, in fact, busy with budgeting, I did not feel it was necessary to confirm this information. Additionally, as the Clerk's records were not requested with a PRR from the ACLU, there was no requirement to them to provide records.

**KCSO no longer had clerks available to assist in the collection of the information:**
Soumas felt he was the "sole source" to conduct the research and gather this information. He said, "...records can't support it, nobody can support it, nobody wants to support it downtown..." He also claimed, "...nobody else has access to that information because I don't have clerical help anymore. Otherwise, it would have been Chris Clay or somebody..."

**Soumas was planning some "long planned staycation with" family:**
Soumas was unavailable during some portions of the time frame in which this PRR was pending. In an email, Soumas indicated he was out of town on August 14, 2017 at 2:09pm through August 15, 2017 in the evening. Additionally, Soumas sent an email indicating he was out of the office on August 22, 2017 at 11:36am through August 23, 2017 in the evening.

A review of Soumas' comp tracker shows he utilized 44 hours of comp time between the dates he received and answered the PRR. Between the date the PRR was received and the 'delayed request' deadline of 10-days (August 18, 2017), Soumas utilized 14 hours of comp time.

In a review of Soumas' calendar, Soumas entered having received the PRR on August 4, 2017. He also entered time he spent at meetings, speaking with Griesmyer, sending email, and conducting research related to the PRR on several dates. Soumas logged a total of 11 hours for these purposes. Granted, Soumas cannot be expected to log each time he worked on this PRR, but the times noted on page 18 of this document do reflect the time which he did log, and can at least be considered as the minimum time he spent on the response.

**Soumas felt he had received an extension to the "end of the month" from Griesmyer:**
On several occasions, Soumas commented that he was under the impression he had 'until the end of the month' to complete the PRR. To describe this impression, Soumas used statements such as:
- "I came away from that phone call that we had time to extend it 'cause I told her I'm not gonna be able to meet the deadline and she was good with that."
- "...our agreement on the phone it was verbal. I didn't get something in writing, um, was hey, you know, just keep working on it and let me know what we're doing."
- "End of the month basically."
- "I felt like the 10-day statutory thing had been waived."
- "...when I talked to her on the phone end of the month is what we came up with."
- "We kind of came to a verbal thing on the phone..."
- "That's my impression that we were good and we just needed to keep communicating."
- "...We made arrangements on this thing and she knew she wasn't gonna get it within 10 days."
- "Basically, we, she and I had an agreement..."

27

Soumas' own words did not describe a solid and tangible deadline which was agreed upon. When asked what specific words used by Griesmyer in a phone conversation gave Soumas the impression that he had until the end of month to complete the PRR, he answered, "I don't remember."

Throughout this investigation, Soumas felt many other people were preventing him from completing this request. The civil attorneys weren't cooperating, the Clerk's office wouldn't assist him, he had no secretarial support to assist him, and he was the 'sole source' for the information, and was trying to take some time off.

Soumas received advice from the civil attorneys who directed him to work only on collecting those records which were maintained by the Sheriff. He was also advised to contact Griesmyer to require an advance payment, which would indirectly provide an extension. Soumas received similar input from Robertson who advised him to clarify what the ACLU was looking for and to ask for an extension if the response was going to be delayed. Soumas did receive clarification, but did not follow through with the request for advance payment. This action would have resulted in an indirect delay to the response he was preparing.

A review of Soumas' personnel file revealed a consistent history of a similar tone. After reviewing the last thirteen evaluations which Soumas received since he was promoted to a command level position, I noted entries regarding past due evaluations, missed suspense dates, delays on administrative tasks, and deficiencies related to timeliness in each of the thirteen evaluations.

Comments such as, "Dan often has to be prodded to get results;" "Dan was significantly behind on some essential paperwork;" and "...the issue of timely processing of work...is Dan's "Achilles heel" and an issue that has historically been a problem for Dan" are also noted. Notes were also made regarding the "bottleneck of work flow at his office." This theme was consistent in each of the past thirteen evaluations.

In reviewing past discipline related to timeliness, I noted three written warnings and one written reprimand all regarding the topic. In one instance, Soumas' office is referred to as "a black-hole." Four counseling notes also exist regarding timeliness, the most current from March 2017.

Once again, we are addressing Soumas' deficiency as it relates to timeliness; in this case, an issue which legal advised could have potential liability for the Sheriff if not handled according to the Idaho Public Records Act. Although potential liability exists, on its face, Soumas' failure to address this PRR within a specified timeframe does not rise to high level of wrongdoing; however, when viewed from a global perspective, taking into consideration his past history of missing deadlines and delays on administrative tasks; the number of times in which he has been counseled, coached, and disciplined for these delays; and his failure to follow the advice of counsel in this matter aggravates the situation several degrees.

When asked if he bears any responsibility for the delayed response, Soumas answered, "No. I don't." Soumas' inability to recognize his responsibility to the delay in this response should also be considered. His final response to the ACLU was three and a half pages long with six automated reports attached. Throughout his interviews, he assigned blame to many other

1.490

people, yet accepted no accountability for a project which he was assigned to complete. The final report did not represent 24 hours of research and six hours of typing a response. Soumas' calendar did not provide for that amount of time to be consumed collecting and preparing the response. In fact, very little occurred between August 11 and August 25, 2017, when Griesmyer prompted an immediate reaction with her email asking when she could expect a response.

The focus of this investigation was to determine the reason for the delay in responding to the PRR. I believe Soumas' impression of a delay was just that – an impression. Griesmyer did anticipate receiving our information prior to sending out that reminder on August 25, 2017. She did not share the same impression Soumas had.

29

1.491

# PUBLIC RECORDS REQUEST  1.492-1.493



ACLU of Idaho
PO Box 1897
Boise, ID 83701
(208) 344-9750
www.acluidaho.org

August 3, 2017

Sheriff Ben Wolfinger
Kootenai County Sheriff
5500 N. Government Way
Coeur d'Alene, ID 83815

RE: Public Records Request

Sheriff Wolfinger:

Under the Idaho Public Records Act, the American Civil Liberties Union of Idaho Foundation, a tax-exempt nonprofit association, requests an opportunity to inspect and copy all of your records that fit any of these descriptions:

1. All documents describing any processes for accounting for all seized property and money in your jurisdiction from 2014-2016.
2. All documents that account for the retention and disposition of all seized property and money in your jurisdiction from 2014-2016.
3. All documents that indicate how many civil asset forfeiture actions were commenced in your jurisdiction from 2014-2016. Please indicate for each of the following categories how many of these were (a) granted; (b) denied; (c) defaulted; (d) settled or (e) resolved in some other manner.
4. All documents that detail all items seized in civil asset forfeiture actions in your jurisdiction from 2014-2016, including:
   a. Documents that detail the total monetary value of the items as well as whether the item was ultimately returned to its original owner or forfeited.
   b. Any documents that indicate whether criminal charges were brought in connection with the seizure and the case numbers of all related cases.
5. All documents that indicate how much funding your office has received for each year from 2014-2016 as a result of civil asset forfeiture, and where money from seized items is allocated.
6. If your jurisdiction participates in the Equitable Sharing Program, please provide any documentation of agreements relevant to the program.

We are requesting all records, whether they are stored physically (such as in file cabinets or boxes) or electronically (such as on computers, hard drives, USB drives, voicemail, or audio-visual equipment). If you have any questions about what materials I am requesting, please contact me.

For any materials available in a commonly used electronic format, please email them in that format to kgriesmyer@acluidaho.org. For any materials that you can't email to me, please phone me before you copy anything, because I am requesting to inspect the materials first to determine whether a record is relevant before it is copied. We need this information as soon as possible within the statutory time periods. If you have any questions, please contact me by email at kgriesmyer@acluidaho.org.

Thank you,

Kathy Griesmyer
Policy Director
ACLU of Idaho

1.492

## KOOTENAI COUNTY SHERIFF'S OFFICE
### Public Records Request Form

Date: 08/04/17     Report # _____     CAD# _____

Name: KATHY GRIESMYER/ACLU OF IDAHO

Mailing Address: PO BOX 1897  BOISE ID 83701

Telephone Number: 208 344-9750     Email: KGRIESMYER@ACLUIDAHO.ORG

I am requesting to copy or to examine certain records of the Kootenai County Sheriff's Office, which may be identified as follows:

Date & Time of Incident: _____

Address or Location of Incident: SEE ATTACHED

Date and Time of Incarcerations: _____

### FOR OFFICE USE ONLY BELOW THIS LINE.

☐ **Request Granted**     Sent: EMAILED DELAY 080417 JM
The requested record is attached.

☒ **Response Delayed**

    ☐ Additional time is necessary to process requested record(s). You should receive a response no later than three (3) working days following the date of your request.

    ☒ Additional time is necessary to locate or retrieve the requested record. You should receive a response no later than ten (10) working days following the date of your request.

    ☐ The electronic record requested will have to be converted to another electronic format which will take more than ten (10) working days following the date of your request to respond. Please contact the Kootenai County Sheriff's Office to discuss when you will receive a response.

☐ **Advance Payment**
The Kootenai County Sheriff's Office will require advance payment of the cost associated with responding to your request. Please contact the Kootenai County Sheriff's Office to discuss the amount and manner of the advance payment.

☐ **Unable to Respond for One or More of the Following Reasons**

    ☐ Record not known to exist.
    ☐ The Kootenai County Sheriff's Office is not the custodian of the requested record.

☐ **Notice of Denial**
The requested record is exempt from disclosure pursuant to Idaho Code §§ _____ (74-104 thru 74-111 and/or 74-124).

☐ **Notice of Partial Denial**
Your request has been partially denied. Certain information has been determined to be exempt from disclosure pursuant to Idaho Code §§ _____ (74-104 thru 74-111 and/or 74-124), and has therefore been redacted from the requested record. A copy of the requested record with the exempt information redacted is attached.

If your request has been denied or partially denied, the attorney for Kootenai County has reviewed the request, or Kootenai County has had the opportunity to consult with an attorney regarding the request for examination or copying of a record and has chosen not to do so. If you wish to appeal the denial or partial denial of your request for public records you may do so pursuant to the provisions of Idaho Code § 74-115, which requires that a petition be filed in the District Court within 180 days from the date of the mailing of the notice of denial or partial denial.

Signature of Kootenai County Sheriff's Office Representative _____ Date: _____

☐ RECORDS   ☐ MEDIA   ☐ 911   ☐ JAIL   ☒ OTHER_____

       KCSO-2-2016

# FINAL PRR REQUEST  4.494-1.523

**Kimberly Edmondson**

| | |
|---|---|
| From: | Daniel Soumas |
| Sent: | Wednesday, August 30, 2017 11:26 AM |
| To: | Kimberly Edmondson |
| Subject: | FW: ACLU Records Response Asset Forfeiture 817 |
| Attachments: | ACLU Records Response Asset Forfeiture 817.pdf |

From: Daniel Soumas
Sent: Wednesday, August 30, 2017 9:22 AM
To: 'Kathy Griesmyer'
Cc: Darrin Murphey
Subject: ACLU Records Response Asset Forfeiture 817

Kathy,

I am sending you the attached as our first response to your request.  I know you are out until the 7th and I again I appreciate your cooperation and the extensions granted on this request.

The attached document contains the answers to your request based upon your clarifications to me on the original request. As we have discussed I anticipate we will have additional conversations at which point I can produce any additional documentation.

Thanks,

Dan Soumas

1

1.494

Exhibit D Page 92 of 175



# SHERIFF
# KOOTENAI COUNTY



SHERIFF **BEN WOLFINGER**                                   UNDERSHERIFF **DAN MATTOS**

Memorandum

| | |
|---|---|
| **To:** | Kathy Griesmyer, Policy Director, ACLU of Idaho |
| **From:** | Captain Dan Soumas, Detective Commander, KCSO |
| **Date:** | August 27, 2017 |
| **Subject:** | Response to ACLU Records Request Asset Forfeiture |

Kathy,

First thank you for working with me on your request to include our conversations which clarified what you are seeking as well as what you <u>would not</u> want to receive as part of this request (IE: copies of police reports and other court paperwork) I have concluded that some of my answers will be more general in nature in anticipation of follow up conversations with you at a later date. After reviewing your request and the records actually held by KCSO I am submitting the following to you as our response:

For clarification on asset forfeitures records held by KCSO, we assist on this record keeping for two separate organizations, KCSO and the North Idaho Violent Crimes Task Force (NIVCTF) of which we are a member agency. I will report on each separately when appropriate as well as whether they are in fact State or Federal asset forfeitures.

Additionally, as you are aware, I have made attempts to coordinate a response by retrieving the records of our state court forfeitures from the Kootenai County Prosecuting Attorney's Office Civil Division (KCPAO) as they represent our interests in such matters. As of August 27, 2017 those KCPAO records have been unavailable. Therefore I will complete the response for KCSO with the information I have that would include only records generated by our Office. As we discussed previously via email, I am now notifying you that you will need to submit a request directly to them for this information. I will indicate in my response which portions of your request will need to be routed there.

Much of your records requests seem to focus on asset forfeitures as a result of state court proceedings. The KCPAO initiates all state forfeiture proceeding on KCSO's behalf, disburses the money or physical asset through the Kootenai County Auditor's Office to our agency when such actions result in a judgment of forfeiture.

<u>Answers to Specific "Descriptions" Set Forth in Request:</u>

1. All documents describing any process for accounting for all seized property and money in your jurisdiction from 2014 – 2016:

Answer: For state court asset forfeitures, KCSO does not per se have an internal policy for tracking and accounting for seized money and property specific to the asset forfeiture process. The monies or property we seize and submit for asset forfeiture are held by our property and evidence section under our normal evidence procedures. They are tracked by the KCPAO during the court process. Under some

5500 N. Government Way • P.O. Box 9000 • Coeur d'Alene, Idaho 83816-9000
Sheriff Phone: 208-446-1300 • Fax: 208-446-1307 • Jail Phone: 208-446-1400 • Fax: 208-446-1407
Website: www.kcsheriff.com • E-mail: kcso@kcgov.us

1.495

circumstances cash may be transferred to a bank account for safe keeping. Once the court process has been completed we receive a copy of any judgment along with instructions from the KCPAO on the disposition of the asset which varies on a case by case basis. KCPAO is the keeper of those records.

The tracking of any cash received or assets converted to cash is conducted by our County Auditor's Office. These monies are kept in a separate fund and further delineated by whether they are state of federal forfeiture dollars as the rules for the use of these monies are different depending upon their origin.

On Federal Court asset forfeitures, all assets are transferred to the US Marshals to be held pending disposition. We follow the Equitable Sharing Guidelines published by the DOJ during this process as well as for the disposition of any assets after they are awarded. Those guidelines are typically modified each year so specific rules did change during the time frame of your request.

Any assets awarded to KCSO are tracked by our auditor's office using the same process as described above.

2.  All documents that account for the retention and disposition of all seized property and money in your jurisdiction from 2014-2016.

Answer: On state asset forfeitures those documents are held by the KCPAO. On the federal side we file annual equitable sharing reports for both KCSO and the NIVCTF. Those report for the years 2014 – 2016 will be submitted as attachments as part of this response.

3.  All documents that indicate how many civil asset forfeiture actions were commenced in your jurisdiction from 2014 – 2016. Please indicate for each of the following categories how many of these were (a) granted, (b) denied, (c) defaulted, (d) settled or (e) resolved in some other manner.

Answer: On state asset forfeitures those documents regarding cases filed and dispositions are held by the KCPAO. On the federal side we file annual equitable sharing reports for both KCSO and the NIVCTF. Those report for the years 2014 – 2016 will be submitted as attachments as part of this response. With some inquiry to the DOJ and Courts we can likely provide copies of any filings / judgments received by both KCSO and the NIVCTF. There were a small number (typically large amounts of cash) during the time period specified in your request. However to get those specific case filings will require additional time.

4.  All documents that detail all items seized in civil asset forfeiture actions in your jurisdiction from 2014 – 2016 including:
    a.  Documents that detail the total monetary value of the items as well as whether the item was ultimately returned to the original owner or forfeited.
    b.  Any documents that indicate whether criminal charges were brought in connection with the seizure and the case numbers of all related cases.

Answer: On state asset forfeitures those documents are held by the KCPAO. On the federal side we file annual equitable sharing reports for both KCSO and the NIVCTF. Those report for the years 2014 – 2016 will be submitted as attachments as part of this response. The specific case numbers on the federal side will require additional time to access records not held by KCSO in order to cross reference those records to the KCSO reports which initiated the asset forfeiture action. In short, we don't maintain a list of police

reports specific to this category. I will need to look at asset transactions transferred to KCSO through the federal process via our Auditor's Office and track them back in that manner.

5. All documents that indicate how much funding your office has received for each year from 2014 - 2016 as a result of civil asset forfeiture, and where these monies are allocated.

Answer: Audit records indicate we received revenues for those <u>fiscal years</u> as follows:

KCSO:

| | | |
|---|---|---|
| 2014 (State): | 14,495.47 | 1,171.64 (Interest) |
| 2014 (Federal) | 121,141.29 | 1,999.23 (Interest) |
| 2015 (State): | 23,729.69 | 2,497.75 (Interest) |
| 2015 (Federal) | 81,158.40 | 2,361.32 (Interest) |
| 2016(State): | 24,258.35 | 243.58 (Interest) |
| 2016(Federal) | -0- | 2,172.48 (Interest) |

NIVCTF:

| | | |
|---|---|---|
| 2014 (State): | 8282.46 | 162.65(Interest) |
| 2014 (Federal) | 31,575.48 | 62.12 (Interest) |
| 2015 (State): | 1,042.00 | 546.98 (Interest) |
| 2015 (Federal) | 83,078.48 | 126.72 (Interest) |
| 2016(State): | 25,572.77 | -0- (Interest) |
| 2016(Federal) | -0- | -0- (Interest) |

Note: The above numbers are part of a spread sheet provided by the KC Auditor's Office prior to this request. I noted no interest indicated for 2016 which was likely updated by journal entry at a later time. Additional information will have to be requested from the auditor's office.

The monies listed above along with any balances carried forward are contained in specific accounts allocated for the Sheriff's use based upon the Prosecutor's Office interpretation of state code regarding the use of state court forfeiture assets and DOJ guidelines for the equitable sharing program on federal forfeiture assets. Generally speaking, the state guidelines are more restrictive than federal and typically require a nexus to drug activity. Specifics on how those dollars were spent will <u>require additional time</u> to audit each transaction.

6. If your jurisdiction participates in the Equitable Sharing Program, please provide any documents relevant to the program.

Answer: As stated previously both KCSO and the NIVCTF participate in the Federal Equitable Sharing Program. Copies of our filings for the time frame requested are attached as part of this response.

As part of your clarification email you added this item specific to future budgeting.

- Any relevant budgetary documents that indicates if the Kootenai County Sheriff's Department budgeted for future civil asset forfeiture income for 2014-2016

Answer: KCSO does not budget for future or anticipated revenues from either state or federal forfeitures. Our budget will include a line item for current asset forfeiture funds already in that fund as part of our budgeting process and authorization to spend a portion of those monies if deemed necessary. As the intent of these dollars is not to supplant normal funding but rather to be used as an enhancement to our general budget for the purpose of providing increased service to the community, these purchases are typically one-time items of equipment or training that improves those services.

Kathy, again I appreciate you working with me on this request and the extensions you have granted. The information to complete the picture is kept by three different government entities along with some other supporting agencies. To that end I had hoped to gather that information and submit a complete picture to you of our asset forfeiture program. Unfortunately that has not been possible to this point. I am asking that you review this document when you return to your office on September 7th, then contact me so we can fill in any gaps you find. I will commit to working with you and the KCPAO to gather any additional information needed to complete this request.

Sincerely,

Captain Dan Soumas
KCSO Detective Commander

1.498

**Kimberly Edmondson**

| | |
|---|---|
| From: | Daniel Soumas |
| Sent: | Wednesday, August 30, 2017 11:26 AM |
| To: | Kimberly Edmondson |
| Subject: | FW: Part 2 Response to Public Records Request |
| Attachments: | 2016 ESAC NIVCTF.pdf; 2015 ESAC NIVCTF.pdf; 2014 ESAC NIVCTF.pdf; 2016 ESAC KCSO.pdf; 2015 ESAC KCSO.pdf; 2014 ESAC KCSO.pdf |

**From:** Daniel Soumas
**Sent:** Wednesday, August 30, 2017 9:57 AM
**To:** 'Kathy Griesmyer'
**Subject:** Part 2 Response to Public Records Request

Kathy,

Attached are our Federal Filings attachments as referred to in the initial response.  Hope you are having some quality time off.  You can contact me at any time to continue this process.

Dan Soumas

1

1.499

OMB Number 1123-0011
Expires January 31, 2018

 **Equitable Sharing Agreement and Certification** 

NCIC/ORI/Tracking Number: IDEQ00287
Agency Name: North Idaho Violent Crimes Task Force          Type: Task Force
Mailing Address: 5500 N. Government Way / P.O. Box 9000
Coeur D' Alene, ID 83816-9000

Finance Contact
Name: Soumas, Dan
Phone: 2084461336          Email: dsoumas@kcgov.us

ESAC Preparer
Name: Soumas, Dan
Phone: 2084461336          Email: dsoumas@kcgov.us

FY End Date: 09/30/2016          Agency FY 2017 Budget: $212,502.37

## Annual Certification Report

| | Summary of Equitable Sharing Activity | Justice Funds [1] | Treasury Funds [2] |
|---|---|---|---|
| 1 | Begining Equitable Sharing Fund Balance (Must match Ending Balance from prior FY) | $97,695.21 | $0.00 |
| 2 | Equitable Sharing Funds Received | $0.00 | $0.00 |
| 3 | Equitable Sharing Funds Received from Other Law Enforcement Agencies and Task Force (Complete Table B) | $0.00 | $0.00 |
| 4 | Other Income | $0.00 | $0.00 |
| 5 | Interest Income | $860.99 | $0.00 |
| | Total Equitable Sharing Funds Received (total of lines 1-5) | $98,556.20 | $0.00 |
| 7 | Equitable Sharing Funds Spent (total of lines a - n below) | $15,665.71 | $0.00 |
| 8 | Ending Equitable Sharing Funds Balance (difference between line 7 and line 6) | $82,890.49 | $0.00 |

[1] Department of Justice Asset Forfeiture Program participants are: FBI, DEA, ATF, USPIS, USDA, DCIS, DSS, and FDA
[2] Department of the Treasury Asset Forfeiture Program participants are: IRS, ICE, CBP and USSS.

| | Summary of Shared Funds Spent | Justice Funds | Treasury Funds |
|---|---|---|---|
| a | Law enforcement operations and investigations | $0.00 | $0.00 |
| b | Training and education | $0.00 | $0.00 |
| c | Law enforcement, public safety and detention facilities | $0.00 | $0.00 |
| d | Law enforcement equipment | $15,665.71 | $0.00 |
| e | Joint law enforcement/public safety operations | $0.00 | $0.00 |
| f | Contracting for services | $0.00 | $0.00 |
| g | Law enforcement travel and per diem | $0.00 | $0.00 |
| h | Law enforcement awards and memorials | $0.00 | $0.00 |
| i | Drug, gang and other education or awareness programs | $0.00 | $0.00 |
| j | Matching grants (Complete Table C) | $0.00 | $0.00 |
| k | Transfers to other participating law enforcement agencies (Complete Table D) | $0.00 | $0.00 |
| l | Support of community-based programs (Complete Table E) | $0.00 | $0.00 |
| m | Non-categorized expenditures (Complete Table F) | $0.00 | $0.00 |
| n | Salaries (Complete Table G) | $0.00 | $0.00 |
| | Total | $15,665.71 | $0.00 |

Date Printed: 08/10/2017          Page 1 of 4          February 2016
                                                        Version 3.2

1.500

**Table A:  Members of the Task Force**

| Agency Name | NCIC/ORI/Tracking Number |
|---|---|
| Bonner County Sheriff Office | ID0090000 |
| Coeur D'Alene Police Depatment | ID0280100 |
| Kootenai County Sheriff's Office | ID0280000 |
| Post Falls Police Department | ID0280200 |

**Table B: Equitable Sharing Funds Received From Other Agencies**

| Transferring Agency Name | Justice Funds | Treasury Funds |
|---|---|---|
|  |  |  |

**Table C: Matching Grants**

| Matching Grant Name | Justice Funds | Treasury Funds |
|---|---|---|
|  |  |  |

**Table D: Transfers to Other Participating Law Enforcement Agencies**

| Receiving Agency Name | Justice Funds | Treasury Funds |
|---|---|---|
|  |  |  |

**Table E: Support of Community-based Programs**

| Recipient | Justice Funds | |
|---|---|---|
|  |  |  |

**Table F: Non-categorized expenditures in (a) - (n) Above**

| Description | Justice Funds | Treasury Funds |
|---|---|---|
|  |  |  |

**Table G: Salaries**

| Salary Type | Justice Funds | Treasury Funds |
|---|---|---|
|  |  |  |

| Paperwork Reduction Act Notice |
|---|
| Under the Paperwork Reduction Act, a person is not required to respond to a collection of information unless it displays a valid OMB control number. We try to create accurate and easily understood forms that impose the least possible burden on you to complete. The estimated average time to complete this form is 30 minutes. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, please write to the Asset Forfeiture and Money Laundering Section: 1400 New York Avenue, N.W., Washington, DC 20005. |

Did your agency purchase any controlled equipment?    ☐ YES    ☒ NO

Exhibit D Page 99 of 175

## Affidavit

Under penalty of perjury, the undersigned officials certify that they have read and understand their obligations under the Equitable Sharing Agreement and that the information submitted in conjunction with this Document is an accurate counting of funds received and spent by the Agency under the Guide during the reporting period and that the recipient Agency is compliant with the National Code of Professional Conduct for Asset Forfeiture.

The undersigned certify that the recipient Agency is in compliance with the applicable nondiscrimination requirements of the following laws and their implementing regulations: Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), and the Age Discrimination Act of 1975 (42 U.S.C. § 6101 et seq.), which prohibit discrimination on the basis of race, color, national origin, disability, or age in any federally assisted program or activity, or on the basis of sex in any federally assisted education program or activity. The Agency agrees that it will comply with all federal statutes and regulations permitting federal investigators access to records and any other sources of information as may be necessary to determine compliance with civil rights and other applicable statutes and regulations.

## Equitable Sharing Agreement

This Federal Equitable Sharing Agreement, entered into among (1) the Federal Government, (2) the above-stated law enforcement agency ("Agency"), and (3) the governing body, sets forth the requirements for participation in the federal Equitable Sharing Program and the restrictions on the use of federally forfeited cash, property, proceeds, and any interest earned thereon, which are equitably shared with participating law enforcement agencies. By submission of this form, the Agency agrees that it will be bound by the statutes and guidelines that regulate shared assets and the following requirements for participation in the Department of Justice and Department of the Treasury Equitable Sharing Programs. Receipt of the signed Equitable Sharing Agreement and Certification (this "Document") is a prerequisite to receiving any equitably shared cash, property, or proceeds.

1. **Submission.** This Document must be submitted within 60 days of the end of the Agency's fiscal year. This Document must be signed and submitted electronically. Electronic submission constitutes submission to the Department of Justice and the Department of the Treasury.

   **Signatories.** This agreement must be signed by the head of the Agency and the head of the governing body. Examples of Agency heads include police chief, sheriff, director, commissioner, superintendent, administrator, city attorney, county attorney, district attorney, prosecuting attorney, state attorney, commonwealth attorney, and attorney general. The governing body's head is the head of the agency that appropriates funding to the Agency. Examples of governing body heads include city manager, mayor, city council chairperson, county executive, county council chairperson, administrator, commissioner, and governor. The governing body head cannot be from the law enforcement agency and must be from a separate entity.

3. **Uses.** Any shared asset shall be used for law enforcement purposes in accordance with the statutes and guidelines that govern the Department of Justice and the Department of the Treasury Equitable Sharing Programs as set forth in the current edition of the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies (Guide).*

4. **Transfers.** Before the Agency transfers funds to other state or local law enforcement agencies, it must first verify with the Department of Justice that the receiving agency is a compliant Equitable Sharing Program participant. Transfers of tangible property are not permitted.

5. **Internal Controls.** The Agency agrees to account separately for federal equitable sharing funds received from the Department of Justice and the Department of the Treasury. Funds from state and local forfeitures, joint law enforcement operations funds, and other sources must not be commingled with federal equitable sharing funds.

The Agency certifies that funds are maintained by the jurisdiction maintaining appropriated funds and agrees that such accounting will be subject to the standard accounting requirements and practices employed by the Agency's jurisdiction in accordance with the requirements set forth in the current edition of the *Guide*, including the requirement to maintain relevant documents and records for five years.

The misuse or misapplication of shared resources or supplantation of existing resources with shared assets is prohibited. The Agency must follow its jurisdiction's procurement policies when expending shared funds. Failure to comply with any provision of 's agreement shall subject the recipient agency to the sanctions stipulated in the current edition of the *Guide*.

6. **Audit Report.** Audits will be conducted as provided by the Single Audit Act Amendments of 1996 and OMB Super Circular.

*Uniform Administrative Requirements, Costs Principles, and Audit Requirements for Federal Awards.* The Department of Justice and the Department of the Treasury reserve the right to conduct periodic random audits or reviews.

**7. Freedom of Information Act.** Information provided in this Document is subject to the FOIA requirements of the Department f Justice and the Department of the Treasury.

> **During the past fiscal year: (1) has any court or administrative agency issued any finding, judgment, or determination that the Agency discriminated against any person or group in violation of any of the federal civil rights statutes listed above; or (2) has the Agency entered into any settlement agreement with respect to any complaint filed with a court or administrative agency alleging that the Agency discriminated against any person or group in violation of any of the federal civil rights statutes listed above?**
>
> ☐ Yes    ☒ No

## Agency Head

Name: Wolfinger, Ben
Title:   Sheriff
Email: bwolfinger@kcgov.us


Signature: Submitted Electronically                          Date:  03/02/2017

To the best of my knowledge and belief, the information provided on this form is true and accurate and has been reviewed and authorized by the Law Enforcement Agency Head whose name appears above. Entry of the Agency Head name above indicates his/her acceptance of and agreement to abide by the policies and procedures set forth in the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies,* including ensuring permissibility of expenditures and following all required procurement policies and procedures. Entry of the Agency Head name above also indicates his/her acceptance of and agreement to abide by requirements set forth in this Equitable Sharing Agreement, and any policies or procedures issued by ⌐ Department of Justice or the Department of the Treasury related to the Asset Forfeiture or Equitable Sharing programs. The Law Enforcement Head o certifies that no items on the Prohibited list, as detailed in "Recommendations Pursuant to Executive Order 13688", were purchased with equitable sharing funds on or after October 1, 2015.

## Governing Body Head

Name:  Eberlien, Mark
Title:   Chairman BOCC
Email:  meberlein@kcgov.us


Signature: Submitted Electronically                          Date:  03/14/2017

To the best of my knowledge and belief, the agency's current fiscal year budget reported on this form is true and accurate and the Governing Body Head whose name appears above certifies that the agency's budget has not been supplanted as a result of receiving equitable sharing funds. Entry of the Governing Body Head name above indicates his/her acceptance of and agreement to abide by the policies and procedures set forth in the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies,* this Equitable Sharing Agreement, and any policies or procedures issued by the Department of Justice or the Department of the Treasury related to the Asset Forfeiture or Equitable Sharing Programs.

☒   I certify that I am authorized to submit this form on behalf of the Agency Head and the Governing Body Head.

Submitted Electronically on 03/16/2017

OMB Number 1123-0011
Expires January 31, 2018



**Equitable Sharing Agreement and Certification**



NCIC/ORI/Tracking Number: IDEQ00287
Agency Name: North Idaho Violent Crimes Task Force          Type: Task Force
Mailing Address: 5500 N. Government Way / P.O. Box 9000
               Coeur D' Alene, ID 83816-9000

**Finance Contact**
Name: Soumas, Dan
Phone: 2084461336
               Email:dsoumas@kcgov.us

**ESAC Preparer**
Name: Soumas, Dan
Phone: 2084461336
               Email:dsoumas@kcgov.us

FY End Date: 09/30/2015          Agency FY 2016 Budget: $320,000.00

## Annual Certification Report

| | Summary of Equitable Sharing Activity | Justice Funds [1] | Treasury Funds [2] |
|---|---|---|---|
| 1 | Begining Equitable Sharing Fund Balance (Must match Ending Balance from prior FY) | $16,286.82 | $0.00 |
| 2 | Equitable Sharing Funds Received | $1,920.08 | $0.00 |
| 3 | Equitable Sharing Funds Received from Other Law Enforcement Agencies and Task Force (Complete Table B) | $81,158.40 | $0.00 |
| 4 | Other Income | $0.00 | $0.00 |
| 5 | Interest Income | $310.36 | $0.00 |
| | Total Equitable Sharing Funds Received (total of lines 1-5) | $99,655.66 | $0.00 |
| 7 | Equitable Sharing Funds Spent (total of lines a - n below) | $1,960.45 | $0.00 |
| 8 | Ending Equitable Sharing Funds Balance (difference between line 7 and line 6) | $97,695.21 | $0.00 |

[1] Department of Justice Asset Forfeiture Program participants are: FBI, DEA, ATF, USPIS, USDA, DCIS, DSS, and FDA
[2] Department of the Treasury Asset Forfeiture Program participants are: IRS, ICE, CBP and USSS.

| | Summary of Shared Funds Spent | Justice Funds | Treasury Funds |
|---|---|---|---|
| a | Law enforcement operations and investigations | $0.00 | $0.00 |
| b | Training and education | $0.00 | $0.00 |
| c | Law enforcement, public safety and detention facilities | $0.00 | $0.00 |
| d | Law enforcement equipment | $1,861.95 | $0.00 |
| e | Joint law enforcement/public safety operations | $0.00 | $0.00 |
| f | Contracting for services | $98.50 | $0.00 |
| g | Law enforcement travel and per diem | $0.00 | $0.00 |
| h | Law enforcement awards and memorials | $0.00 | $0.00 |
| i | Drug, gang and other education or awareness programs | $0.00 | $0.00 |
| j | Matching grants (Complete Table C) | $0.00 | $0.00 |
| k | Transfers to other participating law enforcement agencies (Complete Table D) | $0.00 | $0.00 |
| l | Support of community-based programs (Complete Table E) | $0.00 | $0.00 |
| m | Non-categorized expenditures (Complete Table F) | $0.00 | $0.00 |
| n | Salaries (Complete Table G) | $0.00 | $0.00 |
| | Total | $1,960.45 | $0.00 |

Date Printed: 08/10/2017          Page 1 of 4          February 2016
                                                                 Version 3.1

                                                                     1.504

**Table A: Members of the Task Force**

| Agency Name | NCIC/ORI/Tracking Number |
|---|---|
| Bonner County Sheriff Office | ID0090000 |
| Coeur D'Alene Police Depament | ID0280100 |
| Kootenai County Sheriff's Office | ID0280000 |
| Post Falls Police Department | ID0280200 |

**Table B: Equitable Sharing Funds Received From Other Agencies**

| Transferring Agency Name | Justice Funds | Treasury Funds |
|---|---|---|
| KOOTENAI COUNTY SHERIFF'S OFFICE - ID0280000 | $81,158.40 | |

**Table C: Matching Grants**

| Matching Grant Name | Justice Funds | Treasury Funds |
|---|---|---|
| | | |

**Table D: Transfers to Other Participating Law Enforcement Agencies**

| Receiving Agency Name | Justice Funds | Treasury Funds |
|---|---|---|
| | | |

**Table E: Support of Community-based Programs**

| Recipient | Justice Funds | |
|---|---|---|
| | | |

**Table F: Non-categorized expenditures in (a) - (n) Above**

| Description | Justice Funds | Treasury Funds |
|---|---|---|
| | | |

**Table G: Salaries**

| Salary Type | Justice Funds | Treasury Funds |
|---|---|---|
| | | |

### Paperwork Reduction Act Notice

Under the Paperwork Reduction Act, a person is not required to respond to a collection of information unless it displays a valid OMB control number. We try to create accurate and easily understood forms that impose the least possible burden on you to complete. The estimated average time to complete this form is 30 minutes. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, please write to the Asset Forfeiture and Money Laundering Section: 1400 New York Avenue, N.W., Washington, DC 20005.

Did your agency purchase any controlled equipment?   ☐ YES   ☒ NO

Exhibit D Page 103 of 175

## Affidavit

Under penalty of perjury, the undersigned officials certify that they have read and understand their obligations under the Equitable Sharing Agreement and that the information submitted in conjunction with this Document is an accurate counting of funds received and spent by the Agency under the Guide during the reporting period and that the recipient Agency is compliant with the National Code of Professional Conduct for Asset Forfeiture.

The undersigned certify that the recipient Agency is in compliance with the applicable nondiscrimination requirements of the following laws and their implementing regulations: Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), and the Age Discrimination Act of 1975 (42 U.S.C. § 6101 et seq.), which prohibit discrimination on the basis of race, color, national origin, disability, or age in any federally assisted program or activity, or on the basis of sex in any federally assisted education program or activity. The Agency agrees that it will comply with all federal statutes and regulations permitting federal investigators access to records and any other sources of information as may be necessary to determine compliance with civil rights and other applicable statutes and regulations.

## Equitable Sharing Agreement

This Federal Equitable Sharing Agreement, entered into among (1) the Federal Government, (2) the above-stated law enforcement agency ("Agency"), and (3) the governing body, sets forth the requirements for participation in the federal Equitable Sharing Program and the restrictions upon the use of federally forfeited cash, property, proceeds, and any interest earned thereon, which are equitably shared with participating law enforcement agencies. By submission of this form, the Agency agrees that it will be bound by the statutes and guidelines that regulate shared assets and the following requirements for participation in the Department of Justice and Department of the Treasury Equitable Sharing Programs. Receipt of the signed Equitable Sharing Agreement and Certification (this "Document") is a prerequisite to receiving any equitably shared cash, property, or proceeds.

**1. Submission.** This Document must be submitted within 60 days of the end of the Agency's fiscal year. This Document must be signed and submitted electronically. Electronic submission constitutes submission to the Department of Justice and the Department of the Treasury.

**. Signatories.** This agreement must be signed by the head of the Agency and the head of the governing body. Examples of Agency heads include police chief, sheriff, director, commissioner, superintendent, administrator, city attorney, county attorney, district attorney, prosecuting attorney, state attorney, commonwealth attorney, and attorney general. The governing body's head is the head of the agency that appropriates funding to the Agency. Examples of governing body heads include city manager, mayor, city council chairperson, county executive, county council chairperson, administrator, commissioner, and governor. The governing body head cannot be from the law enforcement agency and must be from a separate entity.

**3. Uses.** Any shared asset shall be used for law enforcement purposes in accordance with the statutes and guidelines that govern the Department of Justice and the Department of the Treasury Equitable Sharing Programs as set forth in the current edition of the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies (Guide)*.

**4. Transfers.** Before the Agency transfers funds to other state or local law enforcement agencies, it must first verify with the Department of Justice that the receiving agency is a compliant Equitable Sharing Program participant. Transfers of tangible property are not permitted.

**5. Internal Controls.** The Agency agrees to account separately for federal equitable sharing funds received from the Department of Justice and the Department of the Treasury. Funds from state and local forfeitures, joint law enforcement operations funds, and other sources must not be commingled with federal equitable sharing funds.

The Agency certifies that funds are maintained by the jurisdiction maintaining appropriated funds and agrees that such accounting will be subject to the standard accounting requirements and practices employed by the Agency's jurisdiction in accordance with the requirements set forth in the current edition of the *Guide*, including the requirement to maintain relevant documents and records for five years.

The misuse or misapplication of shared resources or supplantation of existing resources with shared assets is prohibited. The Agency must follow its jurisdiction's procurement policies when expending shared funds. Failure to comply with any provision of 's agreement shall subject the recipient agency to the sanctions stipulated in the current edition of the *Guide*.

**6. Audit Report.** Audits will be conducted as provided by the Single Audit Act Amendments of 1996 and OMB Super Circular,

*Uniform Administrative Requirements, Costs Principles, and Audit Requirements for Federal Awards.* The Department of Justice and the Department of the Treasury reserve the right to conduct periodic random audits or reviews.

7. **Freedom of Information Act.** Information provided in this Document is subject to the FOIA requirements of the Department of Justice and the Department of the Treasury.

> During the past fiscal year: (1) has any court or administrative agency issued any finding, judgment, or determination that the Agency discriminated against any person or group in violation of any of the federal civil rights statutes listed above; <u>or</u> (2) has the Agency entered into any settlement agreement with respect to any complaint filed with a court or administrative agency alleging that the Agency discriminated against any person or group in violation of any of the federal civil rights statutes listed above?
> ☐ Yes   ☒ No

## Agency Head

Name: Wolfinger, Ben
Title:  Sheriff
Email: bwolfinger@kcgov.us


Signature: _____   Date: _____

To the best of my knowledge and belief, the information provided on this form is true and accurate and has been reviewed and authorized by the Law Enforcement Agency Head whose name appears above. Entry of the Agency Head name above indicates his/her acceptance of and agreement to abide by the policies and procedures set forth in the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies*, including ensuring permissibility of expenditures and following all required procurement policies and procedures. Entry of the Agency Head name above also indicates his/her acceptance of and agreement to abide by requirements set forth in this Equitable Sharing Agreement, and any policies or procedures issued by the Department of Justice or the Department of the Treasury related to the Asset Forfeiture or Equitable Sharing programs. The Law Enforcement Head also certifies that no items on the Prohibited list, as detailed in "Recommendations Pursuant to Executive Order 13688", were purchased with equitable sharing funds on or after October 1, 2015.

## Governing Body Head

Name:  Green, Dan
Title:   Chairman BOCC
Email:  dgreen@kcgov.us


Signature: _____   Date: _____

To the best of my knowledge and belief, the agency's current fiscal year budget reported on this form is true and accurate and the Governing Body Head whose name appears above certifies that the agency's budget has not been supplanted as a result of receiving equitable sharing funds. Entry of the Governing Body Head name above indicates his/her acceptance of and agreement to abide by the policies and procedures set forth in the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies*, this Equitable Sharing Agreement, and any policies or procedures issued by the Department of Justice or the Department of the Treasury related to the Asset Forfeiture or Equitable Sharing Programs.

☒  I certify that I am authorized to submit this form on behalf of the Agency Head and the Governing Body Head.

Submitted Electronically on 10/05/2016



OMB Number 1123-0011
Expires January 31, 2018



**Equitable Sharing Agreement and Certification**



NCIC/ORI/Tracking Number: IDEQ00287
Agency Name: North Idaho Violent Crimes Task Force                 Type: Task Force
Mailing Address: 5500 N. Government Way / P.O. Box 9000
                 Coeur D' Alene, ID 83816-9000

Finance Contact
Name:  Soumas, Dan
Phone: 2084461336            Email:dsoumas@kcgov.us

ESAC Preparer
Name:  Soumas, Dan
Phone: 2084461336            Email:dsoumas@kcgov.us

FY End Date: 09/30/2014                        Agency FY 2015 Budget: $335,000.00

## Annual Certification Report

| | Summary of Equitable Sharing Activity | Justice Funds [1] | Treasury Funds [2] |
|---|---|---|---|
| 1 | Begining Equitable Sharing Fund Balance (Must match Ending Balance from prior FY) | $16,190.67 | $0.00 |
| 2 | Equitable Sharing Funds Received | $0.00 | $0.00 |
| 3 | Equitable Sharing Funds Received from Other Law Enforcement Agencies and Task Force (Complete Table B) | $0.00 | $0.00 |
| 4 | Other Income | $0.00 | $0.00 |
| 5 | Interest Income | $76.15 | $0.00 |
| | Total Equitable Sharing Funds Received (total of lines 1-5) | $16,266.82 | $0.00 |
| 7 | Equitable Sharing Funds Spent (total of lines a - n below) | $0.00 | $0.00 |
| 8 | Ending Equitable Sharing Funds Balance (difference between line 7 and line 6) | $16,266.82 | $0.00 |

[1] Department of Justice Asset Forfeiture Program participants are: FBI, DEA, ATF, USPIS, USDA, DCIS, DSS, and FDA
[2] Department of the Treasury Asset Forfeiture Program participants are: IRS, ICE, CBP and USSS.

| | Summary of Shared Funds Spent | Justice Funds | Treasury Funds |
|---|---|---|---|
| a | Law enforcement operations and investigations | $0.00 | $0.00 |
| b | Training and education | $0.00 | $0.00 |
| c | Law enforcement, public safety and detention facilities | $0.00 | $0.00 |
| d | Law enforcement equipment | $0.00 | $0.00 |
| e | Joint law enforcement/public safety operations | $0.00 | $0.00 |
| f | Contracting for services | $0.00 | $0.00 |
| g | Law enforcement travel and per diem | $0.00 | $0.00 |
| h | Law enforcement awards and memorials | $0.00 | $0.00 |
| i | Drug, gang and other education or awareness programs | $0.00 | $0.00 |
| j | Matching grants (Complete Table C) | $0.00 | $0.00 |
| k | Transfers to other participating law enforcement agencies (Complete Table D) | $0.00 | $0.00 |
| l | Support of community-based programs (Complete Table E) | $0.00 | $0.00 |
| m | Non-categorized expenditures (Complete Table F) | $0.00 | $0.00 |
| n | Salaries (Complete Table G) | $0.00 | $0.00 |
| | Total | $0.00 | $0.00 |

Date Printed: 08/10/2017                    Page 1 of 4                    February 2016
                                                                          Version 3.1

                                                                          1.505

Exhibit D Page 106 of 175

**Table A: Members of the Task Force**

| Agency Name | NCIC/ORI/Tracking Number |
|---|---|
| BONNER COUNTY SHERIFF'S OFFICE | ID0090000 |
| COEUR D'ALENE POLICE DEPARTMENT | ID0280100 |
| KOOTENAI COUNTY SHERIFF'S OFFICE | ID0280000 |
| POST FALLS POLICE DEPARTMENT | ID0280200 |

**Table B: Equitable Sharing Funds Received From Other Agencies**

| Transferring Agency Name | Justice Funds | Treasury Funds |
|---|---|---|
| | | |

**Table C: Matching Grants**

| Matching Grant Name | Justice Funds | Treasury Funds |
|---|---|---|
| | | |

**Table D: Transfers to Other Participating Law Enforcement Agencies**

| Receiving Agency Name | Justice Funds | Treasury Funds |
|---|---|---|
| | | |

**Table E: Support of Community-based Programs**

| Recipient | Justice Funds | |
|---|---|---|
| | | |

**Table F: Non-categorized expenditures in (a) - (n) Above**

| Description | Justice Funds | Treasury Funds |
|---|---|---|
| | | |

**Table G: Salaries**

| Salary Type | Justice Funds | Treasury Funds |
|---|---|---|
| | | |

### Paperwork Reduction Act Notice

Under the Paperwork Reduction Act, a person is not required to respond to a collection of information unless it displays a valid OMB control number. We try to create accurate and easily understood forms that impose the least possible burden on you to complete. The estimated average time to complete this form is 30 minutes. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, please write to the Asset Forfeiture and Money Laundering Section: 1400 New York Avenue, N.W., Washington, DC 20005.

Did your agency purchase any controlled equipment?   ☐ YES   ☒ NO

Date Printed:08/10/2017          Page 2 of 4          February 2016  1.509 Version 3.1

Exhibit D Page 107 of 175

# Affidavit

Under penalty of perjury, the undersigned officials certify that they have read and understand their obligations under the Equitable Sharing Agreement and that the information submitted in conjunction with this Document is an accurate counting of funds received and spent by the Agency under the Guide during the reporting period and that the recipient Agency is compliant with the National Code of Professional Conduct for Asset Forfeiture.

The undersigned certify that the recipient Agency is in compliance with the applicable nondiscrimination requirements of the following laws and their implementing regulations: Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), and the Age Discrimination Act of 1975 (42 U.S.C. § 6101 et seq.), which prohibit discrimination on the basis of race, color, national origin, disability, or age in any federally assisted program or activity, or on the basis of sex in any federally assisted education program or activity. The Agency agrees that it will comply with all federal statutes and regulations permitting federal investigators access to records and any other sources of information as may be necessary to determine compliance with civil rights and other applicable statutes and regulations.

# Equitable Sharing Agreement

This Federal Equitable Sharing Agreement, entered into among (1) the Federal Government, (2) the above-stated law enforcement agency ("Agency"), and (3) the governing body, sets forth the requirements for participation in the federal Equitable Sharing Program and the restrictions upon the use of federally forfeited cash, property, proceeds, and any interest earned thereon, which are equitably shared with participating law enforcement agencies. By submission of this form, the Agency agrees that it will be bound by the statutes and guidelines that regulate shared assets and the following requirements for participation in the Department of Justice and Department of the Treasury Equitable Sharing Programs. Receipt of the signed Equitable Sharing Agreement and Certification (this "Document") is a prerequisite to receiving any equitably shared cash, property, or proceeds.

1. **Submission.** This Document must be submitted within 60 days of the end of the Agency's fiscal year. This Document must be signed and submitted electronically. Electronic submission constitutes submission to the Department of Justice and the Department of the Treasury.

   **Signatories.** This agreement must be signed by the head of the Agency and the head of the governing body. Examples of Agency heads include police chief, sheriff, director, commissioner, superintendent, administrator, city attorney, county attorney, district attorney, prosecuting attorney, state attorney, commonwealth attorney, and attorney general. The governing body's head is the head of the agency that appropriates funding to the Agency. Examples of governing body heads include city manager, mayor, city council chairperson, county executive, county council chairperson, administrator, commissioner, and governor. The governing body head cannot be from the law enforcement agency and must be from a separate entity.

3. **Uses.** Any shared asset shall be used for law enforcement purposes in accordance with the statutes and guidelines that govern the Department of Justice and the Department of the Treasury Equitable Sharing Programs as set forth in the current edition of the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies (Guide)*.

4. **Transfers.** Before the Agency transfers funds to other state or local law enforcement agencies, it must first verify with the Department of Justice that the receiving agency is a compliant Equitable Sharing Program participant. Transfers of tangible property are not permitted.

5. **Internal Controls.** The Agency agrees to account separately for federal equitable sharing funds received from the Department of Justice and the Department of the Treasury. Funds from state and local forfeitures, joint law enforcement operations funds, and other sources must not be commingled with federal equitable sharing funds.

   The Agency certifies that funds are maintained by the jurisdiction maintaining appropriated funds and agrees that such accounting will be subject to the standard accounting requirements and practices employed by the Agency's jurisdiction in accordance with the requirements set forth in the current edition of the *Guide*, including the requirement to maintain relevant documents and records for five years.

   The misuse or misapplication of shared resources or supplantation of existing resources with shared assets is prohibited. The Agency must follow its jurisdiction's procurement policies when expending shared funds. Failure to comply with any provision of 's agreement shall subject the recipient agency to the sanctions stipulated in the current edition of the *Guide*.

6. **Audit Report.** Audits will be conducted as provided by the Single Audit Act Amendments of 1996 and OMB Super Circular.

*Uniform Administrative Requirements, Costs Principles, and Audit Requirements for Federal Awards.* The Department of Justice and the Department of the Treasury reserve the right to conduct periodic random audits or reviews.

**7. Freedom of Information Act.** Information provided in this Document is subject to the FOIA requirements of the Department ʻ Justice and the Department of the Treasury.

> **During the past fiscal year: (1) has any court or administrative agency issued any finding, judgment, or determination that the Agency discriminated against any person or group in violation of any of the federal civil rights statutes listed above; or (2) has the Agency entered into any settlement agreement with respect to any complaint filed with a court or administrative agency alleging that the Agency discriminated against any person or group in violation of any of the federal civil rights statutes listed above?**
>
> ☐ Yes   ☒ No

## Agency Head

Name: Wolfinger, Ben
Title:   Sheriff
Email: bwolfinger@kcgov.us

Signature: _____   Date: _____

To the best of my knowledge and belief, the information provided on this form is true and accurate and has been reviewed and authorized by the Law Enforcement Agency Head whose name appears above. Entry of the Agency Head name above indicates his/her acceptance of and agreement to abide by the policies and procedures set forth in the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies*, including ensuring permissibility of expenditures and following all required procurement policies and procedures. Entry of the Agency Head name above also indicates his/her acceptance of and agreement to abide by requirements set forth in this Equitable Sharing Agreement, and any policies or procedures issued by ˀ Department of Justice or the Department of the Treasury related to the Asset Forfeiture or Equitable Sharing programs. The Law Enforcement Head o certifies that no items on the Prohibited list, as detailed in "Recommendations Pursuant to Executive Order 13688", were purchased with equitable sharing funds on or after October 1, 2015.

## Governing Body Head

Name:  Green, Dan
Title:   Chairman BOCC
Email:  dgreen@kcgov.us

Signature: _____   Date: _____

To the best of my knowledge and belief, the agency's current fiscal year budget reported on this form is true and accurate and the Governing Body Head whose name appears above certifies that the agency's budget has not been supplanted as a result of receiving equitable sharing funds. Entry of the Governing Body Head name above indicates his/her acceptance of and agreement to abide by the policies and procedures set forth in the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies*, this Equitable Sharing Agreement, and any policies or procedures issued by the Department of Justice or the Department of the Treasury related to the Asset Forfeiture or Equitable Sharing Programs.

☒  I certify that I am authorized to submit this form on behalf of the Agency Head and the Governing Body Head.

Submitted Electronically on 01/13/2016

Exhibit D Page 109 of 175

OMB Number 1123-0011
Expires January 31, 2016

 **Equitable Sharing Agreement and Certification** 

**NCIC/ORI/Tracking Number:** ID0280000
**Agency Name:** Kootenai County Sheriff's Office          **Type:** Sheriff's Office
**Mailing Address:** 5500 N. Government Way / P.O. Box 9000
            Coeur D' Alene, ID 83816-9000

**Finance Contact**
**Name:** Soumas, Dan
**Phone:** 2084461336          **Email:** dsoumas@kcgov.us

**ESAC Preparer**
**Name:** Soumas, Dan
**Phone:** 2084461336          **Email:** dsoumas@kcgov.us

**FY End Date:** 09/30/2016          **Agency FY 2017 Budget:** $11,997,791.00

## Annual Certification Report

| | Summary of Equitable Sharing Activity | Justice Funds [1] | Treasury Funds [2] |
|---|---|---|---|
| 1 | Begining Equitable Sharing Fund Balance (Must match Ending Balance from prior FY) | $393,089.15 | $0.00 |
| 2 | Equitable Sharing Funds Received | $0.00 | $0.00 |
| 3 | Equitable Sharing Funds Received from Other Law Enforcement Agencies and Task Force (Complete Table B) | $0.00 | $0.00 |
| 4 | Other Income | $0.00 | $0.00 |
| 5 | Interest Income | $2,172.49 | $0.00 |
| | Total Equitable Sharing Funds Received (total of lines 1-5) | $395,261.64 | $0.00 |
| 7 | Equitable Sharing Funds Spent (total of lines a - n below) | $119,090.94 | $0.00 |
| 8 | Ending Equitable Sharing Funds Balance (difference between line 7 and line 6) | $276,170.70 | $0.00 |

[1] Department of Justice Asset Forfeiture Program participants are: FBI, DEA, ATF, USPIS, USDA, DCIS, DSS, and FDA
[2] Department of the Treasury Asset Forfeiture Program participants are: IRS, ICE, CBP and USSS.

| | Summary of Shared Funds Spent | Justice Funds | Treasury Funds |
|---|---|---|---|
| a | Law enforcement operations and investigations | $0.00 | $0.00 |
| b | Training and education | $0.00 | $0.00 |
| c | Law enforcement, public safety and detention facilities | $0.00 | $0.00 |
| d | Law enforcement equipment | $114,848.94 | $0.00 |
| e | Joint law enforcement/public safety operations | $0.00 | $0.00 |
| f | Contracting for services | $0.00 | $0.00 |
| g | Law enforcement travel and per diem | $4,242.00 | $0.00 |
| h | Law enforcement awards and memorials | $0.00 | $0.00 |
| i | Drug, gang and other education or awareness programs | $0.00 | $0.00 |
| j | Matching grants (Complete Table C) | $0.00 | $0.00 |
| k | Transfers to other participating law enforcement agencies (Complete Table D) | $0.00 | $0.00 |
| l | Support of community-based programs (Complete Table E) | $0.00 | $0.00 |
| m | Non-categorized expenditures (Complete Table F) | $0.00 | $0.00 |
| n | Salaries (Complete Table G) | $0.00 | $0.00 |
| | Total | $119,090.94 | $0.00 |

Exhibit D Page 110 of 175

**Table B: Equitable Sharing Funds Received From Other Agencies**

| Transferring Agency Name | Justice Funds | Treasury Funds |
|---|---|---|
|  |  |  |

**Table C: Matching Grants**

| Matching Grant Name | Justice Funds | Treasury Funds |
|---|---|---|
|  |  |  |

**Table D: Transfers to Other Participating Law Enforcement Agencies**

| Receiving Agency Name | Justice Funds | Treasury Funds |
|---|---|---|
|  |  |  |

**Table E: Support of Community-based Programs**

| Recipient | Justice Funds | |
|---|---|---|
|  |  |  |

**Table F: Non-categorized expenditures in (a) - (n) Above**

| Description | Justice Funds | Treasury Funds |
|---|---|---|
|  |  |  |

**Table G: Salaries**

| Salary Type | Justice Funds | Treasury Funds |
|---|---|---|
|  |  |  |

**Paperwork Reduction Act Notice**

Under the Paperwork Reduction Act, a person is not required to respond to a collection of information unless it displays a valid OMB control number. We try to create accurate and easily understood forms that impose the least possible burden on you to complete. The estimated average time to complete this form is 30 minutes. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, please write to the Asset Forfeiture and Money Laundering Section: 1400 New York Avenue, N.W., Washington, DC 20005.

Did your agency purchase any controlled equipment?    ☐ YES    ☒ NO

## Affidavit

Under penalty of perjury, the undersigned officials certify that they have read and understand their obligations under the Equitable Sharing Agreement and that the information submitted in conjunction with this Document is an accurate accounting of funds received and spent by the Agency under the Guide during the reporting period and that the recipient Agency is compliant with the National Code of Professional Conduct for Asset Forfeiture.

The undersigned certify that the recipient Agency is in compliance with the applicable nondiscrimination requirements of the following laws and their implementing regulations: Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), and the Age Discrimination Act of 1975 (42 U.S.C. § 6101 et seq.), which prohibit discrimination on the basis of race, color, national origin, disability, or age in any federally assisted program or activity, or on the basis of sex in any federally assisted education program or activity. The Agency agrees that it will comply with all federal statutes and regulations permitting federal investigators access to records and any other sources of information as may be necessary to determine compliance with civil rights and other applicable statutes and regulations.

## Equitable Sharing Agreement

This Federal Equitable Sharing Agreement, entered into among (1) the Federal Government, (2) the above-stated law enforcement agency ("Agency"), and (3) the governing body, sets forth the requirements for participation in the federal Equitable Sharing Program and the restrictions upon the use of federally forfeited cash, property, proceeds, and any interest earned thereon, which are equitably shared with participating law enforcement agencies. By submission of this form, the Agency agrees that it will be bound by the statutes and guidelines that regulate shared assets and the following requirements for participation in the Department of Justice and Department of the Treasury Equitable Sharing Programs. Receipt of the signed Equitable Sharing Agreement and Certification (this "Document") is a prerequisite to receiving any equitably shared cash, property, or proceeds.

**1. Submission.** This Document must be submitted within 60 days of the end of the Agency's fiscal year. This Document must be signed and submitted electronically.  Electronic submission constitutes submission to the Department of Justice and the Department of the Treasury.

**Signatories.** This agreement must be signed by the head of the Agency and the head of the governing body. Examples of Agency heads include police chief, sheriff, director, commissioner, superintendent, administrator, city attorney, county attorney, district attorney, prosecuting attorney, state attorney, commonwealth attorney, and attorney general. The governing body's head is the head of the agency that appropriates funding to the Agency. Examples of governing body heads include city manager, mayor, city council chairperson, county executive, county council chairperson, administrator, commissioner, and governor. The governing body head cannot be from the law enforcement agency and must be from a separate entity.

**3. Uses.** Any shared asset shall be used for law enforcement purposes in accordance with the statutes and guidelines that govern the Department of Justice and the Department of the Treasury Equitable Sharing Programs as set forth in the current edition of the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies (Guide)*.

**4. Transfers.** Before the Agency transfers funds to other state or local law enforcement agencies, it must first verify with the Department of Justice that the receiving agency is a compliant Equitable Sharing Program participant. Transfers of tangible property are not permitted.

**5. Internal Controls.** The Agency agrees to account separately for federal equitable sharing funds received from the Department of Justice and the Department of the Treasury. Funds from state and local forfeitures, joint law enforcement operations funds, and other sources must not be commingled with federal equitable sharing funds.

The Agency certifies that funds are maintained by the jurisdiction maintaining appropriated funds and agrees that such accounting will be subject to the standard accounting requirements and practices employed by the Agency's jurisdiction in accordance with the requirements set forth in the current edition of the *Guide*, including the requirement to maintain relevant documents and records for five years.

The misuse or misapplication of shared resources or supplantation of existing resources with shared assets is prohibited. The Agency must follow its jurisdiction's procurement policies when expending shared funds. Failure to comply with any provision of 's agreement shall subject the recipient agency to the sanctions stipulated in the current edition of the *Guide*.

**6. Audit Report.** Audits will be conducted as provided by the Single Audit Act Amendments of 1996 and OMB Super Circular.

Exhibit D Page 112 of 175

*Uniform Administrative Requirements, Costs Principles, and Audit Requirements for Federal Awards.* The Department of Justice and the Department of the Treasury reserve the right to conduct periodic random audits or reviews.

**7. Freedom of Information Act.** Information provided in this Document is subject to the FOIA requirements of the Department ' Justice and the Department of the Treasury.

> **During the past fiscal year: (1) has any court or administrative agency issued any finding, judgment, or determination that the Agency discriminated against any person or group in violation of any of the federal civil rights statutes listed above; or (2) has the Agency entered into any settlement agreement with respect to any complaint filed with a court or administrative agency alleging that the Agency discriminated against any person or group in violation of any of the federal civil rights statutes listed above?**
> ☐ Yes    ☒ No

**Agency Head**
Name: Wolfinger, Ben
Title:  Sheriff
Email: bwolfinger@kcgov.us


Signature: Submitted Electronically                    Date: 03/02/2017

To the best of my knowledge and belief, the information provided on this form is true and accurate and has been reviewed and authorized by the Law Enforcement Agency Head whose name appears above. Entry of the Agency Head name above indicates his/her acceptance of and agreement to abide by the policies and procedures set forth in the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies*, including ensuring permissibility of expenditures and following all required procurement policies and procedures. Entry of the Agency Head name above also indicates his/her acceptance of and agreement to abide by requirements set forth in this Equitable Sharing Agreement, and any policies or procedures issued by ¬ Department of Justice or the Department of the Treasury related to the Asset Forfeiture or Equitable Sharing programs. The Law Enforcement Head ɔ certifies that no items on the Prohibited list, as detailed in "Recommendations Pursuant to Executive Order 13688", were purchased with equitable sharing funds on or after October 1, 2015.

**Governing Body Head**
Name:  Eberlein, Mark
Title:   Chairman BOCC
Email:  meberlein@kcgov.us


Signature: Submitted Electronically                    Date: 03/14/2017

To the best of my knowledge and belief, the agency's current fiscal year budget reported on this form is true and accurate and the Governing Body Head whose name appears above certifies that the agency's budget has not been supplanted as a result of receiving equitable sharing funds. Entry of the Governing Body Head name above indicates his/her acceptance of and agreement to abide by the policies and procedures set forth in the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies*, this Equitable Sharing Agreement, and any policies or procedures issued by the Department of Justice or the Department of the Treasury related to the Asset Forfeiture or Equitable Sharing Programs.

☒   I certify that I am authorized to submit this form on behalf of the Agency Head and the Governing Body Head.

**Submitted Electronically on 03/16/2017**

Exhibit D Page 113 of 175

OMB Number 1123-0011
Expires January 31, 2018



**Equitable Sharing Agreement and Certification**



NCIC/ORI/Tracking Number: ID0280000
Agency Name: Kootenai County Sheriff's Office                    Type: Sheriff's Office
Mailing Address: 5500 N. Government Way / P.O. Box 9000
                 Coeur D' Alene, ID 83816-9000

Finance Contact
Name:  Soumas, Dan
Phone: 2084461336         Email:dsoumas@kcgov.us

ESAC Preparer
Name:  Soumas, Dan
Phone: 2084461336         Email:dsoumas@kcgov.us

FY End Date: 09/30/2015              Agency FY 2016 Budget: $11,519,646.00

## Annual Certification Report

| | Summary of Equitable Sharing Activity | Justice Funds [1] | Treasury Funds [2] |
|---|---|---|---|
| 1 | Begining Equitable Sharing Fund Balance (Must match Ending Balance from prior FY) | $353,237.78 | $0.00 |
| 2 | Equitable Sharing Funds Received | $162,316.80 | $0.00 |
| 3 | Equitable Sharing Funds Received from Other Law Enforcement Agencies and Task Force (Complete Table B) | $0.00 | $0.00 |
| 4 | Other Income . | $0.00 | $0.00 |
| 5 | Interest Income | $2,361.32 | $0.00 |
| | Total Equitable Sharing Funds Received (total of lines 1-5) | $517,915.90 | $0.00 |
| 7 | Equitable Sharing Funds Spent (total of lines a - n below) | $124,826.75 | $0.00 |
| 8 | Ending Equitable Sharing Funds Balance (difference between line 7 and line 6) | $393,089.15 | $0.00 |

[1] Department of Justice Asset Forfeiture Program participants are: FBI, DEA, ATF, USPIS, USDA, DCIS, DSS, and FDA
[2] Department of the Treasury Asset Forfeiture Program participants are: IRS, ICE, CBP and USSS.

| | Summary of Shared Funds Spent | Justice Funds | Treasury Funds |
|---|---|---|---|
| a | Law enforcement operations and investigations | $0.00 | $0.00 |
| b | Training and education | $4,950.00 | $0.00 |
| c | Law enforcement, public safety and detention facilities | $0.00 | $0.00 |
| d | Law enforcement equipment | $36,180.26 | $0.00 |
| e | Joint law enforcement/public safety operations | $0.00 | $0.00 |
| f | Contracting for services | $0.00 | $0.00 |
| g | Law enforcement travel and per diem | $2,538.09 | $0.00 |
| h | Law enforcement awards and memorials | $0.00 | $0.00 |
| i | Drug, gang and other education or awareness programs | $0.00 | $0.00 |
| j | Matching grants (Complete Table C) | $0.00 | $0.00 |
| k | Transfers to other participating law enforcement agencies (Complete Table D) | $81,158.40 | $0.00 |
| l | Support of community-based programs (Complete Table E) | $0.00 | $0.00 |
| m | Non-categorized expenditures (Complete Table F) | $0.00 | $0.00 |
| n | Salaries (Complete Table G) | $0.00 | $0.00 |
| | Total | $124,826.75 | $0.00 |

**Table B: Equitable Sharing Funds Received From Other Agencies**

| Transferring Agency Name | Justice Funds | Treasury Funds |
|---|---|---|
| | | |

**Table C: Matching Grants**

| Matching Grant Name | Justice Funds | Treasury Funds |
|---|---|---|
| | | |

**Table D: Transfers to Other Participating Law Enforcement Agencies**

| Receiving Agency Name | Justice Funds | Treasury Funds |
|---|---|---|
| North Idaho Violent Crimes Task Force - IDEQ00287 | $81,158.40 | |

**Table E: Support of Community-based Programs**

| Recipient | Justice Funds | |
|---|---|---|
| | | |

**Table F: Non-categorized expenditures in (a) - (n) Above**

| Description | Justice Funds | Treasury Funds |
|---|---|---|
| | | |

**Table G: Salaries**

| Salary Type | Justice Funds | Treasury Funds |
|---|---|---|
| | | |

## Paperwork Reduction Act Notice

Under the Paperwork Reduction Act, a person is not required to respond to a collection of information unless it displays a valid OMB control number. We try to create accurate and easily understood forms that impose the least possible burden on you to complete. The estimated average time to complete this form is 30 minutes. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, please write to the Asset Forfeiture and Money Laundering Section: 1400 New York Avenue, N.W., Washington, DC 20005.

Did your agency purchase any controlled equipment?    ☐ YES    ☒ NO

Exhibit D Page 115 of 175

## Affidavit

Under penalty of perjury, the undersigned officials certify that they have read and understand their obligations under the Equitable Sharing Agreement and that the information submitted in conjunction with this Document is an accurate counting of funds received and spent by the Agency under the Guide during the reporting period and that the recipient Agency is compliant with the National Code of Professional Conduct for Asset Forfeiture.

The undersigned certify that the recipient Agency is in compliance with the applicable nondiscrimination requirements of the following laws and their implementing regulations: Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), and the Age Discrimination Act of 1975 (42 U.S.C. § 6101 et seq.), which prohibit discrimination on the basis of race, color, national origin, disability, or age in any federally assisted program or activity, or on the basis of sex in any federally assisted education program or activity. The Agency agrees that it will comply with all federal statutes and regulations permitting federal investigators access to records and any other sources of information as may be necessary to determine compliance with civil rights and other applicable statutes and regulations.

## Equitable Sharing Agreement

This Federal Equitable Sharing Agreement, entered into among (1) the Federal Government, (2) the above-stated law enforcement agency ("Agency"), and (3) the governing body, sets forth the requirements for participation in the federal Equitable Sharing Program and the restrictions upon the use of federally forfeited cash, property, proceeds, and any interest earned thereon, which are equitably shared with participating law enforcement agencies. By submission of this form, the Agency agrees that it will be bound by the statutes and guidelines that regulate shared assets and the following requirements for participation in the Department of Justice and Department of the Treasury Equitable Sharing Programs. Receipt of the signed Equitable Sharing Agreement and Certification (this "Document") is a prerequisite to receiving any equitably shared cash, property, or proceeds.

**1. Submission.** This Document must be submitted within 60 days of the end of the Agency's fiscal year. This Document must be signed and submitted electronically. Electronic submission constitutes submission to the Department of Justice and the Department of the Treasury.

**Signatories.** This agreement must be signed by the head of the Agency and the head of the governing body. Examples of Agency heads include police chief, sheriff, director, commissioner, superintendent, administrator, city attorney, county attorney, district attorney, prosecuting attorney, state attorney, commonwealth attorney, and attorney general. The governing body's head is the head of the agency that appropriates funding to the Agency. Examples of governing body heads include city manager, mayor, city council chairperson, county executive, county council chairperson, administrator, commissioner, and governor. The governing body head cannot be from the law enforcement agency and must be from a separate entity.

**3. Uses.** Any shared asset shall be used for law enforcement purposes in accordance with the statutes and guidelines that govern the Department of Justice and the Department of the Treasury Equitable Sharing Programs as set forth in the current edition of the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies (Guide).*

**4. Transfers.** Before the Agency transfers funds to other state or local law enforcement agencies, it must first verify with the Department of Justice that the receiving agency is a compliant Equitable Sharing Program participant. Transfers of tangible property are not permitted.

**5. Internal Controls.** The Agency agrees to account separately for federal equitable sharing funds received from the Department of Justice and the Department of the Treasury. Funds from state and local forfeitures, joint law enforcement operations funds, and other sources must not be commingled with federal equitable sharing funds.

The Agency certifies that funds are maintained by the jurisdiction maintaining appropriated funds and agrees that such accounting will be subject to the standard accounting requirements and practices employed by the Agency's jurisdiction in accordance with the requirements set forth in the current edition of the *Guide*, including the requirement to maintain relevant documents and records for five years.

The misuse or misapplication of shared resources or supplantation of existing resources with shared assets is prohibited. The Agency must follow its jurisdiction's procurement policies when expending shared funds. Failure to comply with any provision of 's agreement shall subject the recipient agency to the sanctions stipulated in the current edition of the *Guide*.

**6. Audit Report.** Audits will be conducted as provided by the Single Audit Act Amendments of 1996 and OMB Super Circular,

Exhibit D Page 116 of 175

*Uniform Administrative Requirements, Costs Principles, and Audit Requirements for Federal Awards.* The Department of Justice and the Department of the Treasury reserve the right to conduct periodic random audits or reviews.

7. **Freedom of Information Act.** Information provided in this Document is subject to the FOIA requirements of the Department ᶜ Justice and the Department of the Treasury.

> **During the past fiscal year: (1) has any court or administrative agency issued any finding, judgment, or determination that the Agency discriminated against any person or group in violation of any of the federal civil rights statutes listed above; or (2) has the Agency entered into any settlement agreement with respect to any complaint filed with a court or administrative agency alleging that the Agency discriminated against any person or group in violation of any of the federal civil rights statutes listed above?**
> ☐ Yes   ☒ No

## Agency Head

Name: Wolfinger, Ben
Title:  Sheriff
Email: bwolfinger@kcgov.us

Signature: _____   Date: _____

To the best of my knowledge and belief, the information provided on this form is true and accurate and has been reviewed and authorized by the Law Enforcement Agency Head whose name appears above. Entry of the Agency Head name above indicates his/her acceptance of and agreement to abide by the policies and procedures set forth in the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies*, including ensuring permissibility of expenditures and following all required procurement policies and procedures. Entry of the Agency Head name above also indicates his/her acceptance of and agreement to abide by requirements set forth in this Equitable Sharing Agreement, and any policies or procedures issued by ᵗ Department of Justice or the Department of the Treasury related to the Asset Forfeiture or Equitable Sharing programs. The Law Enforcement Head o certifies that no items on the Prohibited list, as detailed in "Recommendations Pursuant to Executive Order 13688", were purchased with equitable sharing funds on or after October 1, 2015.

## Governing Body Head

Name:  Green, Dan
Title:   Chairman BOCC
Email:  dgreen@kcgov.us

Signature: _____   Date: _____

To the best of my knowledge and belief, the agency's current fiscal year budget reported on this form is true and accurate and the Governing Body Head whose name appears above certifies that the agency's budget has not been supplanted as a result of receiving equitable sharing funds. Entry of the Governing Body Head name above indicates his/her acceptance of and agreement to abide by the policies and procedures set forth in the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies*, this Equitable Sharing Agreement, and any policies or procedures issued by the Department of Justice or the Department of the Treasury related to the Asset Forfeiture or Equitable Sharing Programs.

☒  I certify that I am authorized to submit this form on behalf of the Agency Head and the Governing Body Head.

Submitted Electronically on 10/04/2016

OMB Number 1123-0011
Expires January 31, 2018



**Equitable Sharing Agreement and Certification**



NCIC/ORI/Tracking Number: ID0280000
Agency Name: Kootenai County Sheriff's Office          Type: Sheriff's Office
Mailing Address: 5500 N. Government Way / P.O. Box 9000
            Coeur D' Alene, ID 83816-9000

Finance Contact
Name: Soumas, Dan
Phone: 2084461336          Email:dsoumas@kcgov.us

ESAC Preparer
Name: Soumas, Dan
Phone: 2084461336          Email:dsoumas@kcgov.us

FY End Date: 09/30/2014          Agency FY 2016 Budget: $10,877,986.00

## Annual Certification Report

| | Summary of Equitable Sharing Activity | Justice Funds [1] | Treasury Funds [2] |
|---|---|---|---|
| 1 | Begining Equitable Sharing Fund Balance (Must match Ending Balance from prior FY) | $272,490.18 | $0.00 |
| 2 | Equitable Sharing Funds Received | $121,141.49 | $0.00 |
| 3 | Equitable Sharing Funds Received from Other Law Enforcement Agencies and Task Force (Complete Table B) | $0.00 | $0.00 |
| 4 | Other Income | $0.00 | $0.00 |
| 5 | Interest Income | $1,999.23 | $0.00 |
| | Total Equitable Sharing Funds Received (total of lines 1-5) | $395,630.90 | $0.00 |
| 7 | Equitable Sharing Funds Spent (total of lines a - n below) | $42,393.12 | $0.00 |
| 8 | Ending Equitable Sharing Funds Balance (difference between line 7 and line 6) | $353,237.78 | $0.00 |

[1]Department of Justice Asset Forfeiture Program participants are: FBI, DEA, ATF, USPIS, USDA, DCIS, DSS, and FDA
[2]Department of the Treasury Asset Forfeiture Program participants are: IRS, ICE, CBP and USSS.

| | Summary of Shared Funds Spent | Justice Funds | Treasury Funds |
|---|---|---|---|
| a | Law enforcement operations and investigations | $0.00 | $0.00 |
| b | Training and education | $3,016.00 | $0.00 |
| c | Law enforcement, public safety and detention facilities | $0.00 | $0.00 |
| d | Law enforcement equipment | $39,377.12 | $0.00 |
| e | Joint law enforcement/public safety operations | $0.00 | $0.00 |
| f | Contracting for services | $0.00 | $0.00 |
| g | Law enforcement travel and per diem | $0.00 | $0.00 |
| h | Law enforcement awards and memorials | $0.00 | $0.00 |
| i | Drug, gang and other education or awareness programs | $0.00 | $0.00 |
| j | Matching grants (Complete Table C) | $0.00 | $0.00 |
| k | Transfers to other participating law enforcement agencies (Complete Table D) | $0.00 | $0.00 |
| l | Support of community-based programs (Complete Table E) | $0.00 | $0.00 |
| m | Non-categorized expenditures (Complete Table F) | $0.00 | $0.00 |
| n | Salaries (Complete Table G) | $0.00 | $0.00 |
| | Total | $42,393.12 | $0.00 |

Date Printed: 08/10/2017          Page 1 of 4          February 2016
                                                             Version 3.1

1.520

**Table B: Equitable Sharing Funds Received From Other Agencies**

| Transferring Agency Name | Justice Funds | Treasury Funds |
|---|---|---|
|  |  |  |

**Table C: Matching Grants**

| Matching Grant Name | Justice Funds | Treasury Funds |
|---|---|---|
|  |  |  |

**Table D: Transfers to Other Participating Law Enforcement Agencies**

| Receiving Agency Name | Justice Funds | Treasury Funds |
|---|---|---|
|  |  |  |

**Table E: Support of Community-based Programs**

| Recipient | Justice Funds | |
|---|---|---|
|  |  |  |

**Table F: Non-categorized expenditures in (a) - (n) Above**

| Description | Justice Funds | Treasury Funds |
|---|---|---|
|  |  |  |

**Table G: Salaries**

| Salary Type | Justice Funds | Treasury Funds |
|---|---|---|
|  |  |  |

**Paperwork Reduction Act Notice**

Under the Paperwork Reduction Act, a person is not required to respond to a collection of information unless it displays a valid OMB control number. We try to create accurate and easily understood forms that impose the least possible burden on you to complete. The estimated average time to complete this form is 30 minutes. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, please write to the Asset Forfeiture and Money Laundering Section: 1400 New York Avenue, N.W., Washington, DC 20005.

Did your agency purchase any controlled equipment?   ☐ YES   ☒ NO

## Affidavit

Under penalty of perjury, the undersigned officials certify that they have read and understand their obligations under the Equitable Sharing Agreement and that the information submitted in conjunction with this Document is an accurate counting of funds received and spent by the Agency under the Guide during the reporting period and that the recipient Agency is compliant with the National Code of Professional Conduct for Asset Forfeiture.

The undersigned certify that the recipient Agency is in compliance with the applicable nondiscrimination requirements of the following laws and their implementing regulations: Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), and the Age Discrimination Act of 1975 (42 U.S.C. § 6101 et seq.), which prohibit discrimination on the basis of race, color, national origin, disability, or age in any federally assisted program or activity, or on the basis of sex in any federally assisted education program or activity. The Agency agrees that it will comply with all federal statutes and regulations permitting federal investigators access to records and any other sources of information as may be necessary to determine compliance with civil rights and other applicable statutes and regulations.

## Equitable Sharing Agreement

This Federal Equitable Sharing Agreement, entered into among (1) the Federal Government, (2) the above-stated law enforcement agency ("Agency"), and (3) the governing body, sets forth the requirements for participation in the federal Equitable Sharing Program and the restrictions upon the use of federally forfeited cash, property, proceeds, and any interest earned thereon, which are equitably shared with participating law enforcement agencies. By submission of this form, the Agency agrees that it will be bound by the statutes and guidelines that regulate shared assets and the following requirements for participation in the Department of Justice and Department of the Treasury Equitable Sharing Programs. Receipt of the signed Equitable Sharing Agreement and Certification (this "Document") is a prerequisite to receiving any equitably shared cash, property, or proceeds.

**1. Submission.** This Document must be submitted within 60 days of the end of the Agency's fiscal year. This Document must be signed and submitted electronically. Electronic submission constitutes submission to the Department of Justice and the Department of the Treasury.

**Signatories.** This agreement must be signed by the head of the Agency and the head of the governing body. Examples of Agency heads include police chief, sheriff, director, commissioner, superintendent, administrator, city attorney, county attorney, district attorney, prosecuting attorney, state attorney, commonwealth attorney, and attorney general. The governing body's head is the head of the agency that appropriates funding to the Agency. Examples of governing body heads include city manager, mayor, city council chairperson, county executive, county council chairperson, administrator, commissioner, and governor. The governing body head cannot be from the law enforcement agency and must be from a separate entity.

**3. Uses.** Any shared asset shall be used for law enforcement purposes in accordance with the statutes and guidelines that govern the Department of Justice and the Department of the Treasury Equitable Sharing Programs as set forth in the current edition of the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies (Guide).*

**4. Transfers.** Before the Agency transfers funds to other state or local law enforcement agencies, it must first verify with the Department of Justice that the receiving agency is a compliant Equitable Sharing Program participant. Transfers of tangible property are not permitted.

**5. Internal Controls.** The Agency agrees to account separately for federal equitable sharing funds received from the Department of Justice and the Department of the Treasury. Funds from state and local forfeitures, joint law enforcement operations funds, and other sources must not be commingled with federal equitable sharing funds.

The Agency certifies that funds are maintained by the jurisdiction maintaining appropriated funds and agrees that such accounting will be subject to the standard accounting requirements and practices employed by the Agency's jurisdiction in accordance with the requirements set forth in the current edition of the *Guide*, including the requirement to maintain relevant documents and records for five years.

The misuse or misapplication of shared resources or supplantation of existing resources with shared assets is prohibited. The Agency must follow its jurisdiction's procurement policies when expending shared funds. Failure to comply with any provision of this agreement shall subject the recipient agency to the sanctions stipulated in the current edition of the *Guide*.

**6. Audit Report.** Audits will be conducted as provided by the Single Audit Act Amendments of 1996 and OMB Super Circular,

*Uniform Administrative Requirements, Costs Principles, and Audit Requirements for Federal Awards.* The Department of Justice and the Department of the Treasury reserve the right to conduct periodic random audits or reviews.

**7. Freedom of Information Act.** Information provided in this Document is subject to the FOIA requirements of the Department f Justice and the Department of the Treasury.

---

**During the past fiscal year: (1) has any court or administrative agency issued any finding, judgment, or determination that the Agency discriminated against any person or group in violation of any of the federal civil rights statutes listed above; or (2) has the Agency entered into any settlement agreement with respect to any complaint filed with a court or administrative agency alleging that the Agency discriminated against any person or group in violation of any of the federal civil rights statutes listed above?**

☐ Yes    ☒ No

---

**Agency Head**
Name: Wolfinger, Ben
Title:  Sheriff
Email: bwolfinger@kcgov.us


Signature: _____    Date: _____

To the best of my knowledge and belief, the information provided on this form is true and accurate and has been reviewed and authorized by the Law Enforcement Agency Head whose name appears above. Entry of the Agency Head name above indicates his/her acceptance of and agreement to abide by the policies and procedures set forth in the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies*, including ensuring permissibility of expenditures and following all required procurement policies and procedures. Entry of the Agency Head name above also indicates his/her acceptance of and agreement to abide by requirements set forth in this Equitable Sharing Agreement, and any policies or procedures issued by the Department of Justice or the Department of the Treasury related to the Asset Forfeiture or Equitable Sharing programs. The Law Enforcement Head certifies that no items on the Prohibited list, as detailed in "Recommendations Pursuant to Executive Order 13688", were purchased with equitable sharing funds on or after October 1, 2015.

**Governing Body Head**
Name:  Green, Dan
Title:  Chairman BOCC
Email:  dgreen@kcgov.us


Signature: _____    Date: _____

To the best of my knowledge and belief, the agency's current fiscal year budget reported on this form is true and accurate and the Governing Body Head whose name appears above certifies that the agency's budget has not been supplanted as a result of receiving equitable sharing funds. Entry of the Governing Body Head name above indicates his/her acceptance of and agreement to abide by the policies and procedures set forth in the *Guide to Equitable Sharing for State and Local Law Enforcement Agencies*, this Equitable Sharing Agreement, and any policies or procedures issued by the Department of Justice or the Department of the Treasury related to the Asset Forfeiture or Equitable Sharing Programs.

☒  I certify that I am authorized to submit this form on behalf of the Agency Head and the Governing Body Head.

Submitted Electronically on 01/13/2016

# OTHER INFORMATION 1.524-1.570

Kim Edmondson: Official for sure.  It is 10:33 on August 30th, 2017 and present with me is Skye Reynolds from Human Resources and Captain Dan Soumas, and this is Major Kim Edmondson.

Dan Soumas:    ****.

Kim Edmondson: That's great.  Um, the reason that I asked you to come in to be interviewed today is because I'm doing fact finding on the ACLU, um, public records request.  Um, we received it on August 4th, as you're aware.  That's when you were emailed that request.

Dan Soumas:    Mm hmm.

Kim Edmondson: And then, um, I'm gonna jump forward to Monday, this past Monday.

Dan Soumas:    Right.

Kim Edmondson: Um, you did a, a, a formal response, but it went to legal.  Have you sent that yet to the ACLU?

Dan Soumas:    Yeah, it's gone.

Kim Edmondson: So it's, it's –

Dan Soumas:    And the attachments –

Kim Edmondson: Okay.

Dan Soumas:    – ****.

Kim Edmondson: The attachments and everything are gone.

Dan Soumas:    Yeah.

Kim Edmondson: So what, uh, what, or what date and time did that get sent?

Dan Soumas:    Uh, it was this morning.

Kim Edmondson: Okay.

Dan Soumas:    It was on my list when I got back in.

Kim Edmondson: Okay, so this morning on the 30th it got sent out.

Dan Soumas:     Right.

Kim Edmondson: All right, so what I need -

Dan Soumas:     May I ask a question.  Fact, uh, what do you mean, what is fact finding.  Can someone define that for me?

Kim Edmondson: Fact finding, yeah, I'm trying to find out -

Dan Soumas:     It's like a preliminary inquiry?

Kim Edmondson: - so - yeah, and what I'm gonna ask you to do at this point from, uh, August 4th from the date that you received it to this morning to sending it out explain to me, um, what processes you have gone through as far as getting that information collected, and I know that you had to - I got emails from, uh, Kathy, as you're aware.

Dan Soumas:     Right.

Kim Edmondson: **** she sent me -

Dan Soumas:     Right, she copied ****.

Kim Edmondson: - the email conversation that you had.

Dan Soumas:     Mm hmm.

Kim Edmondson: I'm looking for that timeline basically to find out, um, why our response wasn't sent to them until the 30th.

Skye Reynolds: And then if I may, Dan, uh -

Dan Soumas:     Mm hmm.

Skye Reynolds: - the sheriff's office, um, asked that I be present as a neutral third party as a witness -

Dan Soumas:     I get it.

Skye Reynolds: - to the discussion, so -

Dan Soumas:     Sure.

Skye Reynolds: - that's my role.

Dan Soumas:    Um, let me see if I have - well, I have it.  I just gotta figure out what order it's in.  Well, I know that I, I got it on the 4th.  ACLU is dated the 3rd, but it actually reached my desk on the 4th from Joyce -

Kim Edmondson: Right.

Dan Soumas:    - Cox in records and she forwarded that to Darrin Murphy as well at the same time, and I called Joyce and I told her that this - and quoting me here is, um, so you sent me this hot potato, you know, and washed your hands of it and I actually walked over and talked to her too.  I said, uh, you need to let them know that this is a voluminous request and we're gonna have to extend that, and I said it's gonna take all of 10 days and maybe longer, um, so Darrin was gone and I saw it came back.  I sent him an email immediately and said hey, I need to talk to you on this deal.  I tried to call his phone, but I didn't get him on either one, so, or his cell, so, um, I, uh, - since I wasn't anticipating trying to timeline the work I've done on this thing, give me a second to gather.  I know I did that on that Friday.  It's, it's probably all here in the file because I keep copies of all this stuff.

Kim Edmondson: Yeah, that, I have that same day that you forwarded the information to Dave Ferguson.

Dan Soumas:    Okay.

Kim Edmondson: Because Darrin was out of town.

Dan Soumas:    Right, so -

Kim Edmondson: - ****  Ferguson.

Dan Soumas:    - I sent it to David and he said he sent it to Barry McHugh and, uh, as well because, you know, on outside of - I don't know if I talked to David on the phone that day or just through the email.  The concern was when I read the request is that while we're the ones, the agency that initiates all these stops and we spend all the money, the intermediary is, is the prosecutor's office, and so on all the state stuff -

Kim Edmondson: Mm hmm.

Dan Soumas:    - um, they do it and they file and they keep the records, and Lucia will give me a, um, uh, she'll, she'll send me an email and say this judgment has come through and we're

1.526

gonna split this much up and it's coming to you and, and we're
keeping 15 percent for our account, but she keeps the
spreadsheet and she keeps all the records, and so when I need
something I go to her and, um, so I know that when Darrin
returned the next week we talked on the phone.  I said we're
gonna need your office, and the problem is is that, and through
this whole process, my view, is that he's trying to wear two
hats.  He's trying to give me legal advice on what the records
request and then, but he's not helping me fill the records
request, and they are holding some of those records, and I get
the nuance of the fact that the shoriff's records are the
sheriff's records and Barry's records are Barry's records, but
this is the ACLU and I don't wanna screw around with them and I
don't wanna make it a situation where we have, uh, we'll give
you what we have, but you have to, you know, somebody else is
gonna have to provide that and I'm gonna leave all these holes
and provide zero context for 'em on what's going on in this
deal, zero.  And so, um, I met with Darrin and David and it took
- I don't remember when Darrin got back.  It was sometime the
next week and then he emailed me right around the 10th of August,
I think.

Kim Edmondson: 11th, I've got.

Dan Soumas:    Um, or some - and said hey, this is what we need
to do and I think I, I have that, um, and said you have, you
have this time and then I met with him and, and David Ferguson,
I believe, on the 11th to talk about this thing.

Kim Edmondson: Right.

Dan Soumas:    We met in person and we discussed, you know,
'cause now this thing is getting a little bit long.  We
discussed the fact that the best, I thought the decision was
that they were gonna help me, you know, get me some of those
records, get a spreadsheet done, and we could send it all now
because without those, I have no way of telling her what we've
gotten.  I also called the auditors, or emailed the auditor's
office, uh, 'cause I was gonna email Keith anyway, and said hey,
I'm gonna need some help on these accounts, and he said well,
it's gonna be after budgets.  We can't do anything until after
budgets, and so, um, this goes on and I'm gathering information.
I actually prepared a file on the federal side and it's, was
sitting on my desktop waiting to be sent, but I, I wanted to
wait on the response until - let's see what.  That's today's, so
that's Mondays, um, I wanted to wait on the response to do it
properly and I had made an assumption I guess coming out of that

meeting with Darrin that they were gonna get me that information so we could do a - they were gonna kind of piggy back on our response and we were gonna send her the whole package because even with that, um, it's gonna require, um, explanation on my part, verbal and probably more written explanation. It's a pretty complicated thing 'cause we do - I mean she asked for 3 years' worth of transactions and, uh, um, so I wanna back up. I just had a thought on that, so on the 11th we talked, we met. Um, oh, and then I called Kathy.

Kim Edmondson: Mm hmm.

Dan Soumas:     And I said look, um, this is super volum, voluminous and I'm sure this was a statewide request to all the agencies. She said yes, it was, and I said okay, so some probably just don't have anything or don't have much so it's pretty easy. For us we have a fairly or I've had a fairly robust program for quite a while.

Kim Edmondson: Yeah.

Dan Soumas:     And it's not as simple as just, you know, - I don't have those at hand. I mean it's gonna require reports and court paperwork and all this has to be gone through and figured out, and she goes well, I don't want the court paperwork and I don't want reports. I just kind of want it in general, and so she sent me a clarification email and, um, and so working off of that and our phone call, and in essence I came away from the phone call and I know that you've had contact with her, so I don't know what her view is. I came away from that phone call that we had time to extend it 'cause I told her I'm not gonna be able to meet the deadline and she was good with that. She's not looking to have a confrontation. She's looking to get information that they want.

Kim Edmondson: Right.

Dan Soumas:     And that's what I came away with. Um, fast forward to last week. She sent me just a, a follow-up email that said hey, where are we at on this and, um, and I sent sev, several emails back and forth with Darrin and, um, and, and I can't tell you what's going on in his mind, but what I got back from him basically was, hot potato, okay, well, I've been telling you this has to get out and now the sheriff's got liability here and all that, and I go no, you have, you've been te, you've told me that these were the statutory dates and I've told you it's physically impossible to do that, and I don't, I'm

1.528

the only person.  Uh, records can't support it, nobody can
support it, nobody wants to support it downtown, so, um, I mean
that's just my view on it, so I go all right.  Um, then I'm
gonna send you what I have.  I updated the date on it so that it
was at least Sunday, um, because it, it was mostly written and
the, um, and the, the ESAC reports that are the federal
attachments, so federal ****  for Skye and there's stateside.

Kim Edmondson: Mm hmm.

Dan Soumas:    Um, I do the federal stuff here, although I would
have to go back to DOJ and the marshal service and get specific
case numbers and I could do the research, but again, you know,
that's -

Kim Edmondson: Yeah.

Dan Soumas:    - it's not like we don't have something else
going on either, and sometimes when we, you know, we look at
stuff in a vacuum, um, that's what it looks like.  Well, we have
this project and it's not getting done.  I get that, but there's
a lot of other stuff.  You can certainly look in my Outlook and,
um, you know.  So -

Kim Edmondson: So you already had stuff written.  You were
developing information?

Dan Soumas:    Yeah, I'm developing it and adding it to.

Kim Edmondson: How, how much time did you have into what you had
developed by the time it was sent?

Dan Soumas:    Oh, God, I don't know.  Um, you know, writing
time probably 3, 4 hours or more for, with editing.  Um,
research time probably a bunch and I can't, I can't give you a
number.  I, and I don't know if it's all in my Outlook, you
know, but in between I'm grabbing stats and, um, I was able
because the auditor's office couldn't help.  Um, Chris Clay no
longer works here and Trudy no longer works here, so I've been
left holding the bag on that, and they can't help me with that,
but I had - because she didn't try to get current, she went back
3 years.  I had spreadsheets that, um, that Nancy Currado, who
used to work, so when I took over the program, um, there were
some gaps, we'll just put it that way, and I had a full audit
done on the entire program, where we spent the money at, and
then we went back through and we re-designated what should have
come out of state funds because it's, it's an, a journal entry

1.529

more.  We have this big pot of money and they designate certain amount of their for state because that's what their accounting tells them and they have a certain amount on federal because that's what their accounting tells 'em.

Kim Edmondson: Mm hmm.

Dan Soumas:   And I went back and looked at all the expenses and, um, and got with Hildebrandt, who does a lot of the **** Task Force, and that's the other thing that we need to - as long as we're talking on the record here.  We do the task force and ours.  It's not just KCSO patrol, so ****  -

Kim Edmondson: And having started that program, I'm well aware -

Dan Soumas:   Yeah, so you know what I'm talking about.

Kim Edmondson: - of how it works.  Right.

Dan Soumas:   So, um, I was talking with Ed on some of the stuff and, and, uh, going on, uh, going on our site with the feds and so I can't tell you how much in there, um, and I don't know, you know, - so obviously, I'm sitting here because the department is concerned that I just either A, blew it off or we just went over our time, and I've seen the tone in Darrin's emails, like well, it's not my fault.  I told you, you know. Well, that's not helpful.  What helpful is help me.

Kim Edmondson: Yeah.

Dan Soumas:   Yeah.

Kim Edmondson: What, what I have is, is a public records request.

Dan Soumas:   Right.

Kim Edmondson: And it comes in initially.

Dan Soumas:   Mm hmm.

Kim Edmondson: Um, Joyce immediately sent it out.

Dan Soumas:   She did.

Kim Edmondson: ****  contact, uh, uh -

Dan Soumas:     Mm hmm.

Kim Edmondson: - a delayed response.

Dan Soumas:     Right.

Kim Edmondson: And that goes out for 10 days, so -

Dan Soumas:     Okay.

Kim Edmondson: - you have 10 days -

Dan Soumas:     Right.

Kim Edmondson: - business days to answer that.

Dan Soumas:     Right.

Kim Edmondson: Um, and that would be if you didn't count Friday, it'd be the 18th of August.

Dan Soumas:     .Okay.

Kim Edmondson: And I've got nothing in all the email conversations between the 11th is the last email, um, conversation you have with Kathy.

Dan Soumas:     Right.

Kim Edmondson: And then on the 25th she emails you and says hey -

Dan Soumas:     Says hey, where, where are we at.

Kim Edmondson: - where, where are we.

Dan Soumas:     Right.

Kim Edmondson: And then you responded and had the email conversation which you're aware -

Dan Soumas:     Right, and she said she's October 7th.

Kim Edmondson: - she said September 7th.

Dan Soumas:     Right.

1.531

Kim Edmondson: And so that, that deadline is the first time where we're given that deadline, at least from what I can substantiate that says we have more time.

Dan Soumas:    She – well, the reason, um, and I don't mean to interrupt.  The reason that she emailed back in the friendly fashion is because our agreement on the phone it was verbal.  I didn't get something in writing, um, was hey, you know, just keep working on it and let me know what we're doing, so she was leaving town and she was doing her thing.  I sent her an explanatory email as to what my plans were as well, and, uh, she said can we have it by the 7th.  I said sure because I had most of it done.  I mean, you know, –

Kim Edmondson: Yeah.

Dan Soumas:    – all it needed was attorney review.  I did work, did some work on it over the weekend again, um, Saturday night and Sunday morning and then I sent it on out to Darrin and, uh, so, so he would have it first thing Monday.  I came back today.  It was on my list to do anyway, and, uh, um, so I sent him, sent her our initial response.

Kim Edmondson: So –

Dan Soumas:    I can say there's gonna be more, but –

Kim Edmondson: – so on the 11th she sent you the clarifying information, which dwindled the, the initial request down to –

Dan Soumas:    Not really, but –

Kim Edmondson: – just – well, –

Dan Soumas:    – it clarified it

Kim Edmondson: – it clarified.

Dan Soumas:    It didn't really dwindle it.  If you read, if you – in fact, it added one.  If you read my response she actually added something about budgeting and, and, uh, um, uh, budgeting for future revenues, which we don't do, and so, um, you know, if she wants to see the actual budget documents then I'm gonna have to get those from the auditors and, or she's gonna have to get 'em from the auditors.

Kim Edmondson: Right.

Dan Soumas:   Uh, and they're not even gonna know what to look for if she sends 'em a public records request.  It's gonna be a mess, so I was trying to coordinate it between all three of the entities that are ****  County.

Kim Edmondson: And really your only responsibility was ****  –

Dan Soumas:   Well, I get that.

Kim Edmondson: – ****  elected official and then –

Dan Soumas:   But my response –

Kim Edmondson: – records we maintain.

Dan Soumas:   – my responsibility is to the sheriff to not make us look like an ass and I know you can go either way on this. Well, not being responsive makes you look like an ass, but also creating an adversarial relationship and I thought that by building relationship with Kathy Griesmyer we could, we could work our way through this thing.

Kim Edmondson: Sure.

Dan Soumas:   And, you know, Darrin, uh, I'm not pointing fingers at Darrin, but he seems to not grasp the fact that his office is the one that does civil forfeiture and when I send it to them and David Ferguson is the one that does our civil forfeiture, when I send it to David and I say – and he says he copied it to Barry McHugh, I'm expecting, uh, something back and I'm gonna share a sidebar on tape with you.  So why did I not contact Barry McHugh directly to talk to him.  Do you wanna ask me that?

Kim Edmondson: Well, that would be one of my questions down the stream.

Dan Soumas;   Okay.

Kim Edmondson: We'll get back to my other one here after this answer, so go ahead.

Dan Soumas:   I apologize.  Why did I not get to Barry, call Barry McHugh directly?  Because the last time I emailed Barry McHugh about something going on in the office, which was just a month ago.  Neal Robertson paid me a visit in my office and said

why are you going directly to Barry McHugh, and I said because we work with him all the time, and he wants to know on some of this stuff, and, uh, he goes well, you know, the guys – I said what guys. He goes well, I can't tell you that, can't, not gonna tell you who said, but, but it came back around that you had talked to Barry and David Ferguson. You know, I said well, I copied him on the email. You have a copy of it. I copied you too. You know, it was an issue, so this time because somebody was upset last time, I didn't go directly to Barry. I left it to them to contact their boss and get me a response, which they did not. Go, go ahead.

Kim Edmondson: All right, so on the 11th, back to the 11th.

Dan Soumas:       Yes, I get it, yeah.

Kim Edmondson: Uh, you get the clarification email from Kathy.

Dan Soumas:       I do, I had a phone conversation.

Kim Edmondson: And, and you had a phone conversation.

Dan Soumas:       Had a discussion on the phone.

Kim Edmondson: Yep, and so at that point what was your, um, what was your understanding of an extension on the phone?

Dan Soumas:       End of the month basically, you know, and, uh, and that was I told her we should be able to have most of what we need by the end of the month for you, and it's the end of the month coming up this week.

Kim Edmondson: Mm hmm.

Dan Soumas:       So, that's, that was my understanding from our phone conversation. I don't have anything in writing to back that up, and you had your own conversation with Kathy, so you can or cannot share her understanding of it with me, if you choose to.

Kim Edmondson: Well, the understanding that she had is basically outlined in the email. She responded back that she would be back on the 7th.

Dan Soumas:       Right, right.

Kim Edmondson: So that became a new –

1.534

Dan Soumas:    Yeah, that was a new one, but -

Kim Edmondson: - ****.

Dan Soumas:    - before that Friday inquiry where we at on this,
and that, it was one of those housekeeping things, hey, I'm
leaving town, can you tell me what's happening, but before that
there wasn't a lot of communication 'cause I'm working on my end
and I'm also attempting to get the prosecutor's office and the
auditor's office to work with me on this deal, but I did my part
of it that I had actual access to and more because I was able to
get auditor numbers.  I just can't get the state numbers that
come through the civil section of the prosecutor's office,
that's where that stuff is done.

Kim Edmondson: I'm gonna ask you a little bit of an abstract
question -

Dan Soumas:    Go ahead, ****.

Kim Edmondson: - because it's different than how you've been
thinking about this, but if you were to have only answered to
the sheriff's responsibilities, those items that were requested
that were under the sheriff's records -

Dan Soumas:    Right.

Kim Edmondson: - um, how long would that have taken you and how
much research could that have been?

Dan Soumas:    I have - well -

Kim Edmondson: If you could estimate it.

Dan Soumas:    - since my answer was the same, uh, or since my
response did cover that and information that I had in my
possession, those spreadsheets were in the sheriff's possession
-

Kim Edmondson: Right.

Dan Soumas:    - and they were records created for us by ****
Carrato and given to us.  I don't even think the auditor
probably has 'em as Nancy is no longer there.  Uh, I would say
that everything I sent is in the sheriff's, um, and I went back

on and, and looked at all the what you knew 'em as ****  now,
they call 'em ESAC reports.

Kim Edmondson: Mm hmm.

Dan Soumas:   **** sharing.  I went back and reviewed all
those, um, and then I went into some of the numbers on that to
make sure that, um, I had an idea of what - 'cause they
categorized the money, but then the categories changed every
year on what we spent it on, so I just kind of went in and did
some review on all six of those for task force and us.  Um,
sheriff's again **** crimes task force has, since we do theirs,
um, I would have to get Hilde in a room to go over some of their
expenditures, and if she wants to get into the weeds on that, I
kept it general.  Um, so I don't think the time would be any
different, um -

Kim Edmondson: Than what you did put in?

Dan Soumas:   Yeah.

Kim Edmondson: ****.

Dan Soumas:   Yeah, I don't think there would be anymore.  I
could have dug deeper into our records.

Kim Edmondson: Minus, minus the waiting say for the auditors to
answer and the prosecutor to answer.

Dan Soumas:   Yeah.

Kim Edmondson: Could that have been answered by August 18th in
your, within your 10 days?

Dan Soumas:   Mm, you know, I'd have to look in my calendar to
be able to tell you that, to be, to be complete on that.

Kim Edmondson: Mm hmm.

Dan Soumas:   I, I don't know the answer to that question.  Um,
yes, maybe once I talked to Kathy Griesmyer on the 11th and she
wasn't concerned about it until the end of the month.  Um, I
didn't - I felt like the 10-day statutory thing had been waived
by them.  They're there, they're the, uh, - and the attorneys
can tell you that, but they're the requester and they have the
ability to waive that or provide an extension at any time, and
she on - when I talked to her on the phone end of the month is

what we came up with and then when she emailed me on Friday, on the 25th, I think you said it was.

Kim Edmondson: Mm hmm, mm hmm.

Dan Soumas:    Uh, and we went back and forth.  She made it the 7th and I, I told her we would definitely have our portion.  I couldn't speak for the prosecutor's office, uh, and I've copied Darrin on everything all along, so he's well aware of –

Kim Edmondson: Right.

Dan Soumas:    – all the communication, so.

Kim Edmondson: Right.

Dan Soumas:    Um –

Kim Edmondson: So ultimately on the 30th, by the end of the month or the end of the –

Dan Soumas:    Yeah, it's, it's out.

Kim Edmondson: – ****  and the agreement that you –

Dan Soumas:    Yeah, our initial agreement on the 11th once I got clarification 'cause Darrin and I when we met our agreement was this.  Let me call the ACLU.  He goes I would suggest you call her and see what you can work out with her, and I, you know, he knows me.  He's known me for a long time.  I'm capable of negotiating stuff like that, and, and so I did, and she's a nice lady.  I mean I don't know what they may have in the background, but, you know, I would certainly be going to court going no, we had a phone conversation and she agreed to do this.  Now, they can say statutorily it's different, but I have an email now even showing that she's willing to go all the way out to the 7th, and it's, and I'm anticipating, um – I think she's actually on vacation.

Kim Edmondson: Mm hmm.

Dan Soumas:    So I'm anticipating she probably won't read all that 'till she gets back, and then I'll hear back from her, and we'll clarify what needs to be clarified and we'll dig deeper in our records if we need to, uh, but she told me very specifically that she didn't need police reports and court documents at this point.  They don't wanna do that, and I don't know if you read

her, her initial - they're trying to avoid having to pay fees as
well. Um, if you read in there you, uh, between the lines you
can see we wanna review all these. We want you to gather all
that stuff, but we wanna review it. Well, it takes just as much
time to gather it as it does to gather it and copy it basically.

Kim Edmondson: Right.

Dan Soumas:    So, um, they weren't looking at having to, uh, to
pay money, and I, I kind of understood that, and if there were
things that I could do without it turning into this giant
fiasco, other than this, um I did  ****  -

Kim Edmondson: And did you, did you discuss with her at any
point the money, the fees that it could cost?

Dan Soumas:    I did tell her on the phone. I said hey, I'm
gonna - uh, well, you also saw an email, um, on the 11th.

Kim Edmondson: Mm hmm.

Dan Soumas:    It, it's in that thread.

Kim Edmondson: Yep.

Dan Soumas:    Let me go back and look because Skye is going
well, I have no idea what you guys are talking about. Um, ****.

Kim Edmondson: Because I, I show on the 10th that, uh, Darrin
provides the information to you that -

Dan Soumas:    Statutorily.

Kim Edmondson: - the, yeah, the wording that you would use to -

Dan Soumas:    Right.

Kim Edmondson: - uh -

Dan Soumas:    And we talked on the phone, Kathy.

Kim Edmondson: - get that advanced payment.

Dan Soumas:    Yeah, so here on the 11th is we're going back and
forth on emails. At 1:52 in the afternoon I sent her an email,
talked about it, and I said I'll look forward to your email in

the very near future, and that's her clarification email that we discussed on the phone.

Kim Edmondson: Mm hmm.

Dan Soumas:   Once you clarify your request we will notify you of any, you of any anticipated costs and the timeframe to produce the requested information.  Please contact any time with any additional concerns or for clarification.  So that's -

Kim Edmondson: And then she sent the clarification.

Dan Soumas:   Yep, she sent 'em.

Kim Edmondson: And did you, did you ever send her any information saying this is how much time -

Dan Soumas:   No.

Kim Edmondson: - it's going to take and cost.  Why -

Dan Soumas:   No, because -

Kim Edmondson: - why did that not get sent?

Dan Soumas:   Well, because first off, I don't know until I have the material how much time it's gonna take.  It's, I, you know, and then Darrin is telling me it's gotta be the lowest paid employee and I said okay.  Yeah, so I didn't send it to her because at this point there isn't any.  I mean I've got more hours than **** in it, but it's me and Darrin said they're not gonna pay a captain's wage to do it.

Kim Edmondson: Right.

Dan Soumas:   But nobody else has access to that information because I don't have clerical help anymore.  Otherwise, it would have been Chris Clay or somebody and say hey Chris, pull this, pull this, pull this, so, um, yeah.  So no, I didn't send 'em for cost.

Kim Edmondson: Okay.

Dan Soumas:   At this point.

Kim Edmondson: At this point, and, and that's, uh, that would have been clarification for an extension, uh, time extension as

1.539

well, right because it has the, not just the cost, how long it's
going to take, but also an estimated time that you —

Dan Soumas:    Could have been, yeah.

Kim Edmondson: — could expect to receive the information.

Dan Soumas:    We, we kind of came to a verbal thing on the
phone and I was trying to be, again, whole point being we don't
need to be in an adversarial position with the ACLU or anybody
for that matter, but, um, so just working with her.  She was
being cooperative with me.  I was being cooperative with her,
and, uh, you know, I don't get paid overtime, so, you know.

Kim Edmondson: Yeah.

Dan Soumas:    It is what it is.

Kim Edmondson: Right.

Dan Soumas:    I can work as many hours as I want, so,
unfortunately.

Kim Edmondson: Unfortunately.

Dan Soumas:    But it's okay.

Kim Edmondson: You're putting stuff together on a Sunday night.

Dan Soumas:    Um, it, it needed to be done.  Yeah, well, it
needed to be done.  Plus I was trying to work, you know,
I wanted to have some time with my grandson.  I've only known
he's coming for the last 9 months.  This was gonna be the big
vacation out here, and so I'm trying to work, um, you know, some
vacation time in with my family, staycation basically.  We're
not traveling anywhere.  As far as we went was the cabin, but,
uh, but still, you know, maintain my responsibilities to my
command and, you know, 'cause it just — that's just the way it
is.

Kim Edmondson: Mm hmm.

Dan Soumas:    When you got a job, so there it is.

Kim Edmondson: Very good.  Well, I don't have, um, further
information from Kathy regarding the end of the month, um,
agreement that was on the phone.

1.540

Dan Soumas:     Mm hmm.

Kim Edmondson: And so that's something I'll have to follow up with on, um -

Dan Soumas:     Yeah, you can -

Kim Edmondson: - with her.

Dan Soumas:     - ask her what her impression was.

Kim Edmondson: As well.

Dan Soumas:     That's my impression that we were good and we just needed to keep communicating and I needed to be working on it.  I told her I'd be working on it and, and, uh, but when I dug into it and, you know, we were going to be over their statutory deadline anyway, and I didn't wanna like zap her with a big, you know, - 'cause it's not gonna be big to this point, like I say, 6 hours writing it and a bunch more research and probably 24, 20 hours, but that's just the way it is.

Kim Edmondson: Mm hmm.

Dan Soumas:     Um, you know.

Kim Edmondson: That's what you think you have about 20, 24 hours on research?

Dan Soumas:     I would think, um, maybe not that much.  You know, um, at least that much because of all the meetings and the emails trying to get people to comply with, you know - which to me seemed like such a simple thing.  I, and, I, and frankly I don't understand - I understand I'm the sheriff's attorney and we need to, you know, we need to be compliant with this.  I don't understand the inability or the unwillingness to switch over and recognize that oh, civil division and we're the ones that actually do this work, and, you know, I just assumed, without going to Barry, that, or going around David to Lucia and asking for this information, um, because of this other event, you know.  Um, with everything else going on around here I didn't wanna get sideways with somebody on this, which apparently failed miserably because I'm sitting in your office being interviewed, so, um -

Kim Edmondson: But why did you not go to Neal?

Dan Soumas:     He has it.  He knows what's going on.

Kim Edmondson: At what point did he know?

Dan Soumas:     He's had the ACLU request from early on, I'm sure, 'cause he was out of town, by the way, when all this was going on initially.  He's been on vacation.

Kim Edmondson: Mm hmm.

Dan Soumas:     And he wasn't back until the 23rd of August, so that's one reason I didn't go to him 'cause he wasn't here from like the 14th to the 23rd or something like that, but I know he had a copy.  In fact, when I, uh, uh, when I talked to him before I left town Monday, I said hey, I got the ACLU thing. Um, uh, he goes yeah, I was gonna ask you about that.  I said yeah, I'm, I'm, I've got it down at Darrin's.  I'm gonna send it out as soon as, uh, as soon as I get back and he clears it and, so.

Kim Edmondson: Yeah, it, I don't show him being involved until the 10th of August when you send him an email to let him know about the request and where you were with it.

Dan Soumas:     Right.

Kim Edmondson: Uh –

Dan Soumas:     We don't normally forward records request to the bureau commander on –

Kim Edmondson: Normally we don't, but, um –

Dan Soumas:     Yeah.

Kim Edmondson: – I'm asking because you're already considering all of these different issues and the –

Dan Soumas:     Right.

Kim Edmondson: – hot potato, um –

Dan Soumas:     With, yeah.

Kim Edmondson: – that, that it is.

1.542

Dan Soumas:     Yeah.

Kim Edmondson: So looking for some involvement or assistance beyond yourself, um, what steps did you take to, to do that?

Dan Soumas:     Yeah, right.  I frankly didn't think it was gonna be an issue with the prosecutor's office getting what we needed.

Kim Edmondson: Mm hmm.

Dan Soumas:     I let him know that we had it, so he was aware of it, and that, um, you know, I believe we might have even had a quick phone conversation.  Well, I forwarded it to him and talked - I don't remember now.  I've talked to so many people on this thing now.  I don't remember, sorry.

Kim Edmondson: There's a lot of work put into it for sure.

Dan Soumas:     Yeah, there is, and, you know, it, it is what it is and, and, you know, as Darrin said in his last email well, I don't know if we can charge 'em at this late date and he's probably right, you know, but I, my intent all along with that if it gets into additional, we'll give 'em an initial response. I'll spend the time to do what I need to do.

Kim Edmondson: Right.

Dan Soumas:     I'll give 'em initial response and then we'll see where it goes from there.

Kim Edmondson: And really in keeping the peace at this point, why would we want to charge them for something -

Dan Soumas:     Well, we wouldn't.

Kim Edmondson: Yeah.

Dan Soumas:     That would be stupid.

Kim Edmondson: ****.

Dan Soumas:     You know, I mean frankly, just kind of like just keeping it going.

Kim Edmondson: Yeah.

Dan Soumas:    I've been working with Kathy on this deal.  She, like I say, she's a nice lady.  I don't know here, but she's been nice to me.  I've been nice right back.  We've been working together on this deal and you can see I've got a, a fairly significant file.

Kim Edmondson: Yeah, yes.

Dan Soumas:    But.

Kim Edmondson: Yes.

Dan Soumas:    Cappin' it all off, it went out this morning, uh, along with, um, the supporting ****  data, the reports for the other six reports that go with it, and, um, you know, it took time to transfer spreadsheets and stuff over to my response -

Kim Edmondson: Sure.

Dan Soumas:    - but it's out, so yeah.

Kim Edmondson: Uh, Dan, what I'd like you to do is forward to me that, the whole packet of what you forwarded to her this morning.

Dan Soumas:    Sure.

Kim Edmondson: Via electronic, the attachments, everything.

Dan Soumas:    Sure, mm hmm.

Kim Edmondson: And if you could get me a snapshot, weekly snapshot of your August calendar that would be helpful, uh, to show your -

Dan Soumas:    Okay.

Kim Edmondson: - your meeting schedules that you had.

Dan Soumas:    Sure.

Kim Edmondson: That would be great.

Dan Soumas:    All right.

Kim Edmondson: Um, and your comp, your comp log.  Are -

Dan Soumas:     Okay.

Kim Edmondson: - you keeping a comp log.

Dan Soumas:     Yeah.

Kim Edmondson: The current comp log.

Dan Soumas:     Well, I, I can update it.  I put comp used or comp ****.

Kim Edmondson: Yeah.

Dan Soumas:     I don't think I put on Saturday nights or Sunday mornings yet.

Kim Edmondson: Perfect, that'd be great.

Dan Soumas:     Yeah, so I can put 'em on there.  Um –

Kim Edmondson: And I can send you an email with those three things too, if you'd like.

Dan Soumas:     Okay, so where we going?  What do we know?

Kim Edmondson: Uh, I am going to excuse you at this point, unless you have further input or if you have any questions.

Skye Reynolds: I just have one question.

Dan Soumas:     Mm hmm.

Skye Reynolds: It's not an uncommon question for me to ask in any –

Dan Soumas:     Right.

Skye Reynolds: - employee situation.

Dan Soumas:     Right.

Skye Reynolds: Um, truly, so there's no motive behind it, other than to really find out the answer, so –

Dan Soumas:     Right.

Skye Reynolds: – looking back at the whole situation from the date you got the records request, is there anything if you could wave a magic wand that you would do differently?  You, yourself?

Dan Soumas:   Me personally.

Skye Reynolds: Yeah.

Dan Soumas:   If I could wave a magic wand.  Well, that going – I guess maybe I would just have less expectation of everybody else and just do what I can do and get, get it out the door. I'm – at the level I work in the organization I'm used to comprehensive work, so it's not, um, I'm just gonna do what I have to do and I'm not gonna do anything more than that.  I'm just gonna – it's off, the hot potato is off my desk and it's on to somebody else's.  Um, you know, especially with, um, somebody like the ACLU that would have the ability to come back very easily on us and, and, you know, you're kind of – and, and I get why we're even sitting here because they're, it's that very reason.  Well, you were screwing around with the ACLU and you're, you're slow on your response and they could come back, uh, and, you know, but by making the phone call, you know, I've done all that.  If, if, if Kathy hadn't agreed to that, then I would have just worked through the weekend and gave her what I could have given, so the answer to your question is, um, you know, work through the weekend, get what I can get, and just send it out by the 13th.  We were delayed a lot, even just by legal getting back to me and giving me advice because we didn't actually physically meet on it 'till Friday, the 11th, and it was right after that I started the phone conversations with Kathy.  I wanted to talk to our attorney first.  He wasn't initially available.  He was out, I think, 'till midweek that week or something.  He got right back to me on the 10th with here's the statutory part and that's all well and good, but now I need to talk to you about all the whole picture.  What do we wanna do here, and so, you know, I guess, to answer your question, if after I talked to Kathy on the 11th, um, you know, and I just decided we're just gonna do this, then that's what we're gonna do and, and I just plow through it for that weekend and, and get it done, and it's out the door and we don't have an issue, but she had in fact, given me extension on that, and, uh, and I wanted to do a good job for them because that represents the sheriff's interests, uh, you know what I mean?  It's – you know, my heart is pure on this deal.  I'm sorry that we're here and, uh, I guess they'll do what they're gonna do to me, but, uh, it's unfortunate.  It's, it's, you know, along with everything else that's going on, it's just super unfortunate that this

continues, um, but I guess it is what it is, so there's not much I can do about it, and I guess I'm excused, right?

Kim Edmondson: Thank you, Dan.

Dan Soumas:     Thanks for your time, both of you.

Kim Edmondson: All right.  It is, uh, 11:02.

SpeakWrite
www.speakwrite.com
Job Number: 172257-001
Custom Filename: Soumas 083017
Date: 08/16/2017
Billed Words: 7287

1.548

Kim Edmondson: It is the 14th of September, 2017, 12:57.  In my office is Captain Dan Soumas, and this is a second interview. Uh, Dan, I don't want to keep ya, I don't want to keep ya long. I'll get you back to work.  I just have a couple of questions to follow up with what we talked about before.

Dan Soumas:    Okay, um –

Kim Edmondson: Uh, and if there's something that, that you want to add, um, we'll have an opportunity for that, but I just want to go over a couple of things that as I'm going through, um, your responses and emails that you received throughout this event, a couple of questions I had, uh, were that if you can remember too an email, August 4, when this whole thing started, um, you had an email that came, uh, you forwarded the original email to Dave Ferguson –

Dan Soumas:    Mm hmm.

Kim Edmondson: – and then, uh, Ferguson responded to you and told you that he had forwarded the public records request to prosecuting attorney, Barry McHugh, and, uh, he said in that email that some of those records will likely be in our office. All right, if you can recall that email.  Do, do you remember which email, the, it's –

Dan Soumas:    Well –

Kim Edmondson: – I think one of the only responses that you received from Dave Ferguson.

Dan Soumas:    I remember the email and the, let me ask you a couple of, if I can, respectfully, ask you a couple clarifying questions.  Um, we've done a fact-finding interview.  Um, you know, how do I say this without sounding flippant, because I don't want to sound flippant, but I do this for a living as well –

Kim Edmondson: Mm hmm.

Dan Soumas:    – so, um, what are we doing?  Is this an investigation?  Because if it is, I haven't been served a complaint, I haven't been told –

Kim Edmondson: I understand.

Dan Soumas:    – what's going on.

Kim Edmondson: Yeah.

Dan Soumas:    Um, you know, this -

Kim Edmondson: I can answer that very quickly.

Dan Soumas:    If it looks like a duck and it's walkin' like a
duck, is it a duck, or is it, what is it?

Kim Edmondson: Um, based on the initial fact, uh, the facts that
we looked at as far as the emails and the delay in answering
that, um, it moved into an internal investigation -

Dan Soumas:    Mm hmm.

Kim Edmondson: - because you're an at-will employee -

Dan Soumas:    I don't have any due process, so -

Kim Edmondson: - you don't have any due process.

Dan Soumas:    - so there's no service or no -

Kim Edmondson: There's no service -

Dan Soumas:    - timeline?

Kim Edmondson: - or anything like that, uh, attached to this.
So, right now I'm working on an internal investigation into your
performance, um, based on, uh, the delay in responding to this
public records request and just trying to find out why that
occurred.

Dan Soumas:    Okay.

Kim Edmondson: Okay?

Dan Soumas:    All right.

Kim Edmondson: So -

Dan Soumas:    Uh -

Kim Edmondson: - I'm gonna refer you back to that email and in
the email, um, where, where Dave Ferguson says some of those
records will likely be in our office, he also suggested that you

1.550

retrieve all of the sheriff's office records that comply with the request.  Um, so I wanted to find out why then you were continuing to, and I, you've answered this already, but why you were continuing then to gather the other records that weren't the sheriff's office records?

Dan Soumas:     Okay.  Um, with all due respect, I mean, you know, I've just gone through a week of hell -

Kim Edmondson: I understand.

Dan Soumas:     - and you're asking me to remember stuff without record in front of me.  I've already recorded an interview with you that, um, I'd certainly like to see a transcription of and have time to study it so I can at least answer this, because, Kim, I mean, it's, the whole thing just feels like an ambush, and, you know, I'm called over here in the beginning, uh, I mean, this is a, this is a long record, and I need some time, at least, to study what I've already said -

Kim Edmondson: I don't have difficult questions for ya, they really are not.

Dan Soumas:     Difficult or not, you know -

Kim Edmondson: This is, this is -

Dan Soumas:     - just -

Kim Edmondson: - something that you should, um, well, I can give you the record.  I can show you the email.

Dan Soumas:     I'm still gonna need time to study it, but you tell me what you, what you want, and -

Kim Edmondson: ****  through these.  '

Dan Soumas:     I mean, I'm just, I just buried a friend Tuesday -

Kim Edmondson: I understand that -

Dan Soumas:     -  you know?

Kim Edmondson: - Dan, I do.

Dan Soumas:    And – who ordered this internal, if I can ask that?  What's, where is this coming from?

Kim Edmondson: Well, that's not so much of a concern for you.

Dan Soumas:    Well, it is –

Kim Edmondson: Um –

Dan Soumas:    – if I'm under investigation.  I used to have the right to know.  You're telling me I have absolutely no right here.

Kim Edmondson: I was, as an at-will employee you don't.

Dan Soumas:    I have none?

Kim Edmondson: No, and I was directed to  –

Dan Soumas:    No service, no charges.

Kim Edmondson: – through the sheriff.

Dan Soumas:    No, I get that.  I'm not, I'm not blaming you. I'm just trying to clarify in my mind, um, you know, what's going on and where this is coming from and, and what we are trying to accomplish here.

Kim Edmondson: The email that I'm referring to is this one here from August 4 from Dave, at the bottom of ****.

Dan Soumas:    Okay, so, to clear this up in my mind before we continue, you're directing me to answer these questions, but I have no Garrity or anything else on this?

Kim Edmondson: No, no.

Dan Soumas:    Nothing?

Kim Edmondson: No.

Dan Soumas:    Okay.

Kim Edmondson: So this is –

Dan Soumas:    All right.

1.552

Kim Edmondson: - informational to me and then forwarding the email to you, and I'm concerned about this is what I'm asking you about.

Dan Soumas:    Yeah, whatever he told you is, all right, so, so what are you asking me again, please for your ****?

Kim Edmondson: I'm asking you in regards to this email, he says -

Dan Soumas:    At the bottom.

Kim Edmondson: - I suggest working on retrieving any records at the sheriff's office which comply with the request, and I can review any records produced, um, before producing them to determine if they're exempt.

Dan Soumas:    Right, right, okay.

Kim Edmondson: So, at that point you're given direction to just comply with the sheriff's office records.  So, my question to you is, I know -

Dan Soumas:    Well, that's your read on it.  Okay.

Kim Edmondson: - you, what, well, that's now what the request is to the sheriff's office, the public records request, uh, initially, that's what you get from sheriff's records, but, uh, he gives you direction.  Your, you forwarded that to legal for advice, and he gives you direction to provide the sheriff's records.

Dan Soumas:    Okay.  Well, let me, let me back that up just a little bit and, um, we'll move into it.  First off, the request went to Darrin Murphy, and had I not saw that it went there, it would have never reached Dave Ferguson's desk, and they would not even have known about it.  Uh, so he says that he forwarded it to Barry McHugh, which is good, um, and, uh, my response on, I began working on my response actually, uh, at a minimum on the 10th, and I probably gathered stuff before that.  I'd have to go back.  You have my calendar, but, uh, I know the FESA files on the records that we have, uh, I created a, a folder for all that and incorporated in what I was gonna send the ACLU on the 10th, because I know that when I sent her the response that it was on the 10th.  Um, I made that request to legal to work with me on that.  Uh, I finally heard back from Darrin on the afternoon of the 10th.  That was the next communication I had, and then I

believe it was the following day that he and I and David met in my office in the morning, and we talked about are we or are we not going to do a cooperative response because I, we have records.  There are records that exist that partly the auditor has information for it, partly Barry McHugh's office and when I say Barry McHugh, not the Barry McHugh that's trying the Renfro trial right now with his people, but his office, the civil division which is Darrin Murphey and David Ferguson and Jamilla have the actual records.  They do the actual filing for us on this stuff, and I worked through them in the past -

Kim Edmondson: Mm hmm.

Dan Soumas:     - David Lucia to make spreadsheets for me.  I had other requests for other things that we needed to provide reporting on, so, um, you're asking me a question on whether or not I started to gather the information, and the answer to that is yes, I did, and I had already been doing that -

Kim Edmondson: Mm hmm.

Dan Soumas:     - um, and, uh, uh, I don't know what else would make that responsive for ya.

Kim Edmondson: Okay.  **** case ****.   Um, on August 10, Murphey comes back into the office.  That's his return date.  He gets the original email that you sent to him and then he responds to you -

Dan Soumas:     Right.

Kim Edmondson: - and in his response he says the request must be responded to within 10 days of the request.

Dan Soumas:     I see it.

Kim Edmondson: So that's the attorney, um, advice that you get from Darrin at that time, and he's letting you know that you have the 10 days to respond.

Dan Soumas:     Right.

Kim Edmondson: So -

Dan Soumas:     So, on Day 7, by the time he gets back to me -

Kim Edmondson: Yeah.

1 554

Exhibit D Page 153 of 175

Dan Soumas:    - his partner is aware of the request on the 4th because I immediately forwarded it to him because records sent it to an attorney that wasn't in town.  Uh -

Kim Edmondson: Right, so he's back, and this is -

Dan Soumas:    I get that, but his partner -

Kim Edmondson: - this is his -

Dan Soumas:    - his office has had it for days, and I'm now finally getting a response writing on what to do, my point -

Kim Edmondson: Yes.

Dan Soumas:    - as well.

Kim Edmondson: Yes.

Dan Soumas:    Um -

Kim Edmondson: So he is responding to you based off of that original email though -

Dan Soumas:    I get that.

Kim Edmondson: - is -

Dan Soumas:    But he's talking to David 'cause he's ccing David.  Um -

Kim Edmondson: So he's giving you direction on the timeliness of it -

Dan Soumas:    Yeah.

Kim Edmondson: - it needs to be responded to within 10 days, and then he also goes on there to provide that, that second, or that little paragraph that's indented -

Dan Soumas:    I saw that.

Kim Edmondson: - that talks about the, um, advanced payment -

Dan Soumas:    Mm hmm.

1.555

Kim Edmondson: – the opportunity to –

Dan Soumas:    Covered, right, we covered all this ground the following morning when we met in person in my office.

Kim Edmondson: Okay.

Dan Soumas:    Um, and, uh, I'm gonna read this carefully 'cause coming from this, yeah, um, coming off of this thing, 'cause I don't handle public records requests all the time, um, his 10 days is actually, according to the law, 10 working days, and he left me the impression that we were gonna expire with 10 calendar days, uh, by the time Monday the next week came, 'cause if she sent it on the 3rd, Monday's the 13th, or, yeah. Was Monday the 13th or Sunday?  No, Sunday was the 13th, so, when I met with him on Friday morning, um, and I was taking him at his word it's 10 days, but it turns out it's 10 working days–

Kim Edmondson: Ten working days, April, April 18, or not April, August 18th –

Dan Soumas:    Yeah, well –

Kim Edmondson: – would be the date.

Dan Soumas:    – that's not what this says.  It says I have 10 days, and that left me with the impression that it was expiring on Sunday, so when I met with him the next day, are you going to the next day, 'cause I can just answer all at once or, uh, on the contents of our meeting or –

Kim Edmondson: Um, well, yeah, the next day –

Dan Soumas:    Yes, or –

Kim Edmondson: – you send an email to, to Kathy.

Dan Soumas:    I did, after talking with her on the phone and –

Kim Edmondson: yeah.

Dan Soumas:    – talking, but first I met with Darrin and David

Kim Edmondson: Mm hmm.

1.556

Dan Soumas:      - in my office in the morning and, uh, we discussed it, and, uh, we decided as a group that the best way to handle this thing right now because it was so voluminous was for me to call Kathy, uh, and, uh, talk with her and work on that.  So I did.  I made that phone call.  We made arrangements on this thing and she knew she wasn't gonna get it within 10 days.  Um, I know you've had a follow-up conversation with her, I'm assuming, because she sent you another email.  So, um, the, uh, or she sent me an email that said you did.  Um, and by the way, for the record, she has no idea.  I've never talked with her about this.  I've never talked to Darrin about this.  I've never mentioned it to anybody 'cause you trying to do whatever we're doing and I guess it's an investigation, so, um, but, so we just talk-, we talked about, you know, uh, me talking with the ACLU, working on, uh, on this with them in a cooperative effort, and we also talked extensively about their office working with us cooperatively and you'll see my email to Darrin that talks about that, and you'll see an email later on that says as I feel very strongly that he's trying to move away from his responsibility in this and just throw it all on my plate, uh, where I say no, you were supposed to get back to me and let me know what you were doing on your end of this, because this state stuff, part of is their record, but part of it is our record, and without their record, I can't find our record, um, because we don't keep a spreadsheet on it.  Go ahead.

Kim Edmondson: Well, what I'm, what I'm looking at is that you've, on that day you're being provided with the, the timeliness language, and the language for the cost -

Dan Soumas:      I get that.

Kim Edmondson: - to provide that.

Dan Soumas:      But it's, it's not -

Kim Edmondson: So, then -

Dan Soumas:      - it doesn't stand alone.  There's -

Kim Edmondson: But you have a meeting -

Dan Soumas:      - there's context.

Kim Edmondson: Yes, and I understand.  You have a meeting with the attorneys, you come to some decisions, you call -

1.557

Dan Soumas:     Mm hmm.

Kim Edmondson: - Kathy the next day or on the -

Dan Soumas:     That same day.

Kim Edmondson: - other, you call her -

Dan Soumas:     Yeah, I want to make sure.

Kim Edmondson: - and you visit with her for awhile -

Dan Soumas:     Yeah.

Kim Edmondson: - and then you summarize to her in an email, um -

Dan Soumas:     Right.

Kim Edmondson: - what you, what you talked about -

Dan Soumas:     What we talked about, and she sends me a clarifying email back.

Kim Edmondson: Mm hmm, and this email that you sent says in it, if you want to look, it says once you clarify your request we'll notify you of any anticipated costs -

Dan Soumas:     Yep.

Kim Edmondson: - and the timeframe to produce the requested information.  So she does provide, I'm gonna go forward a little bit, she does provide the clarification that -

Dan Soumas:     Yes.

Kim Edmondson: - we don't provide anything to her more about cost or how long it's gonna take.  There's nothing documented that way.

Dan Soumas:     I get it.

Kim Edmondson: And then also, um, there's nothing in here if there was any discussion at this point about how long it's gonna take, because your email, and you said that -

Dan Soumas:     But -

1.558

Kim Edmondson: - in the last interview doesn't say.

Dan Soumas:    But we talked on the phone about it.

Kim Edmondson: Any, but so you summarized everything but a deadline?

Dan Soumas:    Basically, we, she and I had an agreement, and, uh, I was working on it, and I was waiting on Darrin's office to come with their, either decision to not work on it and make them file a request, or work with me on it so that I could get all of our information, our information, not their information -

Kim Edmondson: Right.

Dan Soumas:    - but what, it's the same thing on the federal side.  You'll see that in my response, in my, uh, is that if I don't talk to the DOJ and find out what cases we actually had, we don't keep a, a spreadsheet.  I mean, I have the ****  and I have, um, our auditor office stuff, but they don't reference a case number or -

Kim Edmondson: Mm.

Dan Soumas:    - so I have to go to the DOJ and say, um, give me this information.  What did we actually file with you?  Can you give me our case number off this so I can go back?  Those are our records.  They're not theirs.  The same as, uh, these reports we initiate through our prosecutor's office are our police report records.  They may have asset forfeiture stuff, but there, those records are ours and when I talk to Kathy, she told me on the 11th, I don't need your police reports.  I don't want a bunch of corporate paperwork.  So Darrin and I talked by phone, uh, and he said maybe you want to create a document that just kinda summarizes what we have and then let them go back and forth, and that was kind of the agreement that Kathy and I had, that I'm gonna create this document, um, and I'm gonna submit it to you.  You're gonna ask me, and she may still come back, even now, and ask for a supplemental -

Kim Edmondson: Sure.

Dan Soumas:    - even though she considers it closed, she may ask for a supplemental after Barry's office and the auditor has it.  So anyway, go ahead.

1.559

Kim Edmondson: There may be.  So, in that conversation that you had with her on the phone before you sent that email, is that where you got the end of the month -

Dan Soumas:    Mm hmm.

Kim Edmondson: - deadline?  What words did she use to -

Dan Soumas:    I don't remember.

Kim Edmondson: You don't remember?

Dan Soumas:    My god, Kim, that's, it's a month ago and everything I've been through in the last 10 days?

Kim Edmondson: So I'm, I'm just looking at -

Dan Soumas:    I don't recall.

Kim Edmondson: - you wrote a, you wrote a summary to her about your conversation -

Dan Soumas:    Mm hmm.

Kim Edmondson: - and she follows it up with a summary about the conversation -

Dan Soumas:    Right, what she needed.

Kim Edmondson: - and those clarifying points -

Dan Soumas:    Right.

Kim Edmondson: - and she also doesn't mention a deadline to the end of the month.

Dan Soumas:    She says we can jump back on the phone again if we need to.  We're working together on it -

Kim Edmondson: Yes.

Dan Soumas:    - at that point -

Kim Edmondson: But then on August 25, she sends an email that says -

Dan Soumas:    Where are we at?

Kim Edmondson: - I've been waiting.

Dan Soumas:    No, that's not what she said.

Kim Edmondson: Her email says when can I expect, I haven't received any information from Kootenai County yet.  So I wanted to check in.  When can I expect your response?

Dan Soumas:    She sent it on her vacation.

Kim Edmondson: If she, but if she knew that, that she gave you an end-of-the-month deadline, why would she ask when she could see your response?

Dan Soumas:    I don't know.

Kim Edmondson: I don't know either, that's why I'm asking you.

Dan Soumas:    I don't know.  She's doing every agency in the state.  She might have forgot.  She might have not had it.  She has a spreadsheet.  I know that, 'cause –

Kim Edmondson: Okay.

Dan Soumas:    – she told me she's running a spreadsheet.  I don't know.

Kim Edmondson: Okay.  Uh –

Dan Soumas:    You, you would know.  Have you not talked to her?

Kim Edmondson: I have talked to her.

Dan Soumas:    Well, what's her version of events?

Kim Edmondson: She does not recall having an end-of-the-month extension.

Dan Soumas:    Well, that's unfortunate.

Kim Edmondson: This is an understanding that, uh, an impression that you, you've developed in your conversations with her, and I'm trying to understand how you developed that impression.

Dan Soumas:    By talking with her and working cooperatively and her understanding it was gonna take time.  I told her it was

1.561

Exhibit D Page 160 of 175

gonna take time, at least a couple weeks.  So, um, which from
August the, whatever it is, the 11th.

Kim Edmondson: So, you sent an email to Darrin at one point, uh,
about the information and your email says, and this is on the
25th I believe.  Your email says **** problem is no one else
seems to have the info or knows how to find it.  The last clerk
left our employ.  Can you contact Kathy and get her to agree to
an extension?  I'm not even at work right now.  Let me know if I
need to call her.

Dan Soumas:    Right.

Kim Edmondson: Why would you want Darrin to call for an
extension if you've already –

Dan Soumas:    'Cause she's asking about it.  She's asking about
the paperwork.

Kim Edmondson: But you've already, in your mind, established
you've got this impression of there being an end-of-August –

Dan Soumas:    Right, and I'm also –

Kim Edmondson: – ****.

Dan Soumas:    – trying to be responsive to her request.  You
know, the whole way this works is that we're cooperative on this
deal, um, with them.  You know, I'm trying not to, and I think
we talked about it last time, not to create an adversarial –

Kim Edmondson: Mm hmm.

Dan Soumas:    –relationship with these guys over this deal.
The request is voluminous in nature and requires a lot of work
on our part.  Um, you know, but unfortunately we don't have a
lot of people with that information.  Um, so, um, you know, I
don't know, I'm just goin' with the flow.  If the flow says
she's concerned about it, I'm gonna be responsive to that
concern to make sure that we're back on track and that we're
workin' with each other cooperatively.  I would think that would
be the expectation.  I think that's what my role is here –

Kim Edmondson: Mm hmm.

Dan Soumas:    – to do that.  So that's what I did, and I asked
Darrin, 'cause he was working, and, uh, he didn't get back to me

right away, and then he asked about an extension which I didn't see.  So I just dealt with Kathy myself and got it in writing, so.

Kim Edmondson: Yeah.

Dan Soumas:     Um -

Kim Edmondson: And that worked.  I mean, that's the first time -

Dan Soumas:     But it's -

Kim Edmondson: - and you see that there's a deadline that, that you, that's tangible, I mean, it's -

Dan Soumas:     That, yeah, that's in writing -

Kim Edmondson: - ****.

Dan Soumas:     - in an email, I get that.

Kim Edmondson: Okay.

Dan Soumas:     I do, but I'm still holding to my, my original agreement with her which is to get it out by the end of August if I can.  Our part, and I'm hoping by September 7, that if she has any supplemental that she needs to do, um, you know, I just finally, you see an email exchange between Darrin and I this weekend -

Kim Edmondson: Mm hmm.

Dan Soumas:     - or that weekend, and, uh, I sent, I went ahead and just arranged it with Kathy because for whatever reason, and I don't know what is reason is, either he didn't want to do it, or was uncomfortable doing it, or he didn't have enough context to do it, or he, whatever it was, because you know, something this important to what I, that I keep getting repeated emails on, and now we're doing an investigation, you would think that Darrin not knowing I was in the office and I don't respond right back another email from him, he might pick up the phone and actually call my cell phone.  Um, you know, it's, I'm amazed.  I just am.  You know, if there's that big of a concern then call me on the phone and tell me what's going on and we'll, we'll put a plan together to, to alleviate your concern, but he didn't, so, not seeing that I just went ahead and called her or emailed with her directly -

1.563

Kim Edmondson: Mm hmm.

Dan Soumas:     - and started workin' on it and got the extension, again, but I still met her deadline and, and you know, it just became apparent to me that weekend, 'cause Darrin sent me another email, uh, that they were not gonna cooperate with us, um, and, and I'm not sure why.  So now they have a records request.  Um, they could have easily -

Kim Edmondson: Right.

Dan Soumas:     - that now they're under a deadline on, and I already had an extension.  We could have just had the whole thing handled.  That's my view.  Apparently it's not anybody else's, so there we are.

Kim Edmondson: Did Darrin not send you a personal text that advised you as a friend that please Dan, just work on this?

Dan Soumas:     No.  Let's look.

Kim Edmondson: Okay.

Dan Soumas:     Not that I recall.  A lot going on that day but I definitely have, he sent me an email that said this is a problem for the sheriff, and I sent him an email back and said you need to let the sheriff know then.  Uh, that's all, the last text I had with Darrin Murphy on this part was May 4 on a meeting.

Kim Edmondson: Okay.

Dan Soumas:     Um, but let me make sure there's not another one, 'cause I see I have two entries for Darrin in my phone.  Try that Darrin Murphy.  Nope, May 4.

Kim Edmondson: Okay, all right.

Dan Soumas:     Last time we ever text-, he sent me an email.  You should have a copy of it.  I can't imagine that you don't -

Kim Edmondson: I'm su- -

Dan Soumas:     - that talks about -

Kim Edmondson: I do.

Dan Soumas:     - I'm concerned about the sheriff.

Kim Edmondson: Mm hmm.

Dan Soumas:     I'm the actual sheriff's attorney, and frankly I'm like -

Kim Edmondson: The liability to the sheriff -

Dan Soumas:     Right.

Kim Edmondson: - ****  about that.

Dan Soumas:     Why don't you, well, why haven't you been the sheriff's attorney the last 2 weeks and help me work on this damn thing.  You know?  I'm sure that he, uh, you know, he sends me the law again.  I know what the law is.

Kim Edmondson: Mm hmm.

Dan Soumas:     I know it a lot better now 'cause I finally read the law, um, researched it, 'cause it wasn't 10 days, it was 10 working days, and, uh, so this whole August 18 deal, you know, I went on his advice, he told me it was 10 days.  He kept saying 10 days.  You have 10 days.  Well hell, the 10 days is up 2 days after we sit here, so I'm working with Kathy Griesmyer, you know, and it also says if you have an extension you're okay -

Kim Edmondson: Mm hmm.

Dan Soumas:     - um, and that has been, uh, kind of not talked about in this email exchange with him and I.

Kim Edmondson: There's, yeah, there's really no talk of an extension until the September 7 -

Dan Soumas:     Well, I get what you're saying -

Kim Edmondson: - deadline.

Dan Soumas:     - you're saying that I didn't have talk of an extension.  I get that.

Kim Edmondson: Yeah.

Dan Soumas:     But -

1.585

Kim Edmondson: Nobody did.  There's no clarification on anybody part that -

Dan Soumas:     I've told Darrin, I told Darrin about our conversation on the phone -

Kim Edmondson: Mm hmm.

Dan Soumas:     - and I've copied him on everything.  He's known all along.  I'm not trying to lay this on him, but I'm just saying, it seems like we're anglin' in on some performance issue on me and, and okay -

Kim Edmondson: Well -

Dan Soumas:     - you know, the Department's gonna do -

Kim Edmondson: Well let's, let's get to that -

Dan Soumas:     - what they're gonna do.

Kim Edmondson: - let's, let's move there.  So this, what we're lookin' at, what I'm looking at right now is, is a timeliness issue on this circumstance.  Right?

Dan Soumas:     Okay.

Kim Edmondson: But part of my investigation caused me to go look at your personnel file.  So I'm looking at counselings, I'm looking at, at eval-, evaluations that you've had -

Dan Soumas:     Mm hmm.

Kim Edmondson: - in the past, and what do I find there?  What do you think I found there?

Dan Soumas:     We both know what's in there -

Kim Edmondson: Yeah, and -

Dan Soumas:     - we also know that -

Kim Edmondson: - and a lot of reference to, I saw a lot of reference to what was considered a black hole, and that's been brought to your attention in the past.

1.566

Dan Soumas:    It's also been grieved and, uh -

Kim Edmondson: And those things weren't changed in the grievances.

Dan Soumas:    I get that they weren't changed.

Kim Edmondson: Those weren't accepted.

Dan Soumas:    I didn't ask for them to be changed.

Kim Edmondson: So, so, when that, when that happens -

Dan Soumas:    All right.

Kim Edmondson: - and we're talking about a timeliness, a timeliness issue, again, because this would be another one, do you, do you bear any responsibility in the delayed response in this public records request?

Dan Soumas:    No. I don't. I, I've done what needed to be done on this thing and, you know, to, this is a, once again, and I'm gonna be respectful here, just, uh, you know, this is an investigation, this is not a disciplinary hearing, and yet because this is so weak on its face, we're gonna try to go back into Dan's file and make it something that it's not -

Kim Edmondson: This -

Dan Soumas:    - Major.

Kim Edmondson: - this is definitely your opinion of what is going on.

Dan Soumas:    Well, I, well, it's what it is. I mean, I can't, I can't change that. I mean, we don't, we didn't use to go, well, I'm gonna bring your personnel. I mean, that is for, um, either you or whoever the other sheriff designates when you walk me off the campus, uh, to put in that charging document to say this is a performance issue, repeatedly, um, this is an issue that stands by itself. It either is or isn't timely. I believe that I did everything I could given the circumstances and the delayed response from my attorney, uh, I did everything that I could make happen, and the only difference that we have here is that because I didn't send something to Kathy on the 11th saying thanks for the extension because it's not in writing, we're gonna say that it wasn't timely, or maybe we're gonna say that

I'm making it all up.  Um, maybe that's where we're goin'.  Um, you know, this has been handled with grace on her end, I'll give her that, considering it's gotta be really confusing to her to have somebody calling her and pretending like we're making this, we're just, I'm just trying to help you with this request, at least that's the impression I got off the email she sent back to you, when in fact, I was helping her with the request, and, you know, uh, I don't know.  I, you know, I asked you for time on this thing, and you directed me not to be able to, I've gotta sit here and answer your questions –

Kim Edmondson: Mm hmm.

Dan Soumas:     – I have no rights whatsoever in this deal, it's just whatever and however you want to do it, um, I, it's just wrong, but, okay, I'm following orders.

Kim Edmondson: All right, I don't have any further questions for ya.

Dan Soumas:     At all?

Kim Edmondson: No, that's it.

Dan Soumas:     All right.

Kim Edmondson: Do you have anything else?

Dan Soumas:     Mm, not right now.

Kim Edmondson: Okay.

Dan Soumas:     I would have thought that the Department would have wanted my view, and I, you know, frankly –

Kim Edmondson: I got your view at the beginning.  That's what I, I, that was an open door.  You told me the whole story from your perspective.  Our first interview.

Dan Soumas:     Well, in a, in a, hey, come over to my office, let me record this.  I'm gonna have Skye Reynolds here, uh, not time to prepare, no, uh, time to review my notes, no, you know, if we were lookin' at being honest with each other, um, you know, we would have, in fact, said hey, Dan, can you kind of tell me what's going on, instead of opening an investigation into this deal.  Um, I don't understand why we're here.  I don't, other than the appearance that it looks like somebody's

1.565

just out to get me.  I don't know who that is or what is going on, but you couple this with everything that's been going on around this organization in the last month, the rumors, the -

Kim Edmondson: I get it.

Dan Soumas:     - it's not right.  You know, this, this is, it's not right.  This is handled.  You have the email.  It's been handled.  It's been handled satisfactorily for the ACLU, and I'm still in the process of I will work with Barry's office and the auditor because Jim Brand's gonna call me, and he's gonna say what the hell do we do with this, and the reason is, is 'cause they don't know a lot of this stuff.

Kim Edmondson: Yeah.

Dan Soumas:     Um -

Kim Edmondson: And, and that'll happen when it happens.

Dan Soumas:     I get this.

Kim Edmondson: We're just looking at this, at this situation.

Dan Soumas:     Well, we are, but then we're not, 'cause we're over in my personnel file.

Kim Edmondson: Mm hmm.

Dan Soumas:     Um, going well, do you think it's a performance issue?  I don't think it's a performance issue, and if we're gonna open that up and make it part of it, then we're gonna have to go back and talk about all this stuff -

Kim Edmondson: Mm hmm.

Dan Soumas:     - that's in there.

Kim Edmondson: And I'm sure you'll have that opportunity at some point.

Dan Soumas:     I, it sounds like I will.

Kim Edmondson: So -

Dan Soumas:     Um -

1.569

Kim Edmondson: - I am, I'm concluded with the interview.  Okay?

Dan Soumas:    I am, before you turn the tape off -

Kim Edmondson: Okay.

Dan Soumas:    - I am requesting a copy of the transcripts of both interviews.

Kim Edmondson: You will have a copy of that, yeah.  We'll do that.

Dan Soumas:    All right, and, uh, ****  turn it off.

Kim Edmondson: All right.  It's 1:25.

SpeakWrite
www.speakwrite.com
Job Number: 17257-002
Custom Filename: Soumas 091417
Date: 09/16/2017
Billed Words: 6968

1.570

# TIME LINE  1.571-1.572

**8/3/17**
- ACLU - Kathy Griesmyer generates Public Records Request (PRR) document for various information related to civil asset forfeitures, seized property and money, and funding KCSO has received from forfeitures during 2014-2016.

**8/4/17**
- PRR is received at KCSO. Joyce Cox processes it, sending to Captain Dan Soumas by email with a copy to KCSO Legal Counsel Darrin Murphey.
- Joyce provides a revised PRR to Griesmyer showing "Response Delayed" for 10 days. Joyce indicated that she does this automatically when a PRR comes in and is going to be handled outside of her Records area. Based on this delay, a response should be provided by 8/18/17 if 8/4/17 is not taken into consideration.
- Joyce indicated Soumas came to her office shortly after she sent the PRR to him and advised he was going to need more time. Joyce advised him she had already sent the delayed response info to Griesmyer. Joyce had no further conversations regarding delays for this project with Soumas.
- Soumas receives Joyce's email and copies KCSO Legal Counsel Dave Ferguson for FYI purposes.
- Ferguson replies that he provided PRR to Prosecuting Attorney Barry McHugh. Suggests Soumas work on retrieving KCSO records.

**8/9/17**
- Griesmyer emails Joyce in regards to PRR sent by Joyce on 8/4/17.

**8/10/17**
- Soumas emails Major Neal Robertson to inform Robertson of this PRR and of Soumas' actions taken regarding contacting Ferguson and Joyce.
- Robertson emails back suggesting a meeting the next morning.
- Robertson met with Soumas either in the afternoon on this date, or the morning of the 11th. Soumas explained how complicated the request was and how the records were stored in various locations. Robertson advised Soumas to contact Griesmyer to get clarification on the requested documents and to request an extention.
- Murphey emails Soumas and advises that a response is due within 10 days - also provides language for payment for processing the PRR.

**8/11/17**
- Soumas emails Griesmyer to recount phone conversation. Soumas asks for clarification of her requests. He advises in this email that once clarification is received, he can notify her of any anticipated costs and "the time frame" to produce the requested documents (no time frame established at this point).
- Griesmyer responds back with specific detail for clarification. No mention of time frame.
- Soumas counters with instructions regarding PAO office and copies Murphey.
- Possibly on this date (near it, for certain), Ferguson and Murphey met with Soumas and expressed the need for urgency (based on recent and local ruling on timely response to PRRs). Both recommended Soumas request extention in time due to Soumas' explanation regarding amount of information requested and time it will take to collect.

1.571



**8/11/17**

•Soumas sends email regarding being out of town beginning 2:09pm 8/14/17 through 8/15/17 in the evening.

**8/14/17**

•Response due given the 10 day delayed response time.

**8/18/17**

# 14 Day Gap in Information

•Soumas sends email regarding being out of town beginning 11:36am 8/22/17 through 8/23/17 in the evening

**8/22/17**

•Griesmyer emails Soumas for update - she hadn't received info from anyone at this point.
•Soumas returns email explains his "staycation" and plans to have more to her in the coming week. Response sent by phone.
•Griesmyer advises she is out of the office until September 7th and would like response by then.
•Soumas responds affirmatively via phone.

**8/25/17**

•Soumas emails Murphey his PRR response for Murphey's review and advising of the September 7th response date.
•Murphey responds to Soumas' email advising Soumas that McHugh should be contacted for PA records as custodian.  Murphey also reminds Soumas of the 10 days in which records should have been produced by the Sheriff as custodian.
•US Mattos requests Fact Finding Inquiry be conducted - assigns me.

**8/28/17**

1.572

# E-MAILS  1.586-1.597

**From:** Darrin Murphey
**Sent:** Monday, August 28, 2017 5:17 PM
**To:** Daniel Soumas
**Cc:** Neal Robertson; David Ferguson
**Subject:** RE: ACLU Records Response Asset Forfeiture 817

Dan:

As Dave and I informed you, neither Dave nor I are the custodian of the records of the Prosecutor. If you have want to discuss, coordinate or obtain records of the Prosecutor, you need to contact Barry McHugh, not Dave or I.

Regarding your response, if you have produced all of the records in the custody of the Sheriff which are responsive to the request, then that is all that is required of the Sheriff. The Sheriff is not responsible for producing records in the custody of another elected official. Informing the ACLU where it can obtain any other records responsive to the request, although not required by the law, is helpful and appropriate in my opinion. The only problem is that the Sheriff should have produced the records within 10 days of the public records request. However, producing all of the records responsive to the request which are in the custody of the Sheriff, although untimely, mitigates any liability to the Sheriff.

Let me know if you have any questions.

Darrin

**From:** Daniel Soumas
**Sent:** Monday, August 28, 2017 8:22 AM
**To:** Darrin Murphey <dmurphey@kcgov.us>
**Cc:** Neal Robertson <nrobertson@kcgov.us>
**Subject:** ACLU Records Response Asset Forfeiture 817

Darrin:

I am attaching my response to date for your review prior to forwarding it to the ACLU. I copied you an email on Friday evening wherein Kathy Griesmyer will be out of the office until the 7th and was ok with us continuing to work on the request.

At this point unless your office has moved in a different direction, I am just going to submit what I can based upon our records. I would anticipate a request from the ACLU to your office as I told them at this point you won't be combining your information with our response.

I will be out of the office and email range from this morning until tomorrow afternoon. I intend to send this request via email along with the supporting Federal reports on Wednesday.

1

1.596

I would still like to coordinate with your office on any response you make so I can understand what was sent.  I would anticipate Lucia will need to produce a spreadsheet on the requested items and case information.

Talk to you Wednesday.

Thanks,

Dan S.

1.597